1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              WESTERN DISTRICT OF WASHINGTON

10                        AT SEATTLE

11  COMPASS, INC. AND COMPASS
    WASHINGTON, LLC,
12
               Plaintiffs,              Case No.
13
        v.                              **COMPLAINT**
14                                      **JURY DEMANDED**
    NORTHWEST MULTIPLE LISTING
15  SERVICE,

16             Defendant.

17

18        Plaintiffs Compass, Inc. and Compass Washington, LLC (collectively, "Compass")

19  bring this action, on behalf of consumers, Compass itself, and its brokers, against Northwest

20  Multiple Listing Service ("NWMLS") to obtain preliminary and permanent equitable and other

21  relief for violations under federal and state laws, and allege as follows:

22        1.      NWMLS is a monopolist and a combination of competing real estate brokers.

23  Nearly 100% of the residential real estate transactions by Seattle area real estate brokers are

24  listed on NWMLS, and NWMLS has no meaningful competitors (*i.e.*, there are no other

25  meaningful multiple listing services in the Seattle area).  NWMLS also has a direct interest in

26  limiting competition among Seattle area real estate brokers, as it is owned and controlled by

27  competing real estate brokerages, including the largest traditional real estate brokerages in the

28

COMPLAINT

Seattle area.  Its decisions are made by agreement among competitors as well:  its Board of Directors is comprised of competitors, with most of the directors being affiliated with the long-standing traditional real estate companies in the Seattle area and *six* (including the current Chairperson and Vice Chairperson) affiliated with the largest real estate brokerage in Washington state (Windermere Real Estate Services Company).

2.    NWMLS has successfully prevented any meaningful threat to itself and its owner-brokerages by adopting and enforcing a series of rules designed to force anyone wishing to buy or sell a home in the Seattle area with the help of a real estate professional to do so through its platform.  Unless stopped, NWMLS will continue engaging in anticompetitive and tortious conduct that has, is, and will harm homeowners, Compass, and Compass brokers in the Seattle area by depriving homeowners of choice, competition, strong reasons to use a Compass broker, and potential pecuniary and non-pecuniary benefits brought by Compass's innovative products and services.

3.    Compass is an innovative real estate brokerage that has successfully challenged traditional real estate companies across the United States, provided consumers with more choices and better services, and provided real estate brokers a better platform to serve those consumers.  One of Compass's innovative client offerings is the Compass 3-Phased Price Discovery and Marketing Strategy for homeowners with the first phase being a pre-marketing phase called "Compass Private Exclusives."  Homeowners who choose Compass Private Exclusives instruct Compass to test the market and gather feedback about their property with Compass brokers and their clients before placing the property on the multiple listing service ("MLS"), for a period of time.

4.    Homeowners' demand for these innovative options has been significant.  In the first quarter of 2025, 48.2% of homeowners who listed their home with Compass, outside of Washington state, started their listing using the Compass 3-Phased Price Discovery and Marketing Strategy; this equates to 19,393 homeowners choosing these client offerings in the first quarter of 2025 alone.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

5.      Homeowners are choosing to list in this way because the Compass 3-Phased Price Discovery and Marketing Strategy has proven to provide homeowners with incredible value and risk reduction.  These offerings give homeowners the ability to test price, gain critical pricing insights, retain their privacy and confidentiality, and generate early demand without public price drops or accumulating days on the market, the latter two of which lead to a reduction in the ultimate selling price of a home.

6.      Even if they hire an experienced real estate broker, when a homeowner immediately places their property onto the multiple listing service without the opportunity to test the market as an office exclusive, they:  (a) take a gigantic risk that the property is incorrectly priced (priced too high or too low, both of which hurt the seller); (b) forgo feedback that would otherwise inform their marketing strategy and potential home improvements (*e.g.*, staging, renovations, or cosmetic repair) and increase buyer demand and their home's sale price; and (c) are forced to launch a broad public marketing campaign that creates negative indicators (such as days on market and public price drops), which impose considerable costs on the seller if the property is not perfectly priced and positioned.  While the expertise of a Compass broker can help address some of these concerns, there is no substitute for the data collected with pre-marketing combined with the innovations Compass and its brokers bring to the industry.

7.      Compass Private Exclusives (again, the first step in the 3-Phrased Price Discovery and Marketing Strategy) use a time-honored industry practice, improved with new innovations using Compass technology and Compass broker experience, to give homeowners the ability to gain valuable insights before launching their property on the MLS.  Specifically, Compass Private Exclusives are based on a type of marketing—called "office exclusives"—that has been an option for homeowners for many decades in every state except Washington, where NWMLS and its co-conspirators have blocked this type of competition.  By using Compass Private Exclusives as part of the 3-Phased Price Discovery and Marketing Strategy, homeowners can test the market, refine their pricing strategy, address any concerns prospective buyers might have, and optimize the presentation of their property.  This gives homeowners the ability to enter

COMPLAINT
- 3 -

the multiple listing service with maximum demand and with the confidence to achieve the best outcome.

8.      Such pre-marketing provides tangible benefits.  A Compass study assessing Compass sell-side residential transactions from January 1, 2024, through December 31, 2024, found that:  (a) homes pre-marketed using Compass's 3-Phased Price Discovery and Marketing Strategy were associated with an average 2.9% higher close price compared to those that were not pre-marketed; (b) homes with pre-marketing received an accepted offer on average 20% faster, or 8 days sooner, once active on the MLS; and (c) homes with pre-marketing were on average 30% less likely to experience a price drop once active on the MLS, compared to those that were not pre-marketed.

9.      However, Compass's aggressive competition, innovative offerings, and consumer-facing business, including Compass' 3-Phased Price Discovery and Marketing Strategy, can be unpopular with competing real estate brokers because these innovations bring fresh competition and options that attract consumers from traditional real estate brokerages to Compass brokers.  Basically, Compass's client offerings disrupt the traditional real estate brokers from being able to continue business-as-usual.

10.     Thus, in the Seattle area, NWMLS, Windermere, and the other traditional real estate brokerages who own and control NWMLS first agreed to adopt and enforce NWMLS rules that prevent office exclusive listings from being used by homeowners, unlike every other state.  Then, NWMLS and its co-conspirators eliminated another of its own long-standing rules, which only Compass was using to allow Compass homeowners to use office exclusives. NWMLS next chose to ignore its own third long-standing rule that Compass was using to give homeowners the choice to use office exclusives.

a.      ***NWMLS Rule 2.***  On July 15, 2024, at an in-person meeting, and subsequently via several emails, Compass asked NWMLS to modify Rule 2 to bring NWMLS in line with the rest of the country, and allow office exclusives in any instance that a seller instructs real estate brokers that they want to use an office exclusive.  After seven months of asking for a rule change and trying to formally engage in NWMLS' rule

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 452 8700

1   change governance process, on February 28, 2025, NWMLS finally responded and

2   simply refused.

3        b.    ***NWMLS Rule 4.*** With the path blocked to change Rule 2, Compass went

4   back to the drawing board and found a solution within the existing NWMLS rules.

5   Compass offered its 3-Phased Price Discovery and Marketing Strategy in the Seattle area

6   to sellers who chose a particular type of listing agreement known as a "non-exclusive

7   listing agreement" (whereby a seller can list their home with multiple brokers).  Under

8   NWMLS's own rules, Rule 4, those types of listings could not be accepted by NWMLS,

9   and thus, are not subject to NWMLS's one-size-fits-all rules regarding the marketing of

10  the listing.  But, one week later, NWMLS and its co-conspirators responded by bypassing

11  its traditional rulemaking procedure to change the decades-longstanding Rule 4, and

12  requiring properties listed with a non-exclusive agreement to now also be submitted to

13  NWMLS and subject to all NWMLS rules.

14       c.    ***NWMLS Rule 6.*** After this second blocking, Compass again looked at

15  NWMLS's existing rules for a solution.  According to Rule 6, properties would not be

16  accepted by NWMLS if the home seller reserved the discretion whether to pay a

17  commission to the buyer's real estate broker.  Compass offered this option to

18  homeowners in the Seattle area.  Within days, NWMLS responded to this renewed

19  competitive threat to its monopoly by claiming that Compass was not in compliance with

20  the NWMLS rules.

21  11.    On April 15, 2025, and without warning or due process, NWMLS cut off

22  Compass's access to the listings data feed, harming all Compass clients, Compass and its

23  brokers, and homeowners by forcing them to choose between marketing their properties publicly

24  before they were ready (and no longer getting the associated benefits of pre-marketing and price

25  discovery) or not listing them at all.  As NWMLS and its co-conspirators likely intended from

26  this boycott, some clients entirely canceled their listing agreements with Compass because the

27  sellers were only comfortable listing their homes because of the benefits Compass's Private

28  Exclusives offering provided them.  Seattle area brokers (at least one of whom is represented on

COMPLAINT

Cooley LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

the NWMLS Board) also have used these anticompetitive and tortious acts to try to take Compass brokers.

12.     As a result, all of these anticompetitive and tortious acts maintain the market power of NWMLS and block competition against the traditional real estate brokerages that own and control NWMLS, and they deprive homeowners in the Seattle area of the freedom, choice, and benefits that Compass Private Exclusives provided.

13.     Homeowners in the Seattle area are being hurt by NWMLS and its co-conspirators' anticompetitive and tortious conduct.  In the short time homeowners in the Seattle area were offered a choice—specifically Compass Private Exclusives—homeowners expressed considerable interest in the program and appreciation of the innovation and options that Compass brought.  In the first week of launching the Compass 3-Phased Price Discovery and Marketing Strategy in the Washington area, approximately 36% of homeowners who listed with Compass chose to market their home using the Compass Private 3-Phased Price Discovery and Marketing Strategy.  And this is consistent with homeowners nationwide:  in Q1 2025, approximately 48.2% of homeowners (19,393 homeowners) who listed their home with Compass, outside of Washington State, used the Compass 3-Phased Price Discovery and Marketing Strategy, including starting with Compass Private Exclusives.

14.     With NWMLS's anticompetitive and tortious conduct, the only way a home seller in the Seattle area can effectively have the choice on how to market their home is to forgo using a professional real estate broker at all, because NWMLS has 100% of the real estate brokers in the Seattle area, and, as a result of its anticompetitive and tortious conduct, it has prevented meaningful competition from gaining traction.

15.     Both NWMLS enforcing, modifying, and ignoring its rules, and the extreme step of cutting off Compass's access to the NWMLS data feed to force Compass to bend to NWMLS's desire to protect its monopoly power and control of how homeowners market their property, was catastrophic for Compass and its Seattle area real estate brokers.  A real estate broker in the Seattle area cannot successfully compete without access to NWMLS listings data.

COMPLAINT

- 6 -

Given NWMLS was threatening to put Compass out of business in the Seattle area by taking away access to the MLS data feed, Compass was forced to either take down a listing or submit it to NWMLS, effectively eliminating Compass Private Exclusives, even when the homeowner had chosen that strategy and instructed Compass to make the listing an office exclusive and not to submit the listing to NWMLS at that time.

16.     Through its anticompetitive and tortious conduct, NWMLS is hurting consumers by: (a) taking away a critical freedom available in every other state to sell their properties in the manner the home seller chooses; (b) decreasing the innovation available to consumers; (c) quashing competition that Compass brings to the traditional real estate brokers (like Windermere and the others that own and control NWMLS); and (d) further entrenching NWMLS's monopoly and the traditional real estate brokerages' collective power in the Seattle area (by ensuring all listings continue to go to NWMLS and homeowners' market their home as NWMLS and traditional brokerages instruct).

17.     Moreover, NWMLS has hurt Compass and its real estate brokers by: (a) eliminating an option that homeowners like; (b) blocking competition from Compass and its brokers; (c) curtailing their ability to win business from traditional real estate brokerages; and (d) requiring Compass and its brokers to ignore instructions from homeowners on how to sell their properties.

18.     NWMLS has tried to justify its anticompetitive and tortious conduct with stock responses such as office exclusives are "fundamentally unfair and perpetuate[] inequities that have long plagued the housing system," are "further enabl[ing] the proliferation of exclusionary practices, such as restricting access to listings," and "will lead to the dismantling of the real estate marketplace for the exclusive benefit of those brokerage firms that choose to exploit them." However, these claims are transparently pretextual and are proven wrong by the many decades of experience with office exclusives in every other state—without causing the parade of horribles NWMLS claims would happen here.

19.     By adopting, enforcing, and changing rules to prohibit consumers in the Seattle area from the freedom to choose to sell their home by office exclusives—a choice all other

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

homeowners in the United States have—NWMLS has restrained competition, reduced consumers' choices, and tortiously interfered with Compass, its real estate brokers, and Seattle area consumers. Therefore, Compass brings this action under federal and state law to enjoin NWMLS from restricting consumer choice and broker competition, and obtain relief for any injuries suffered as a result of NWMLS's conduct.

## THE PARTIES

20.     Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York City that operates 11 offices in the Seattle, Washington area. It was launched in 2012 with an aim towards being innovative and client-focused. Nationwide, Compass services 96 cities with over 400 offices and 33,000 real estate brokers.

21.     Plaintiff Compass Washington, LLC, (together with Compass, Inc. "Compass") is a limited liability company formed in the State of Delaware, and registered in Washington State as a foreign limited liability company. It is licensed to, and does, operate as a real estate brokerage in the state of Washington. Compass Washington, LLC is a wholly-owned subsidiary of Compass Brokerage, LLC, which in turn is a wholly-owned subsidiary of Compass, Inc.

22.     "Compass is building the first modern real estate platform, pairing the industry's top talent with technology to make the search and sell experience intelligent and seamless."[1] In a short period of time, Compass has succeeded in disrupting the real estate brokerage industry: "Talk about disruptive. Since launching 18 months ago, Compass–a real estate listing app for iOS and Android formerly known as Urban Compass–has generated quite a bit of discomfort among its legacy competitors[.]"[2] "[Y]ou might think of Compass as the equivalent of the launch of the first iPhone to the various other smartphones that preceded it."[3]

---

[1] *About*, COMPASS, INC., https://www.compass.com/about/ (last visited Apr. 25, 2025).
[2] John Paul Titlow, *Why This Real Estate App Is Making New York Brokers Nervous*, FAST COMPANY (June 18, 2015), https://www.fastcompany.com/3047603/why-this-real-estate-app-is-making-new-york-brokers-nervous.
[3] Ingrid Lunden, *Compass gets $350M from SoftBank; real estate portal now valued at $2.2B*, TECHCRUNCH (Dec. 7, 2017, 5:45 AM PST), https://techcrunch.com/2017/12/07/compass-gets-450m-from-softbank-real-estate-portal-now-valued-at-2-2b/.

COMPLAINT

- 8 -

23.     Compass has grown in the greater Seattle area, but it still pales in comparison to the dominant Windermere and the combined share of the other traditional real estate brokerages combined.

24.     Defendant Northwest Multiple Listing Service is a corporation that is registered in the state of Washington with its principal place of business in Kirkland, Washington. According to its website, "NWMLS is one of the largest member-owned multiple listing services in the United States and the largest MLS in the Northwest" and is "the leading resource for the region's residential real estate industry." NWMLS's service area covers Washington state and Oregon. Other than NWMLS, there are no other meaningful multiple listing services in the Seattle area.

25.     While NWMLS is owned and controlled by competing real estate brokers, it also is "dedicated to fostering cooperation among its member real estate firms." According to its website, NWMLS has more than 30,000 members. And it "offers a comprehensive suite of tools, including a property listing system, public records database, online showing scheduling, electronic forms and signatures, mobile applications, cloud storage, data analytics, keybox services, and regional member service centers."

26.     NWMLS is owned and controlled by competing real estate brokerages in the Seattle area, and its decisions are made by a Board of Directors. Of the 15 current directors, most are affiliated with the long-standing traditional real estate companies in the Seattle area, with *six* (Cory Brewer, Patrick Chinn, Jill Himlie, Anne Jones, David Maider, and Lena Maul) affiliated with the largest real estate brokerage in Washington state: Windermere. In fact, both the current Chairperson (David Maider) and Vice Chairperson (Jill Himlie) of NWMLS are affiliated with Windermere. The other board members work also for traditional brokerages: JoAnna Harrison (Coldwell Banker Cascade Real Estate); Martha Hunt (Century 21 Lund); Jon Hunter (John L. Scott Real Estate); Frank Leach (RE/MAX Platinum Services); Shelly Schmitz (Keller Williams Premier Partners); Jeff Pust (Van Dorm Realty Inc.); Jason Wall (Lake & Company Real Estate); Todd Shively (Ensemble); and Rachelle Willhite (Best Choice Realty). A Compass real estate broker had a seat on the NWMLS Board of Directors, but she resigned it

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1    in protest of NWMLS's anticompetitive and tortious conduct.  When NWMLS engaged in the

2    anticompetitive and tortious conduct described herein, those decisions made by the Directors

3    were made as representatives of competing real estate brokerages.  These brokerages are co-

4    conspirators with each other and NWMLS.

5                          **JURISDICTION AND VENUE**

6         27.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 26 and 28

7    U.S.C. §§ 1331 and 1337 because Compass brings this action under Section 4 of the Clayton

8    Act, 15 U.S.C. § 15, seeking injunctive relief, damages, treble damages, cost of suit, and

9    reasonable attorneys' fees, arising from NWMLS's violations of Sections 1 and 2 of the Sherman

10   Antitrust Act, 15 U.S.C. §§ 1 and 2.

11        28.    This Court has subject matter jurisdiction over Compass's state law claims

12   pursuant to 28 U.S.C. § 1367, which should be exercised in the interests of judicial economy,

13   convenience, and fairness, because state law claims are so related to Compass's federal law

14   claims that they form part of the same case or controversy.

15        29.    This Court has personal jurisdiction over NWMLS and venue is proper here

16   pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because NWMLS transacts business in

17   Washington state, NWMLS is headquartered and organized in Washington state, NWMLS's

18   acts giving rise to this case or controversy were engaged in Washington state, and consumers in

19   Washington state have been harmed by NWMLS's acts giving rise to this case or controversy.

20                          **TRADE AND COMMERCE**

21        30.    According to a January 17, 2025 press release, in just 2024, NWMLS facilitated

22   the sales of 67,788 residential homes and condominiums with "total closings valued at more

23   than $54 billion."[4]   Interstate mortgage financing and title insurance are affected by this

24   exchange of property.  Thus, NWMLS's activities are in the flow of, and have a substantial

25   effect on, interstate commerce.

26

27   [4] Press Release, *NWMLS brokers log 67,788 sales during 2024*, NORTHWEST MULTIPLE LISTING
     SERVICE (Jan. 17, 2025), https://www.nwmls.com/nwmls-brokers-log-67788-sales-during-
28   2024/.

COMPLAINT
                                    - 10 -

## **FACTS**

### *NWMLS Is the Dominant Way Homes Are Sold in the Seattle Area*

31.    Most homeowners engage the services of a real estate broker to sell their homes. According to the National Association of REALTORS® ("NAR"), for-sale-by-owner accounted only for 6% of nationwide home sales in 2024.[5]  Selling a home without a real estate broker can be difficult.  For example, according to the NAR, the most difficult tasks for for-sale-by-owner sellers include:  "getting the price right"; "selling within the length of time planned"; "understanding and performing paperwork"; "preparing or fixing up the home for sale"; "having enough time to devote to all aspects of the sale"; and "attracting potential buyers."[6]

32.    Real estate brokers selling a home in the Seattle area typically submit detailed information regarding the property to NWMLS.  NWMLS is owned and controlled by competing real estate brokers in the Seattle area who use NWMLS to share their clients' listings and cooperate in other ways.

33.    Including as a result of its anticompetitive and tortious conduct described herein, NWMLS's database contains virtually all homes for sale through a real estate broker in the Seattle area, and virtually all homes sold in the Seattle area for many years.  This database allows real estate brokers representing sellers to market the sellers' listing to all other NWMLS participants and their buyers.  Similarly, the NWMLS database allows real estate brokers to provide their buyers with information about virtually all listed properties in which the customers might have an interest.  NWMLS has ensured that there is no meaningful alternative listing service available in the area in which NWMLS operates, including through its anticompetitive and tortious conduct described herein.  NWMLS's revenue, including membership dues and licensing fees, is increased by having more data, more members, and more market power.

34.    Real estate brokers formed the predecessor of NWMLS to facilitate the provision of real estate brokerage services to buyers and sellers: "The multiple listing concept emerged in

---

[5] *Quick Real Estate Statistics*, NATIONAL ASSOCIATION OF REALTORS® (Jul. 7, 2024), https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics.
[6] *Id.*

COMPLAINT

- 11 -

the late 1940s in the form of cooperative listing exchanges. They originated with real estate brokers sharing information over coffee. Eventually, details on available properties were compiled on a card system, then catalogued in books."[7] Today, in addition to serving as a repository of property listings, multiple listing services syndicate those listings through data sharing feeds to other participants, including the other real estate brokers in the area and the large public-facing aggregator websites, like Zillow, Trulia, and Realtor.com. This is a powerful marketing tool as it allows homeowners to widely publicize their homes beyond one multiple listing service or region to any potential buyer looking at the public-facing aggregator website.

35.     In order to serve their customers and compete with other real estate brokers in the Seattle area, real estate brokers must participate in NWMLS as NWMLS has ensured there is no alternative way to access the listings provided in the NWMLS. As a result, few real estate brokers would voluntarily withdraw from NWMLS participation even if the fees or other costs associated with that participation substantially increased or the rules prevented them from offering competing services that consumers want.

36.     NWMLS promulgates rules governing the conduct of its participants. Those rules are approved by the competing real estate brokers who sit on NWMLS's committees and Board of Directors, which again is dominated by Windermere and other long standing real estate brokerages in the Seattle area. If a NWMLS participant violates those rules, including by violating NWMLS's Data Use Policy pursuant to Rule 27, NWMLS can punish the real estate broker and/or brokerage, including by fining the real estate broker or blocking their access to the listings database by revoking their license under NWMLS's Data Use Policy. Given the necessity of being able to access that database, virtually all real estate brokers in the Seattle area must follow NWMLS's rules.

---

[7] Blog, *The History of Northwest Multiple Listing Service: Powering the Region's Real Estate Industry for 40 Years*, NORTHWEST MULTIPLE LISTING SERVICE (Jan. 12, 2024), https://www.nwmls.com/the-history-of-northwest-multiple-listing-service-powering-the-regions-real-estate-industry-for-40-years/.

COMPLAINT

- 12 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Office Exclusives Have Been an Important Option for Homeowners for 50 Years***

37.    Office exclusives are listings to sell a home where the "seller refuses to permit the listing to be disseminated by the [multiple listing] service."[8]

38.    For over 50 years, office exclusives have been a critical piece of the freedom that homeowners have in deciding how to market their property.  In fact, it is so important that the NAR has protected office exclusives in its antitrust policy since 1971, following resolution of an investigation initiated by the U.S. Department of Justice.  In the most recent version of its antitrust policy, along with the prohibitions against price-fixing, NAR instructs multiple listing services that follow its rules that they "shall not . . . [p]rohibit or discourage Participants from taking 'office exclusive' listings."[9]

39.    Office exclusives have long been important to sellers:  they provide homeowners a path to hiring a licensed real estate broker without immediately putting their home on the multiple listing service.  Office exclusives provide sellers with the option to market and sell their homes without the multiple listing service entirely, if they choose.  Office exclusives are also used as an important complement to multiple listing services (approximately 94% of Compass listings that started off the multiple listing service in 2024 eventually sold on the multiple listing service).  Sellers and their real estate brokers can use office exclusives as a pre-marketing tool to fine-tune listings before they are broadcast through the multiple listing service to public-facing aggregator websites.  They provide sellers with the benefit of testing different aspects of their listing, including their asking price, pictures, and home specifications, and getting feedback from real potential buyers and other real estate brokers before publicly marketing on the multiple listing service and accruing days on the market and price drops.

40.    The feedback a seller and their real estate broker receive during this period allows them to tailor their marketing strategy and put them in the best position to sell their home quickly

---

[8] *MLS Clear Cooperation Policy*, NATIONAL ASSOCIATION OF REALTORS®, https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (last visited Apr. 25, 2025).
[9] *Policies: MLS Antitrust Compliance Policy*, NATIONAL ASSOCIATION OF REALTORS®, https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (last visited Apr. 25, 2025).

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

when it is listed on the multiple listing service.  For example, a seller may want to ask $250,000 for their home, but is unsure if the price is realistic.  The seller can list their property as an office exclusive and get valuable feedback from the market on whether their asking price is too high. It is possible in this scenario that the home sells during the pre-market phase, but most listings ultimately do sell on the MLS (approximately 94% of Compass Listings in 2024).  It is also possible the seller learns during this period that reducing the asking price by $20,000 would entice more buyers or that there is such interest in the home that the asking price should be increased by $20,000.

41.     If the home does not sell during pre-marketing, the seller will have gained insight and adjusted the price when they list on the multiple listing service so they can appeal to the widest audience.  This will help them avoid accruing days on market, which can drive down the selling price of their home.  This feedback relates not only to price, but also to any potential flaws in the home that should be addressed before they list on the multiple listing service, such as whether landscaping should be spruced up, carpets cleaned, or walls painted a more neutral color.  There are other potential benefits that may be important to some homeowners, including minimizing inconvenience associated with preparing a home for public showings and open houses.

42.     On its website, Compass explains those benefits as follows:

COMPLAINT

Cooley LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 452 8700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

## The Benefits of Pre-Marketing Your Home as a Compass Private Exclusive



**Soft-Launch to an Exclusive Audience**

Make your listing available to a network of thousands of top agents and their millions of clients.



**Showcase Before Being Market-Ready**

Pre-market your home to buyers before investing time or effort into preparing it for the public.



**Generate Early Demand**

Create early buyer anticipation and interest without accumulating days on market or damaging public price drops.



**Test Your Price & Gain Insights**

Know how buyers are engaging with your listing. These insights, available only before your home goes live on other sites, help you make adjustments to your pricing.



**Attract Competitive Offers**

You can get competitive offers from buyers who are willing to pay a premium for certainty and reduced stress.



**Maintain Your Privacy**

Your privacy is valuable. Photos and floorplans of your home are only visible to Compass agents and their serious clients.

19    43.    In fact, a marketing plan that includes office exclusives also often provides

20  pecuniary benefits to homeowners, as Compass found in a recent study:

21

22

23

24

25

26

27

28

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Compass research assessed Compass sell-side residential transactions from January 1, 2024, through December 31, 2024, finding that:

- Homes pre-marketed as Compass Private Exclusives and/or Compass Coming Soon before going active on the MLS were associated with an average 2.9% higher close price compared to those that were not pre-marketed.

- Homes with pre-marketing received an accepted offer 20% faster on average – 8 days sooner – once active on the MLS.

- Only 13% of pre-marketed Compass listings experienced a price drop, compared to 19% without pre-marketing. This translates to about 30% fewer listings taking a price drop once active on the MLS.

44.     Not surprisingly, homeowners are quite interested in Compass's Private Exclusives.  During the one week where Washington homeowners were presented with the opportunity to take advantage of Compass's 3-Phased Price Discovery and Marketing Strategy through non-exclusive pre-marketing offerings, approximately 36% of Compass's new listings were non-exclusives.  Outside of Washington, in the first quarter of 2025, approximately 48.2% of homeowners who listed their home with Compass started their listing using the Compass 3-Phased Price Discovery and Marketing Strategy; this equates to approximately 19,393 new listings in the first quarter of 2025.

*Compass Innovates, Including Offering Compass Private Exclusives*

45.     Compass is always looking for a better way to help consumers.  For example, on February 3, 2025, Compass launched Compass One, the industry's first all-in-one client dashboard that seamlessly connects a client with their broker through their real estate journey, before, during, and after their real estate transaction.  It was developed by Compass's in-house technology team—the largest in the real estate brokerage industry—to deliver an exceptional client experience.  Compass One provides home buyers nationwide access to a personalized home search collection by automatically searching all listing information available, primarily

COMPLAINT

- 16 -

through the multiple listing service data feeds, to identify and propagate properties that match with the buyers selected criteria (which Compass refers to as "Collections"). This home search collection allows potential buyers to more easily identify potential homes to view and place an offer on. Compass describes its Compass One product as being able "to connect you [the home seller or buyer] and your agent through every phase of your real estate journey."[10] And its tagline is "[e]xperience 24/7 transparency before, during, and after the transaction for total peace of mind."[11]

46.     One year earlier, in 2024, Compass announced Make Me Sell, which gives sellers the ability to share an aspirational price they would sell their home for if there was a buyer. And in 2018, Compass launched Compass Concierge, a program designed to provide homeowners nationwide with upfront funds to cover the cost of home improvement services to prepare their home for market.

47.     Continuing to innovate, Compass launched a new product recognizing that the "the traditional way of selling [a] home has been part of a system that has put sellers at a disadvantage."

48.     This "traditional way of selling" can hurt homeowners in at least six ways:

        a.      unnecessary days on market and price-drop history which devalues the property in the eyes of buyers;

        b.      missed buyer opportunities because some third-party websites block buyers' ability to reach out to the listing real estate broker directly (these leads are sold to other brokers who are likely unfamiliar with the home and whose interests may not align with homeowners selling goals);

        c.      lack of pricing control because third-party websites often apply their "own" pricing information through outdated algorithms and incomplete data, effectively wresting control over pricing from the home seller, and often mispricing homes and shaping buyer expectations;

---

[10] COMPASS ONE, https://one.compass.com/ (last visited Apr. 25, 2025).
[11] *Id.*

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

d.      third-party platforms can add their own superfluous and potentially irrelevant assessments and data to a listing, such as a home's "walkability," which may not accurately reflect the true value or desirability of the home;

e.      removing homeowners' ability to develop a tailored marketing strategy that takes into account non-economic factors such as where the home seller has security concerns about widely publicizing the sale of the home, has not yet fully committed to selling the property, or wishes to limit physical contact with prospective buyers for health and safety reasons; and

f.      depriving homeowners of valuable information critical to achieving their desired outcome as a result of testing the price and positioning of their home through specific marketing with high-interest buyer groups before advertising to the broader market or before important home improvements are complete, which reduces the price at which the home is ultimately sold.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 452 8700

49.     To avoid these negative consequences for consumers, Compass developed its "3-Phased Price Discovery and Marketing Strategy," which starts with the seller instructing Compass to use Compass Private Exclusives:

**PHASE 1**

**Compass Private Exclusive**

Just like many companies test products with a smaller audience before launch, listing your home as a Private Exclusive allows you to test price, gain critical insights, generate early demand, and extend your marketing runway — all before going public.

Find out more about Compass Private Exclusives here.

· Make your listing available to a nationwide network of 34,000 top agents and their millions of clients.

· Begin to create urgency and generate buyer interest without accumulating days on market or damaging public price drops.

· Sometimes you'll find a buyer that will pay a premium for certainty and reduced stress.

**PHASE 2**

**Compass Coming Soon**

Publicly launch your property on Compass.com, showcasing it to all agents and consumers on the internet without displaying days on market or price drop history. Signal to the market that increased competition for the listing will be coming soon when it's launched on all other sites.

Find out more about Compass Coming Soon here.

· Receive key engagement insights from your agent about how agents and their buyers are viewing, commenting, and sharing your listing on Compass.com — data that is lost when listings go into other platforms.

· Improve the chance of ranking higher on Google while increasing the likelihood that serious buyers contact us directly, instead of an agent who may not be familiar with your home.

· In this phase, have more control over your data so photos of your home and personal information don't stay on the Internet.

**PHASE 3**

**Go Live on All Platforms**

Go 'Active' on MLS & third-party sites with the benefit of price discovery from Phases 1 & 2.

Armed with feedback from agents and buyers, we strategically launch your home on the public market to help ensure maximum demand and confidence to achieve the best outcome for you. Now that your home is launched, it will accrue days on market and visible price drop history.

50.     In fact, these marketing strategies, while innovative in the context of residential real estate, are a proven concept in other contexts; they "have been used by the largest and most successful group of sellers in the industry—professional homebuilders and real estate developers. They have a sophisticated playbook on how to sell homes and just like some

COMPLAINT

Cooley LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

homeowners, have properties they want to advertise that aren't ready to be shown."[12]  Compass has applied its innovative, customer-focused approach, and its deep technological experience and tools, to pre-marketing strategies, and introduced pre-marketing options to residential homeowners, a context in which they have not historically been offered.

51.     Compass's pre-marketing options, launched first in markets outside of Washington where it is a permitted practice, quickly drew praise from homeowners and their real estate brokers who were able to benefit from the choice of pre-marketing their properties. Compass then sought to, and did, offer these same services to clients in Washington, who also were quick to embrace and praise the offering.

52.     For example, one Seattle area Compass real estate broker had a client interested in selling their house, but a divorce and an existing tenant in the home made the timeline complicated.  The real estate broker therefore launched a Compass Private Exclusive on March 22, 2025, which provided valuable market feedback that the price listed was too aspirational. Therefore, when the real estate broker lists the house on the multiple listing service in the coming week, they'll strategically price the home 8% below the price set by the seller under the Compass Private Exclusive to ensure the home receives the best possible offer in the shortest period of time.

53.     Similarly, other Seattle area Compass real estate brokers shared examples of clients who were able to test pricing and market response prior to their full launches that allowed them to refine their launch strategies.  For example, Compass was preparing to bring a rare log cabin to market over Easter weekend when there was high traffic in a market.  In that market, average days on the market often exceeds six months and price reductions are common.  But Compass's ability to show the home privately and generate early interest from serious buyers was key to helping the seller achieve top value, and avoid time on the market, which can drive down the eventual sales price.  Likewise, connecting buyers with homes they are interested in sooner and more efficiently helps home buyers reach their preferred outcome more quickly.

---

[12] COMPASS HOMEOWNERS, https://www.compass-homeowners.com/ (last visited Apr. 25, 2025).

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

Compass's 3-Phased Price Discovery and Marketing Strategy thus benefits consumers on both sides of the market by making the process of reaching a successful transaction more efficient for both home buyers and sellers.

54.     This testing of the water is not possible if a property is only able to be listed on NWMLS.  Therefore, when a property is first listed on NWMLS at too high a price point and remains unsold or is "delisted" and pulled from the NWMLS, this information is retained in the NWMLS and available to real estate brokers subscribing to the service.  A protracted time on the NWMLS may harm consumers as it results in the home presenting as less attractive and thus losing value.

### *NWMLS Prohibits Office Exclusives*

55.     While office exclusives can benefit sellers, other real estate brokers can disfavor them because they bring competition, consumer options, and reasons for a home seller to choose an innovative firm like Compass over a traditional real estate brokerage. They can be further disfavored by MLSs, whose financial incentives are directly correlated to the number of listings included on their database.  The fewer properties for sale outside of the MLS, especially any potentially included on another listing network database, the more the MLS benefits financially.

56.     NWMLS thus has conspired with traditional real estate brokers and brokerages in the Seattle area to protect, and continues to protect, its dominance as a listing network, and its co-conspirators' dominance in the brokerage services market, including by implementing and enforcing policies blocking office exclusives, and consequently eliminating the competitive threat they represent.  Specifically, NWMLS Rule 2 prohibits office exclusives: "Members shall not promote or advertise any property in any manner whatsoever, including, but not limited to yard or other signs, flyers, websites, e-mails, texts, mailers, magazines, newspapers, open houses, previews, showings, and tours, unless a listing for that property has been delivered to NWMLS or input by the member and has not been cancelled, expired, or taken temporarily off the market."

COMPLAINT

- 21 -

57.    On July 15, 2024, Compass met with Justin Haag, the President and CEO of NWMLS to ask it to allow office exclusives, including Compass Private Exclusives, like every other multiple listing service in the country.

58.    NWMLS did not respond for almost seven months.  Then, on February 28, 2025, Mr. Haag said that Compass Private Exclusives and similar programs "are not allowed."

59.    Mr. Haag further explained:

> As you requested, the NWMLS Bylaws and Rules Committee met on February 21st to address this issue, among others. . . .  Unlike many MLSs that enable brokers to take 'office exclusive' listings, NWMLS members agree to timely input all listings into the collective system before publicly promoting the property.   After an open discussion, the Committee overwhelming[ly] recommended that NWMLS not change its current rules related to mandatory submission of listings.  The recommendation was reported to the NWMLS Board of Directors, which supported the Committee's recommendation.

60.    Not only did Mr. Haag tell Compass that its homeowners could not use Compass Private Exclusives, he also said they could not use unrelated, separate, innovative products, such as Compass One.

61.    Mr. Haag asked Compass to "refrain[] from promoting these programs in NWMLS's service area where they are not available for consumers" and to send "a reminder from Compass—directed to the Compass brokers in the NWMLS service area—that the programs are not available."

62.    On March 20, 2025, Compass then started offering homeowners in Washington state who wanted to use Compass Private Exclusives the option to sign listing agreements that allowed the seller to engage another real estate broker in addition to Compass (called an open listing agreement).  Under NWMLS Rule 4 at the time (and for years prior), open listing agreements "will not be accepted by NWMLS and shall not be taken on a NWMLS listing agreement or input into NWMLS's online system."  Many homeowners chose to enter into open listing agreements with Compass real estate brokers with the explicit restriction that their properties only be pre-marketed under Compass Private Exclusives and not be input into NWMLS's online system.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

63.    Compass publicly promoted the broker's listing through social media noting, "[f]or homesellers days on market and price drop history are the killers of value—and now, for the first time in the state of Washington, through Compass, sellers and their brokers have the choice to market privately and publicly without the risk of days on market and price drop history."  Likewise, between March 22, 2025, and March 28, 2025, Compass continued publicly supporting homeowners' Private Exclusive listings in the Seattle area.

64.    On March 21, 2025, NWMLS informed Compass via a phone call that it had received complaints regarding Compass listings not being entered on the MLS, and demanded Compass immediately enter them.  Later that day, Compass responded by email explaining that the subject listings were in fact non-exclusive, open listings and, "[g]iven the fact that this listing would not be accepted by the MLS, we believe that we can market it pursuant to the seller's instructions without being subject to mandatory submission upon public marketing."  On March 25, 2025, NWMLS issued Compass a "Discipline Complaint" for launching Compass Private Exclusives in NWMLS territory.

65.    On March 28, 2025, NWMLS unilaterally, and without utilizing its typical process for rule modification, modified Rule 4 to remove the reference to open agreements, forcing all such agreements to be listed on the NWMLS platform.  That same day, NWMLS wrote to Compass, stating "Rule 4 relating to non-exclusive listings has been revised, and non-exclusive listings are accepted by NWMLS effective today, March 28th.  This rule change applies to listings taken from tomorrow forward."  That same day, on March 28, Mr. Haag emailed "A Message from NWMLS CEO," issued a press release, and posted it to the NWMLS website.  NWMLS attempted to justify its conduct:

> Restricting the visibility of available homes to a select, exclusive group of buyers and real estate brokers is fundamentally unfair and perpetuates inequities that have long plagued the housing system.  Policies that further enable the proliferation of exclusionary practices, such as restricting access to listings, will lead to the dismantling of the real estate marketplace for the exclusive benefit of those real estate brokerage firms that choose to exploit them.  The discriminatory effect and disparate impact that results from restricting access to listings to an exclusive group of buyers and real estate brokers is just that–discrimination.

COMPLAINT

- 23 -

66.     However, these justifications are transparent pretext, as shown by the fact that every multiple listing service in the country provides fair and equal access, supports fair housing opportunities, and opposes discrimination, while still allowing for office exclusives.  In fact, the requirement that office exclusives be permitted has been enshrined in NAR's Antitrust Compliance Policy since the 1970s, following resolution of an investigation by the DOJ.  Unlike the majority of multiple listing services in the country, NWMLS does not follow NAR policy.  But even other multiple listing services that do not follow NAR's policies, like Midwest Real Estate Data LLC in Chicago, still protect the consumer's freedom to choose office exclusives.  Moreover, despite office exclusives being allowed for decades, there has been no "dismantling of the real estate marketplace for the exclusive benefit of those brokerage firms that choose to exploit them."

67.     In an effort to preserve this option for consumers in the NWMLS area, Compass then began offering homeowners in the Seattle area the option to sign listing agreements that contained a provision permitting the seller to avoid payment of any "Compensation Offer" made to a potential buyer's real estate broker.  These agreements were referred to as "Unenforceable Agreements," by NWMLS Rule 6, which provides that such listings "will not be published by NWMLS and shall not be input by the listing firm."  Many homeowners again expressed their interest in this option and entered into these agreements with Compass brokers with the explicit restriction that their properties only be pre-marketed through Compass and not be input into NWMLS's online system.

68.     Two weeks later, on April 15, 2025, and without warning or any due process, NWMLS imposed one of the most significant penalties it has, and cut off Compass's access to its data feed, blocking Compass's website and those of its real estate brokers from receiving home listings data, including any updates to existing listings.

69.     Access to this data is critical for any real estate broker or brokerage to do business.  This unprecedented, unjustified step was designed to, and did, force Compass and its brokers to capitulate to NWMLS's demands, or be completely out of business in a matter of days.  By giving Compass the ultimatum to either leave the Seattle area entirely or comply,

COMPLAINT
- 24 -

1   NWMLS pressured Compass to enter all its listings into the database and to stop taking any

2   future listings involving pre-marketing.  Compass responded it would not violate its clients

3   wishes not to engage in marketing on the multiple listing service, explaining "we cannot [list

4   Private Exclusive listings on NWMLS] without violating our seller's instructions and our duties

5   to them.  Based on our earlier good faith interpretation of Rule 6, many of these sellers executed

6   the agreements with the express understanding that their properties would only be marketed

7   privately.  These sellers are not ready to market their homes publicly, so adding those listings to

8   NWMLS now would be contrary to their desires and in violation of our duties to them."  Despite

9   that reasonable request, NWMLS refused to even allow the already existing Rule 6 listings to

10  remain off the MLS system, something they had allowed two weeks earlier with regard to the

11  existing open listings.

12          70.     As a result, only after Compass actually cancelled or in put all Rule 6 listings into

13  NWMLS, did NWMLS start providing Compass with the home listing data again.  During the

14  time NWMLS blocked Compass's access, (a) new and updated Seattle area listings, which rely

15  on the data feed, no longer appeared accurately on Compass.com; (b) new and updated Seattle

16  area listings, which rely on the data feed, were not accurately reflected in Compass's agent

17  search tools and marketing systems impacting their ability to operate efficiently and manage

18  listings ; and (c)  inaccuracies on the search platform due to the loss of the data feed led to

19  confusion and Compass real estate brokers diminishing credibility with their clients.

20          71.     NWMLS's actions are a group boycott perpetrated by it and its co-conspirators

21  with the intention and effect of undermining Compass's business and the freedom of choice for

22  its clients.  Compass brokers have shared stories of disappointment, frustration, and even

23  contract cancellations as a result of NWMLS's actions.  Brokers have reported clients fully

24  canceling listing agreements because Compass can no longer offer them Compass Private

25  Exclusive listings as an option.  Brokers have likewise lost business opportunities because

26  potential clients no longer wish to list their homes for sale at all as a result of the brokers'

27  inability to offer Compass Private Exclusive listings.

28

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

72.    Other Seattle area brokers have shared stories of clients who were drawn to the unique benefits of Compass Private Exclusives and the potential of gathering important market insights only to be told they no longer had the option to privately market their own homes pursuant to NWMLS's rules.  For example, a Washington broker shared a story of a client who needed heart surgery and needed to sell the home quickly with minimal intrusion due to the client's health condition.  After signing the listing agreement to market the property as a Private Exclusive listing, the client was very disappointed to learn they no longer had that option.  This has led to frustration on the part of homeowners and Compass brokers alike who were excited about the unique benefits and privacy of Compass's marketing strategy and are no longer able to receive those benefits.

73.    After NWMLS took the unjustified and unprecedented step of blocking every Compass agent from receiving its data feed, a Coldwell Banker real estate managing broker (another Coldwell Banker real estate broker is the Chairperson of the NWMLS Rules and Disciplinary Committees) took advantage of the existential threat this represented to Compass brokers' livelihoods, sending an email to Compass's brokers saying, "[a]t Coldwell Banker Bain, we're fully in compliance with NWMLS rules.  Our IDX [listings data] feed is live, accurate, and working exactly as it should.  No dramas, no disruption—just a stable, trusted platform to run your business on."  The solicitation continued, "what if the MLS takes further action?  What if this situation escalates?"  If these competing real estate brokers are successful in using the NWMLS conduct to steal Compass's brokers and clients, then the innovative competition Compass brings to real estate brokers in the Seattle area is at risk.

74.    NWMLS's actions against Compass were intended to, and did, have a chilling effect on Compass's business—both with consumers and with its own brokers.  Compass prides itself on its ability to attract the best talent to serve homeowners and buyers.  Since NWMLS shut off Compass's data feed, brokers have left Compass and at least three have specifically cited NWMLS's actions as the reason for their departure.

75.    NWMLS and its co-conspirator's decisions to adopt and enforce NWMLS rules that prevent office exclusive listings, eliminate Rule 4, and finally ignore Rule 6 had the purpose

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

and effect of protecting their market share and eliminating competition. These actions, taken to an even more extreme level with the decision to cut off Compass's NWMLS data feed, constitute a conspiracy to reduce competition and boycott Compass and any other potential non-conspiring brokerages in violation of federal and state antitrust laws. These actions are illegal, exclusionary, and represent an unreasonable restraint on trade.

76.   As of today, without relief, NWMLS and its co-conspirators block not only any competitive threat to their business, but also prevent homeowners in the Seattle area from choosing to use office exclusives, even though every other home seller in every other area Compass serves, has the freedom to sell their home that way—and have for decades.

## RELEVANT PRODUCT MARKETS

77.   A relevant product market is the provision of real estate brokerage services to sellers of residential real property. This product market includes all real estate brokers licensed to provide real estate brokerage services, including the real estate brokers who own and control NWMLS. In the event of a small but significant increase in the price of brokerage services, the number of home sellers who would switch from a real estate broker to for-sale-by-owner would not be sufficient to make such a price increase unprofitable.

78.   Another relevant product market is the provision of multiple listing services to real estate brokers. This product market includes NWMLS. In the event of a small but significant increase in the price of real estate brokerage services, the number of real estate brokers representing sellers that would switch from multiple listing services to yard signs, word of mouth, the classified section of the local newspaper, or any other non-multiple listing service methods would not be sufficient to make such a price increase unprofitable.

## RELEVANT GEOGRAPHIC MARKET

79.   Two relevant geographic markets are the city of Seattle and King County. Real estate brokerage services are local in nature because most sellers prefer to work with a real estate broker who is familiar with local market conditions and homeowners often desire a residential real estate broker who is a member of the multiple listing service that serves the area in which they are selling a home. In the event of a small but significant increase in the price of real estate

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 452 8700

brokerage services relating to properties in the city of Seattle or King County, the number of sellers who would switch to brokerage services relating to properties located outside of the city of Seattle or King County would not be sufficient to make such a price increase unprofitable.

## MARKET SHARE AND MARKET POWER

80.     In all relevant markets, NWMLS is a monopolist with almost 100% market share.

81.     As the U.S. Department of Justice has stated, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing real estate brokers) has market power in almost every relevant market." As the U.S. Department of Justice and Federal Trade Commission reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[13]

82.     In the market for the provision of real estate brokerage services to sellers of residential real property, NWMLS is owned, controlled by, and constitutes a combination or conspiracy among competing real estate brokers. And NWMLS describes itself on its website as "the leading resource for the region's residential real estate industry . . . with more than 2,500 member officers and 30,000+ real estate brokers in Washington state and Oregon." This is more than the number of NAR members in the entire state. Windermere alone dominates real estate brokerage in Washington state, and NWMLS. It is the largest residential real estate company in Washington state by far, and one of the largest real estate companies in the Western United States. On information and belief, it had a market share of 30% in the city of Seattle based on gross transaction volume for the last twelve months as of March 31, 2025.

83.     These real estate brokers, as a group and through the Board of Directors and committees they elect and the staff they indirectly employ, have agreed to, adopted, maintained,

---

[13] U.S. Department of Justice and Federal Trade Commission, *Competition in the Real Estate Brokerage Industry*, U.S. DEPARTMENT OF JUSTICE (Apr. 2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/05/08/223094.pdf.

COMPLAINT
- 28 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

and enforced rules affecting the method of members' provision of real estate brokerage services, participation in NWMLS, and access to NWMLS's services, including access to the listings database. Through and with NWMLS, the members of this combination or conspiracy collectively control 100% share of the market for the provision of real estate brokerage services to sellers of residential real property in the city of Seattle and King County.

84.     In the market for the provision of multiple listing services to homeowners, NWMLS is a monopolist with almost 100% market share. In the city of Seattle and King County, there are no meaningful multiple listing services other than NWMLS.

## **BARRIERS TO ENTRY**

85.     Barriers to entry in the relevant markets are high.

86.     First, the network effects that accrue to NWMLS as a result of its large market shares and its ownership and control by the largest real estate brokerages in the Seattle area create barriers to entry. As more buyer-brokers use NWMLS to search for prospective homes for their clients, more seller-brokers must list their clients' homes on NWMLS in order to attract a buyer. Non-conspiring real estate brokers would need to establish an alternative listing service to compete with the conspiring real estate brokers, or alternatively, attempt to compete without access to a listing service. For an alternative listing service to compete effectively, it would need to have listings as comprehensive as NWMLS. However, homeowners are unlikely to retain real estate brokers using a new and unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. As a result of the anticompetitive rules, any listing service attempting to compete with NWMLS would likely fail to attract enough property listings to operate profitably and be competitive. Likewise, a seller's broker without access to NWMLS in the region would be unable to reach most potential buyers and be unable to compete effectively with the conspiring real estate brokers.

87.     Second, the barriers to entry are shown by NWMLS and its co-conspirators' durably high market shares in both product markets. Nearly 100% of listings in the Seattle area are included on NWMLS.

COMPLAINT
COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

88.     Third, NWMLS's anticompetitive and tortious conduct described herein have maintained and increased the barriers to entry.

## ANTICOMPETITIVE EFFECTS

89.     NWMLS's and its co-conspirators' adoption and enforcement of Rule 2, modification of Rule 4, decision to ignore Rule 6, and boycott of Compass by cutting off its access to the listings database are anticompetitive acts and tortious conduct. These anticompetitive acts and tortious conduct have had, and continue to have, anticompetitive effects harming Compass, its brokers, and homeowners, particularly those who wanted to use office exclusives or Compass Private Exclusives. By preventing consumer choice to market properties with office exclusives, NWMLS has deprived homeowners of choice, the competition brought by Compass's innovative products and services, and the potential pecuniary and non-pecuniary benefits of office exclusives outlined above, including in Paragraphs 39-44.

## ANTITRUST INJURY

90.     NWMLS's anticompetitive and tortious conduct has harmed, and continues to harm, competition by stifling competition among residential real estate brokers in the Seattle area, reducing consumer choice and service quality, and quashing innovation. By serving to protect its monopoly and the traditional real estate brokers it conspires with, NWMLS ensures that consumers cannot benefit from aggressive, innovative competitors like Compass, and the unique products and services they offer.

91.     Homeowners in the Seattle area have suffered, and continue to suffer, injury and damages because of NWMLS's anticompetitive and tortious conduct. NWMLS and the real estate brokers that own and control it, including Windermere, have deprived, and continue to deprive, homeowners in the Seattle area of the freedom to choose to market their property with office exclusives—an option available to homeowners in every other state for 50 years and preserved as part of those other multiple listing services' antitrust policies. NWMLS's anticompetitive and tortious conduct also has deprived, and continues to deprive, homeowners of the competition brought by innovative real estate brokerages, like Compass, to traditional brokerages, like Windermere, including by preventing Compass real estate brokers from

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

1   competing based on innovative product offerings including pre-marketing services for

2   homeowners.

3       92.     Moreover, Compass and its real estate brokers have suffered, and continue to

4   suffer, injury and damages because of NWMLS's anticompetitive and tortious conduct, which

5   has prevented Compass from bringing its innovative products and competition to consumers in

6   the Seattle area.  By blocking Compass Private Exclusives, NWMLS has harmed the business

7   operations of Compass and its real estate brokers and their contracts and business relations with

8   homeowners.  Brokers were unable to offer this service as a reason to use them over a traditional

9   real estate broker, transact business, fulfill their contractual, statutory, and ethical obligations to

10  already-existing clients, and have suffered, and continue to suffer, reputational harm as a result.

11  Thus, NWMLS's anticompetitive and tortious conduct harmed the goodwill and reputation of

12  Compass and its real estate brokers as shown by the solicitations by traditional real estate brokers

13  of Compass agents using the NWMLS dispute, and it resulted in the cancellation of existing

14  contracts agents had in place with homeowners.

15      93.     Injury to Compass and its real estate brokers was the direct, foreseeable, and

16  intended result of NWMLS's conduct.  NWMLS's conduct simultaneously harmed Compass

17  and its real estate brokers as well as consumers by reducing sellers' options for marketing their

18  properties.  Further, NWMLS's and its co-conspirators' actions to engage in a group boycott of

19  Compass by cutting off its access to the essential NWMLS IDX feed had the purpose and effect

20  of not only punishing Compass for attempting to challenge the conspirators' market dominance,

21  but also having a chilling effect on any other non-member brokerage's future efforts to compete.

22      94.     These injuries to homeowners and Compass and its real estate brokers are the

23  direct result of NWMLS's anticompetitive acts and tortious conduct, and thus they are

24  proximately caused by NWMLS.  Moreover, as explained above, NWMLS's anticompetitive

25  acts and tortious conduct have reduced competition, and the harm to homeowners and Compass

26  and its real estate brokers is caused by that reduction of competition.  Thus, these injuries are of

27  the type the antitrust laws are intended to prevent, and Compass has standing to vindicate these

28  wrongs.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

1

## NO PROCOMPETITIVE JUSTIFICATIONS

2      95.    As discussed above, including in Paragraphs 66-76, there are no pro-competitive

3  justifications for NWMLS's anticompetitive conduct.  All of the excuses NWMLS has made

4  defending its anticompetitive and tortious conduct are pretextual and meritless.  In fact, multiple

5  listing services across the country have allowed office exclusives for generations without any

6  negative impact on competition, fair housing, or any other pretextual justification NWMLS

7  offers.

8                            ## CAUSES OF ACTION

9                    ### Count I: Section 1 of the Sherman Act

10      96.    Compass repeats and re-alleges the allegations in all of the above paragraphs as

11  though the same were set forth in full herein.

12      97.    Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a cause of action "for any

13  person who shall be injured in his business or property by reason of anything forbidden in the

14  antitrust laws."

15      98.    Section 1 of the Sharman Act, 15 U.S.C. § 1, is an antitrust law.

16      99.    NWMLS has market power.  NWMLS is owned and controlled by competing

17  real estate brokers and it maintains a network listing service that is critical to effective

18  competition in the market.

19      100.    Plaintiffs compete in the relevant markets.

20      101.    Starting at least in March 2025, when NWMLS engaged in the anticompetitive

21  acts and tortious conduct, NWMLS and its co-conspirators have engaged in a continuing

22  contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in

23  violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24      102.    The contract, combination, or conspiracy alleged herein has consisted of a

25  continuing agreement between and among NWMLS and its co-conspirators to unreasonably

26  suppress competition and the competitive process in the relevant markets.   The specific

27  agreements at issue are NWMLS's enforcement of Rule 2, modification of Rule 4, decision to

28  ignore Rule 6, and decision to cut off Compass's access to the listings database.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

1    103.    The contract, combination, or conspiracy alleged herein constitutes a horizontal

2    combination, agreement, and/or conspiracy to restrain trade, including via engaging in a group

3    boycott of non-conspiring brokers and brokerages, including Compass, in violation of Section 1

4    of the Sherman Act, 15 U.S.C. § 1.

5    104.    NWMLS and its co-conspirators engaged in the contract, combination, or

6    conspiracy for the purpose and having the effect, actual or probable, of impeding the competitive

7    process and suppressing competition in the relevant markets, benefitting traditional brokerages,

8    such as Windermere, hindering innovative brokerages, such as Compass, and harming

9    consumers, such as homeowners.

10    105.    NWMLS and its co-conspirators' contract, combination, or conspiracy lack any

11    plausible or cognizable justifications.  Any possible justifications could be achieved in a manner

12    that does not inhibit competition nor limit consumer choice.

13    106.    As a direct and proximate result of NWMLS and its co-conspirators' past and

14    continuing conduct in violation of Section 1 of the Sherman Act, homeowners and Compass and

15    its brokers have been injured in their business and property and suffered antitrust damages in an

16    amount to be proven at trial.

17    **Count II: RCW 19.86.020 and 19.86.030**

18    107.    Compass repeats and re-alleges the allegations in all of the above paragraphs as

19    though the same were set forth in full herein.

20    108.    RCW 19.86.090 provides a cause of action for "[a]ny person who is injured in

21    his or her business or property by a violation of RCW 19.86.020, 19.86.030, 19.86.040,

22    19.86.050, or 19.86.060 19.86.090."

23    109.    NWMLS has market power.  NWMLS is owned and controlled by competing

24    real estate brokers and it maintains a network listing service that is critical to effective

25    competition in the market.

26    110.    Plaintiffs compete in the relevant markets.

27    111.    Starting at least in March 2025, when NWMLS engaged in the anticompetitive

28    and tortious conduct, NWMLS and its co-conspirators have engaged in a continuing contract,

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of RCW 19.86.030.

112.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement between and among NWMLS and its co-conspirators to unreasonably suppress competition and the competitive process in the relevant markets.   The specific agreements at issue are NWMLS's enforcement of Rule 2, modification of Rule 4, decision to ignore Rule 6, and decision to cut off Compass's access to the listings database.

113.    The contract, combination, or conspiracy alleged herein constitutes an illegal horizontal combination, agreement, and/or conspiracy to restrain trade, including via engaging in a group boycott of non-conspiring brokers and brokerages, including Compass.

114.    NWMLS and its co-conspirators engaged in the contract, combination, or conspiracy for the purpose and having the effect, actual or probable, of impeding the competitive process and suppressing competition in the relevant markets, benefitting traditional brokerages, such as Windermere, hindering innovative brokerages, such as Compass, and harming consumers, such as homeowners.

115.    NWMLS and its co-conspirators' contract, combination, or conspiracy lack any plausible or cognizable justifications.  Any possible justifications could be achieved in a manner that does not inhibit competition nor limit consumer choice.

116.    As a direct and proximate result of NWMLS and its co-conspirators' past and continuing conduct in violation of RCW 19.86.030, homeowners and Compass and its brokers have been injured in their business and property and suffered antitrust damages in an amount to be proven at trial.

### **Count III: Section 2 of the Sherman Act**

117.    Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a cause of action "for any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

118.    Section 2 of the Sharman Act, 15 U.S.C. § 2, is an antitrust law.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

119.    Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

120.    NWMLS is a monopolist.

121.    Starting at least in March 2025, when NWMLS engaged in the anticompetitive acts and tortious conduct, NWMLS have engaged in the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.    The willful acquisition or maintenance of monopoly alleged herein has consisted of NWMLS's enforcement of Rule 2, modification of Rule 4, decision to ignore Rule 6, and decision to cut off Compass's access to the listings database.

123.    NWMLS's predatory and exclusionary conduct has the purpose and the effect, actual or probable, of impeding the competitive process and suppressing competition in the relevant markets, benefitting traditional brokerages, such as the dominant Windermere, hindering innovative brokerages, such as Compass, and harming consumers, such as homeowners.

124.    NWMLS's predatory and exclusionary conduct lacks any plausible or cognizable justifications.  Any possible justifications could be achieved in a manner that does not inhibit competition nor limit consumer choice.

125.    As a direct and proximate result of NWMLS predatory and exclusionary conduct in violation of Section 2 of the Sherman Act, homeowners and Compass and its brokers have been injured in their business and property and suffered antitrust damages in an amount to be proven at trial.

### Count IV: RCW 19.86.020 and 19.86.040

126.    Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

COMPLAINT

Cooley LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 452 8700

127.    125.    RCW 19.86.090 provides a cause of action for "[a]ny person who is injured in his or her business or property by a violation of RCW 19.86.020, 19.86.030, 19.86.040, 19.86.050, or 19.86.060 19.86.090."

128.    NWMLS is a monopolist.

129.    Starting at least in March 2025, when NWMLS engaged in the anticompetitive acts and tortious conduct, NWMLS have engaged in the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident in violation of 19.86.040.

130.    The willful acquisition or maintenance of monopoly alleged herein has consisted of NWMLS's enforcement of Rule 2, modification of Rule 4, decision to ignore Rule 6, and decision to cut off Compass's access to the listings database.

131.    NWMLS's predatory and exclusionary conduct has the purpose and the effect, actual or probable, of impeding the competitive process and suppressing competition in the relevant markets, benefitting traditional brokerages, such as the dominant Windermere, hindering innovative brokerages, such as Compass, and harming consumers, such as homeowners.

132.    NWMLS's predatory and exclusionary conduct lacks any plausible or cognizable justifications.  Any possible justifications could be achieved in a manner that does not inhibit competition nor limit consumer choice.

133.    As a direct and proximate result of NWMLS predatory and exclusionary conduct in violation of 19.86.040, homeowners and Compass, its brokers, and its agents have been injured in their business and property and suffered antitrust damages in an amount to be proven at trial.

### Count V: Tortious Interference with Contract

134.    Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington  98101
+1 206 206 452 8700

135.    At the time of NWMLS's anticompetitive acts and tortious conduct, Compass, its brokers, and its agents were parties to valid contracts with each other and with homeowners in the Seattle area, as required by Washington state real estate law;

136.    NWMLS knew of the existence of those contracts;

137.    That NWMLS intentionally prevented Compass's and its brokers' performance of those contracts;

138.    NWMLS's interference was for an improper purpose or by improper means; and

139.    NWMLS's anticompetitive acts and tortious conduct were a proximate cause of damages to Compass and its brokers.

### Count VI: Tortious Interference with Business Expectancy

140.    Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

141.    At the time of NWMLS's anticompetitive acts and tortious conduct, Compass, its brokers, and its agents had business relationships or expectancies with a probability of future economic benefit for Compass, its brokers, or its agents;

142.    NWMLS knew of the existence of those business relationships or expectancies;

143.    NWMLS intentionally induced or caused the termination of those business relationships or expectancies;

144.    NWMLS's interference was for an improper purpose or by improper means; and

145.    NWMLS's anticompetitive acts and tortious conduct were a proximate cause of damages to Compass and its brokers.

### PRAYER FOR RELIEF

WHEREFORE, Compass prays that final judgment be entered against NWMLS declaring, ordering, and adjudging:

a. That the aforesaid contract, combination, or conspiracy unreasonably restrains trade and is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1, and RCW 19.86.020 and 19.86.030;

COMPLAINT

- 37 -

b. That NWMLS is a monopolist and the aforesaid conduct by NWMLS is monopolistic and is illegal under Section 2 of the Sherman Act, 15 U.S.C. § 2, and RCW 19.86.020 and 19.86.040;

c. That the aforesaid conduct by NWMLS tortiously interfered with Compass's contracts and business expectancy and is illegal under Washington state common law;

d. That NWMLS, its officers, directors, agents, employees, successors, and assigns and all other persons acting or claiming to act on their behalf, be preliminarily and permanently enjoined from engaging in, carrying out, renewing or attempting to engage in, the combination and conspiracy alleged herein, or any other combination or conspiracy having a similar purpose or effect in violation of Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, RCW 19.86.020, 19.86.030, and 19.86.040, or Washington state common law;

e. That NWMLS be ordered to pay for Compass's damages, trebled, and for its attorneys' fees and costs; and

f. That the Court grant such other relief as the Plaintiffs may request and the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Compass demands a trial by jury of all issues properly triable to a jury in this case.

COMPLAINT

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 452 8700

1   Dated: April 25, 2025                          Respectfully submitted,

2

3                                                  *s/Christopher B. Durbin*
                                                   Christopher B. Durbin (41159)
4                                                  COOLEY LLP
                                                   1700 Seventh Avenue
5                                                  Suite 1900
                                                   Seattle, WA  98101
6                                                  Telephone: +1 206 452 8700
                                                   Fax: +1 206 452 8800
7                                                  Email: cdurbin@cooley.com

8                                                  Ethan Glass
                                                   (*Pro Hac Vice* Application Forthcoming)
9                                                  Georgina Inglis
                                                   (*Pro Hac Vice* Application Forthcoming)
10                                                 COOLEY LLP
                                                   1299 Pennsylvania Avenue
11                                                 Suite 700
                                                   Washington, DC  20004
12                                                 Telephone: +1 202 842 7800
                                                   Fax: +1 202 842 7899
13                                                 Email: eglass@cooley.com
                                                   Email: ginglis@cooley.com
14
                                                   Samantha A. Strauss
15                                                 (*Pro Hac Vice* Application Forthcoming)
                                                   COOLEY LLP
16                                                 110 North Wacker Drive
                                                   Suite 4200
17                                                 Chicago, IL  60606
                                                   Telephone: +1 312 881 6500
18                                                 Fax: +1 312 881 6598
                                                   Email: sastrauss@cooley.com
19
                                                   Sarah M. Topol
20                                                 (*Pro Hac Vice* Application Forthcoming)
                                                   COOLEY LLP
21                                                 55 Hudson Yards
                                                   New York, NY  10001
22                                                 Telephone: +1 212 479 6000
                                                   Fax: +1 212 479 6275
23                                                 Email: stopol@cooley.com

24                                                 *Attorneys for Plaintiffs Compass, Inc. and*
                                                   *Compass Washington, LLC*
25

26

27

28

COMPLAINT
                                        - 39 -