1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

COMPASS, INC. AND COMPASS
WASHINGTON, LLC,

              Plaintiffs,

     v.

NORTHWEST MULTIPLE LISTING
SERVICE,

              Defendant.

Case No. 2:25-cv-00766-JNW

DEFENDANT NORTHWEST MULTIPLE
LISTING SERVICE'S MOTION TO
DISMISS

NOTE ON MOTION CALENDAR:
July 28, 2025

ORAL ARGUMENT REQUESTED

DEFENDANT NWMLS's MOTION TO DISMISS
CASE NO. 2:25-cv-00766-JNW

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

    1.    ABOUT NWMLS ........................................................................................ 3

    2.    COMPASS' PRIVATE EXCLUSIVE AND COMING SOON "PRE-MARKETING" PROGRAMS ........................................................................ 6

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ..................................................................................................................... 8

    I.    Compass Fails to State Any Federal Antitrust Claim. ........................................ 8

        A.    Compass fails to allege harm to competition. ......................................... 9

            1.    Compass fails to plead a cognizable relevant geographic market. ............................................................................................ 10

            2.    Compass fails to plead NWMLS' alleged conduct caused any harm to competition. ........................................................... 12

                a.    Compass only alleges it should be entitled to free-ride. ............................................................................... 12

                b.    Compass fails to allege harm to both sides of the putative relevant market. .......................................... 15

        B.    Compass fails to plead antitrust injury. ................................................ 16

        C.    Compass fails to plead other elements of a Section 2 Claim. ................. 18

            1.    Compass' Section 2 claim fails because Compass does not plead that NWMLS committed any unlawful exclusionary conduct. ............................................................................... 18

            2.    Compass' Section 2 claim also fails because NWMLS has no antitrust duty to deal with Compass or any other entity. ........ 20

    II.    Compass Fails to Plausibly Allege State Antitrust Claims. .............................. 21

    III.    Compass Fails to Plausibly Allege its State-Law Tort Claims. .......................... 22

        A.    Compass fails to plead that NWMLS interfered with any contract or business expectancy. ................................................................... 22

        B.    Compass fails to plead that NWMLS acted with an improper purpose or means. ................................................................................ 23

CONCLUSION ................................................................................................................ 24

DEFENDANT NWMLS's MOTION TO DISMISS - i
CASE NO. 2:25-cv-00766-JNW

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal,*
5
    556 U.S. 662 (2009) ..............................................................................................8

6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................................8

7

*Birkenwald Distrib. Co. v. Heublein, Inc.,*
8
    776 P.2d 721 (Wash. App. 1989) .......................................................................23

9

*Brantley v. NBC Universal, Inc.,*
10
    675 F.3d 1192 (9th Cir. 2012) ............................................................................12

11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ............................................................................................15

12

*Chi. Prof'l Sports Ltd P'ship v. Nat'l Basketball Ass'n,*
13
    961 F.2d 667 (7th Cir. 1992) ..............................................................................13

14

*Conn v. Gabbert,*
15
    526 U.S. 286 (1999) ............................................................................................17

16

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ...........................................................................4, 8

17

*Epic Games, Inc. v. Apple, Inc.,*
18
    67 F.4th 946 (9th Cir. 2023) ................................................................................9

19

*Flaa v. Hollywood Foreign Press Ass'n,*
    2021 WL 1399297 (C.D. Cal. Mar. 23, 2021), aff'd, 55 F.4th 680 (9th Cir.
20
    2022) ...................................................................................................................10

21

*FTC v. Qualcomm Inc.,*
22
    969 F.3d 974 (9th Cir. 2020) .........................................................................10, 15

23

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.,*
    711 F.3d 68 (2d Cir. 2013) .................................................................................17

24

*In re Gilead Scis. Sec. Litig.,*
25
    536 F.3d 1049 (9th Cir. 2008) ..............................................................................8

26

DEFENDANT NWMLS's MOTION TO DISMISS - ii
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

*Greensun Grp., LLC v. City of Bellevue*,
  436 P.3d 397 (Wash. App. 2019)...........................................................................22

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018)................................................................................9

*Kieburtz & Associates*,
  842 P.2d at 267.......................................................................................................22

*Kieburtz & Assocs., Inc. v. Rehn*,
  842 P.2d 985 (Wash. App. 1992)...........................................................................22

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*,
  930 P.2d 288 (Wash. 1997)....................................................................................22

*Libera v. City of Port Angeles*,
  316 P.3d 1064 (Wash. App. 2013)........................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...............................................................................................18

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ..............................................................................18

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
  364 F.3d 1288 (11th Cir. 2004) ............................................................................13

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
  Publ'ns, Inc.*,
  63 F.3d 1540 (10th Cir. 1995) ..............................................................................18

*name.space, Inc. v. Internet Corp. for Assigned Names &
  Numbers*, No. 12-8676, 2013 WL 2151478 (C.D. Cal. Mar. 4, 2013) ................16

*Nosalek v. MLS Prop. Info. Net., Inc.*,
  No. 1:20-cv-12244-PBS, ECF 358 (D. Mass. Mar. 17, 2025)..............................15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)................................................................................................9

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)....................................................................................9, 10, 14, 15

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ................................................................................19

DEFENDANT NWMLS's MOTION TO DISMISS - iii
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .................................................................................23, 24

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................................................................20, 21

*PBTM LLC v. Football Nw., LLC*,
    511 F. Supp. 3d 1158 (W.D. Wash. 2021)....................................................................21

*Pleas v. City of Seattle*,
    774 P.2d 1158 (Wash. 1989)........................................................................................23

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) .........................................................................................9

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) .....................................................................................17

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986).................................................................................13, 14

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021) .........................................................................................17

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ...........................................................................10

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) .........................................................................................16

*State v. Black*,
    676 P.2d 963 (Wash. 1984)..........................................................................................21

*Subspace Omega, LLC v. Amazon Web Servs., Inc.*,
    No. 2:23-CV-01772-TL, 2024 WL 5202517 (W.D. Wash. Dec. 23, 2024).....................21, 23

*Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*,
    279 P.3d 487 (Wash. App. 2012)..................................................................................23

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).....................................................................................................10

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .....................................................................................10

DEFENDANT NWMLS's MOTION TO DISMISS - iv
CASE NO. 2:25-cv-00766-JNW

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

129463289.1 0068832-00015

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006) .............................................................................................................8

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ...........................................................................................14

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ....................................................................................................9, 20

*Zulily, LLC v. Amazon.com, Inc.*,
    761 F. Supp. 3d 1368 (W.D. Wash. 2024) ......................................................................21

**Statutes**

15 U.S.C. §§ 1-7 (Sherman Act) .................................................................................... passim

RCW 19.86, *et seq.* (Washington Consumer Protection Act) ..............................................21

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................................8

**Other Authorities**

Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*
    J. Eur. Econ. Assn. 990, 991-93 (2003) ...........................................................................15

Northwest Multiple Listing Serv. Rule 2 ................................................................4, 7, 19

Northwest Multiple Listing Serv. Rule 27 .......................................................18, 23, 24

Northwest Multiple Listing Serv. Rule 4 ...................................................................4, 7

Northwest Multiple Listing Serv. Rule 6 ...................................................................4, 7

Organization for Economic Co-operation and Development, Roundtable on Two-
    Sided Markets, Note by the United States submitted to the Competition
    Committee, ¶ 23 (June 4, 2009),
    http://justice.gov/sites/default/files/atr/legacy/2011/05/12/270430.pdf ..................15

DEFENDANT NWMLS's MOTION TO DISMISS - v
CASE NO. 2:25-cv-00766-JNW

**INTRODUCTION**

For decades, Defendant Northwest Multiple Listing Service ("NWMLS") has operated a multiple listing service ("MLS"), governed by certain operating rules and policies, that foster fairness, efficiency, and transparency in real estate transactions for the benefit of home buyers, sellers, listing brokers, and buy-side brokers.  Among those rules is a requirement—subject to important exceptions—that all member brokers getting access to the listings of other member brokers submit their property listings to NWMLS for inclusion in the listings database.  That requirement ensures that all members have fair access to each other's listings and eliminates the possibility that one member may extract value from others without a corresponding contribution for that value.

Plaintiff Compass Washington, LLC is a member of NWMLS, and has been for years.  Plaintiff Compass, Inc. is a parent company of Compass Washington, LLC (collectively "Compass").  Like all other NWMLS members, Compass has agreed to abide by NWMLS' operating rules, including rules regarding the submission of its listings to NWMLS as part of its access to the listings of other NWMLS members.  Compass now comes before this Court asserting that the Sherman Act and Washington state antitrust and common law compel that NWMLS grant it an exemption from that rule to which every other member must adhere.  Specifically, Compass has recently pursued a business strategy of withholding listings from submission to NWMLS—its "Private Exclusives" and "Coming Soon" "pre-marketing" strategies—to instead market those listings internally, solely within Compass, and to steer those listings to a Compass-represented buyer.  *See* ECF 1 ("Compl.") ¶¶ 42, 49, 51.  Nonetheless, Compass demands—indeed, claims legal entitlement to—unfettered access to the listings of all other brokers participating in NWMLS, "access" which the Complaint itself concedes is essential for any broker to "successfully compete." *See id.* ¶¶ 15, 69, 70.  Compass, however, cannot have it both ways.  By demanding access to others' listings while claiming a right to deprive other member brokerages of its own listings, Compass' Complaint confirms the pro-competitive nature of NWMLS' rules requiring submission

DEFENDANT NWMLS'S MOTION TO DISMISS - 1
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

of listings, which Compass' new "pre-marketing" program subverts. NWMLS has no antitrust or common-law obligation to promote Compass' exclusionary, free-rider strategy. NWMLS' rules were designed to prohibit conduct like Compass', which destroys competition in the real estate market, harms consumers, and contravenes NWMLS' founding purpose. *See id.* ¶ 65.

Compass' Complaint fails to state any claim. Its putative claims under Sections 1 and 2 of the Sherman Act and Washington state antitrust law founder because they suffer from several fatal deficiencies:

*First*, Compass fails to allege a cognizable relevant market, purposely gerrymandering the geographic market to just the "Seattle and King County area," while touting that its own "pre-marketing" program includes an entire initial phase devoted to marketing Compass Private Exclusives to only its "nationwide network of 34,000 top agents and their millions of clients." *Id.* ¶¶ 42, 49.

*Second*, Compass' own allegations undermine any claim of anticompetitive effects and confirm the pro-competitive nature of NWMLS' rules regarding the submission of listings to the MLS. Compass instead alleges only that it should be entitled to a free ride, something the antitrust laws do not countenance.

*Third*, because the Complaint alleges no harm to competition, it necessarily fails to allege antitrust injury to Compass. Compass can plead antitrust injury only if it alleges facts plausibly suggesting that its own injuries flow from an anticompetitive aspect of the challenged practice. Having failed to allege harm to competition, it necessarily has failed to allege antitrust injury.

*Fourth*, the Complaint fails to allege any exclusionary conduct required for a monopolization claim. NWMLS exercised its rights under rules and policies, to which Compass agreed. Those rules and policies authorized NWMLS to revoke Compass' access to listings data feed for "any reason" and at "any time," the conduct Compass complains about.

*Finally*, Compass' state-law tort claims fail for two reasons: (1) Compass does not identify any contract or business expectancy with which NWMLS supposedly interfered; and (2) Compass'

DEFENDANT NWMLS'S MOTION TO DISMISS - 2
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

own allegations establish that NWMLS acted in good-faith reliance on its own rules.  The Court should dismiss this entire case with prejudice, without leave to replead.

## BACKGROUND

**1.    ABOUT NWMLS**

NWMLS is a private, broker-owned, not-for-profit corporation providing MLS services in Washington and part of Oregon.  Compl. ¶ 24.  NWMLS' members, including Compass, own the company.  Among the services NWMLS provides its members include: "a property listing system, public records database, online showing scheduling, electronic forms and signatures, mobile applications, cloud storage, data analytics, keybox services, and regional member service centers." *Id.* ¶ 25.  NWMLS also separately licenses its members' property listings in a data feed available to all member firms, including Compass and other large national brokerages, like Zillow and Redfin.  *Id.* ¶ 34.  The data feed contains *all NWMLS member listings*, including those submitted by all other brokers, and members use it to populate their own public websites through a program called Internet Data Exchange ("IDX").

NWMLS is not a real estate brokerage; its members and owners, however, are competing real estate brokers.  *Id.* ¶¶ 24–25, 33.  They formed NWMLS to facilitate more robust and transparent brokerage services for home buying and selling.  *Id.* ¶ 34.  NWMLS is a separate entity independent of its members and is governed by its 16-person board of directors which, until recently, included a Compass broker.  *Id.* ¶ 26.

Like most member organizations, NWMLS has operating rules.  *Id.* ¶ 36.  All NWMLS members—including Compass—agree to abide by those rules, *which ensure all members receive fair and equal access to all listings*.  *Id.* ¶ 15.  Compass itself admits that "[a] real estate broker in the Seattle area cannot successfully compete without access to NWMLS listings data."  *Id.* Members can propose amendments to these rules.  *Id.* ¶ 10.

NWMLS' Data Use Policy provides that a violation of the NWMLS rules can result in a fine or license revocation (*i.e.*, termination or suspension of access to the IDX data feed of listings

DEFENDANT NWMLS'S MOTION TO DISMISS - 3
CASE NO. 2:25-cv-00766-JNW

1    maintained by NWMLS). *Id.* ¶¶ 36, 93. Notwithstanding the suspension of access to the IDX data

2    feed, a firm may continue to access the main NWMLS database of listings and conduct daily

3    business operations.

4    Among the rules and policies governing members' participation in NWMLS, three are

5    pertinent here:[1]

6    - Rule 2 provides that a "listing firm shall deliver to NWMLS or input all listings not later

7      than the date specified in the listing agreement," and prohibits members from advertising

8      or promoting listings that have not been submitted to NWMLS. Ex. 1 at 2 (emphasis

9      added); *see id.* ¶ 10(a).

10   - Rule 4 identifies listing agreements that NWMLS will not accept. Ex. 1 at 3. Although

11     non-exclusive listing agreements were previously among those, NWMLS has accepted

12     them since March 28, 2025, Compl. ¶¶ 10(b), 65, which increases the type and number of

13     available listings that participating firms and consumers may view.

14   - Rule 6 identifies listings that NWMLS will not publish because they contain certain

15     provisions permitting a seller to avoid payment of any optional compensation offer in the

16     listing, even if an offer meets all other terms required. Ex. 1 at 4. For example, a listing

17     will not be accepted if it includes a provision that a sale is subject to seller finding a

18     satisfactory home. Compl. ¶ 10(c).

19   NWMLS rules and policies expressly permit listing customization that Compass complains

20   it is unable to offer its sellers. Specifically, the NWMLS Undisclosed Address/Tax Identification

21   or Unpublished Listing Policy ("Unpublished/Undisclosed Policy") acknowledges that "[s]ome

22   property owners may have concerns about listing their property in the MLS due to confidentiality,

23

24   _____

[1] The Court may consider the complete copy of the NWMLS rules and related policies, attached
25   as Exhibits 1-6 to the Declaration of Claude Szyfer, because Compass has incorporated them by
     reference in its Complaint. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010)
26   (holding external information has been "incorporated into the complaint by reference" where the
     information was quoted in the complaint (citation omitted)).

DEFENDANT NWMLS'S MOTION TO DISMISS - 4
CASE NO. 2:25-cv-00766-JNW

security, or other unique reasons.  There are many ways NWMLS accommodates these situations within the framework of NWMLS Rules."  Exs. 3–5.  Those accommodations include:

- Limiting showings to appointment-only;

- Prohibiting the installation of a keybox on the property;

- Requiring that a broker from the seller's brokerage be present at all showings;

- Withholding the seller's name;

- Withholding the property address and/or tax parcel number from the internet and public.

*Id.*  Additionally, the form listing agreement that firms participating in NWMLS may use "address[es] any privacy or similar concerns" by allowing "[a] Seller [to] instruct Listing Broker [like Compass] to limit marketing by not displaying the Property address or map location on the internet, eliminating internet advertising altogether, imposing specific showing requirements, and other similar restrictions."  Ex. 6.  NWMLS rules, policies, and forms provide sellers with options they can use so their listing will have many of the security, privacy, and other features that Compass alleges are critical to its Private Exclusive program.

Additionally, the Undisclosed/Unpublished Policy allows property owners to request that their listings be published in the NWMLS database without disclosing addresses and/or tax parcel numbers to other member brokers.  In rate circumstances, they may even request that their listings *not be published in the NWMLS database.  See* Exs. 3, 5.  These rules accommodate home sellers who may, for security or convenience, not want their homes publicly promoted, while still ensuring the listing, except for rare circumstances, is shared amongst all NWMLS members.  Compl. ¶¶ 52–53, 72.

DEFENDANT NWMLS'S MOTION TO DISMISS - 5
CASE NO. 2:25-cv-00766-JNW

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

**2.    COMPASS' PRIVATE EXCLUSIVE AND COMING SOON "PRE-MARKETING" PROGRAMS**

Compass offers real estate brokerage services across the United States. *Id.* ¶¶ 3, 20–21, 49. It is a member of NWMLS, but does not itself offer MLS services. *Id.* ¶ 21, *see id.* ¶ 26 (noting that Compass held a seat on the NWMLS Board of Directors).

In March 2025, Compass began taking advantage of all NWMLS listings, while withholding listings of its own in violation of NWMLS' rules. *Id.* ¶¶ 7, 10, 62–65. Compass launched the "3-Phased Price Discovery and Marketing Strategy," which would purportedly offer sellers the ability to market and sell their homes with Compass without listing the house in the NWMLS database "for a period of time." *Id.* ¶¶ 7, 10, 49, 62–65.

During the first phase, called "Compass Private Exclusive," Compass withholds a listing from NWMLS and shares and markets the home only to other Compass agents and the buyers they represent. *Id.* ¶¶ 3, 49. Although Compass labels these offerings as "pre-marketing," the Complaint concedes that a home might sell during this period, *id.* ¶¶ 40–41, and so there is nothing "pre" about the marketing during this phase. Compass brokers are, in fact, attempting to sell the home without listing it on NWMLS. *See id.* ¶ 39–40.[2] The Private Exclusive locks up the property during its most critical first days for sale, preventing non-Compass brokers from accessing the listing and sharing it with their buyers—in short, the listing is invisible to non-Compass brokers in NWMLS. The listing is accessible only to Compass brokers not only in Seattle and King County but far beyond, including New York City, Florida, and other regions in which Compass' 34,000 agents operate. *Id.* ¶ 49. Compass touts its marketing during this phase as "nationwide." *Id.*

In the second phase, called "Coming Soon", the listing shifts to a Compass "exclusive"— a Compass listing that competing brokers can see, but only if they subscribe to Compass.com. *Id.*

---

[2] The only thing "private" about the Private Exclusive phase is that Compass disseminates the listing to its 34,000 "nationwide" agents and their "millions of buyers," but not to non-Compass agents, thus contradicting the Complaint's conclusory assertions about owner security and privacy. Compl. ¶ 48(e). Compass wants its agents' "millions of buyers" to know about the listing, but not competing NWMLS member firms, and their potential buyers.

DEFENDANT NWMLS'S MOTION TO DISMISS - 6
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES LLP**
**ATTORNEYS**
**600 University Street, Suite 3600, Seattle, WA 98101**
*Telephone 206.624.0900*

1    Only in the third phase, if the property still has not sold, will Compass submit the listing to

2    NWMLS.  *Id.*

3          Compass spent months attempting to circumvent the NWMLS rules to promote its 3-

4    Phased listings strategy.  *Id.* ¶ 10.  First, Compass recognized that NWMLS Rule 2 did not allow

5    brokerages to withhold their listings while receiving listings from others.  So Compass directly

6    petitioned NWMLS to change its longstanding rule.  *Id.* ¶¶ 10, 57.  NWMLS' Bylaws and Rules

7    Committee (which included a Compass broker) voted down the proposal.  *Id.* ¶ 58.  Compass then

8    offered the Private Exclusive listing option anyway, having sellers execute supposedly "non-

9    exclusive listing agreements", which otherwise were not to be submitted to NWMLS under the

10   prior version of Rule 4.  *Id.* ¶ 10.b.  Shortly thereafter, and consistent with its bylaws, on March

11   28, 2025, NWMLS amended Rule 4 to allow non-exclusive listings to be submitted to NWMLS,

12   thereby increasing the total listing options available to all broker members, including Compass.

13   *Id.* ¶ 65.  NWMLS informed Compass of the change, acknowledging that non-exclusive listing

14   agreements entered with sellers before the amendment of Rule 4 need not be submitted to

15   NWMLS, but stating that all exclusive and non-exclusive listing agreements entered after March

16   28, 2025, must be input into the NWMLS database when Compass markets the property.  *Id.*

17         Undeterred, Compass began entering into listing agreements with sellers that contained "a

18   provision permitting the seller to avoid payment of any optional 'Compensation Offer.'"  *Id.* ¶ 67.

19   Compass believed these contracts would be ineligible for listing pursuant to NWMLS Rule 6,

20   thereby concocting a loophole to allow Private Exclusives to continue.  *Id.* ¶ 67.  NWMLS

21   informed Compass that it disagreed with Compass' interpretation.  *See id.* ¶¶ 67–68.

22         After months of this whack-a-mole with Compass' continued subversion of the operating

23   rules, NWMLS suspended Compass' license to the NWMLS IDX data feed *for two days*.  *Id.* ¶¶

24   11, 36, 68.  During that suspension, Compass brokers had full access to all NWMLS systems,

25   including all members' listings.  As Compass acknowledges in its Complaint, it lost only access

26   to the IDX data feed.  *Id.* ¶¶ 68, 93 (explaining that NWMLS' suspension merely "block[ed]

DEFENDANT NWMLS'S MOTION TO DISMISS - 7
CASE NO. 2:25-cv-00766-JNW

Compass's website … from receiving home listings data").  Nowhere in the Complaint does Compass allege that its NWMLS membership or access to the NWMLS listings database, which contains all listings submitted, was ever suspended.  In fact, they were not.  The suspension of the IDX data feed merely meant that, for two days, Compass could not transfer other members listings from NWMLS' database to Compass' public facing website.  *Id.*  NWMLS acted in accordance with its Data Use Policy, to which Compass agreed upon becoming a member, because Compass had failed to make its listings available to all other member brokers.  *Id.* ¶ 11, 36, 68–70.[3]  On April 25, 2025, Compass filed this suit, purporting to allege claims under federal and Washington state antitrust law, as well as two counts of common-law tortious interference.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court may not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citations omitted).  Nor may the Court "accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555 (citation omitted).  Rather, a plaintiff must plead sufficient facts to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I. Compass Fails to State Any Federal Antitrust Claim.

The Court should dismiss Compass' Sherman Act Section 1 and Section 2 claims.  The default standard for adjudging the lawfulness of any alleged agreement or business practice under Section 1 is the rule of reason.  *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("This Court

---

[3] The Court may consider the complete NWMLS Data Policy, attached as Exhibit 2, because Compass has incorporated it by reference in its complaint.  *See Daniels-Hall*, 629 F.3d 992.

DEFENDANT NWMLS'S MOTION TO DISMISS - 8
CASE NO. 2:25-cv-00766-JNW

presumptively applies rule of reason analysis."). While "a small group of restraints are unreasonable per se because they always or almost always tend to restrict competition and decrease output," *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (internal quotation marks and citation omitted), operating rules of cooperative ventures such as NWMLS are well outside that limited category of agreements. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 296–98 (1985) (noting that cooperative ventures "must establish and enforce reasonable rules in order to function effectively" and applying the rule of reason to the expulsion of a member from a joint purchasing cooperative). Accordingly, to state a claim for relief, Compass must allege facts plausibly suggesting that the NWMLS operating rules it challenges run afoul of the rule of reason. *Am. Express*, 585 U.S. at 541. The rule of reason requires Compass to allege: (a) a proper antitrust market; (b) NWMLS' operating rules have harmed competition within that market; and (c) antitrust injury to Compass flowing from the alleged antitrust competitive effects. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) ("[P]laintiff must prove that the defendant has market power and present 'some evidence that the challenged restraint harms competition.'") (quoting *Am. Express*, 585 U.S. at 541). Compass fails to allege facts that plausibly suggest any of these elements for either of its Sherman Act claims.

Compass' Section 2 monopolization claims suffer similar infirmities. To plead monopolization, Compass must allege that NWMLS has: (a) monopoly power in a proper antitrust market; and (b) willful acquisition or maintenance of that monopoly power through exclusionary or predatory conduct. *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Its deficient relevant market allegations doom its Section 2 claim on the first element, and the absence of allegations of exclusionary or predatory conduct defeat the second.

### A.    Compass fails to allege harm to competition.

Compass' putative claims under Sections 1 and 2, Compl. ¶¶ 96–106, 117–25, require pleading of a relevant market as a threshold step. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022)

DEFENDANT NWMLS'S MOTION TO DISMISS - 9
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

("For rule of reason claims based on indirect evidence . . . a plaintiff must define the relevant market and show that the defendant has market power in that market to prove that the challenged practice is anticompetitive").  Compass must further plead that NWMLS' alleged conduct harmed competition in that relevant market.  *Am. Express*, 585 U.S. at 541.  Compass fails to do either.

### 1. Compass fails to plead a cognizable relevant geographic market.

As a threshold matter, Compass fails to plead a relevant geographic market for its antitrust claims.  "A threshold step in any antitrust case is to accurately define the relevant market," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020), which is the "area of effective competition." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28 (1961).  Alleging a proper, relevant market requires facts establishing both a relevant *product market* and a relevant *geographic market*.  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.").  Compass' conclusory assertion the relevant market consists of "the city of Seattle and King County," Compl. ¶ 79, is vague and inconsistent with the few facts Compass actually pleads.  Compass readily acknowledges that NWMLS' areas of operation include Washington State broadly and even Oregon, *id.* ¶¶ 13, 24, 44, 82, but it attempts to allege a gerrymandered geographic market of only "the city of Seattle and King County." *Id.* ¶ 79.

Allegations attempting to define an artificially narrow geographic market are fatal to a plaintiffs' antitrust claims.  *See Tanaka*, 252 F.3d at 1063–64 (noting that a college athlete's preference to be near Los Angeles did not allege a local geographic market when other pled facts suggested that the market was national); *Flaa v. Hollywood Foreign Press Ass'n*, 2021 WL 1399297, at *8 (C.D. Cal. Mar. 23, 2021) (dismissing plaintiff's group boycott claim with prejudice in part for failing to define a relevant geographic market), aff'd, 55 F.4th 680 (9th Cir. 2022); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1175 (N.D. Cal. 2013) (dismissing for lack of a properly pled geographic market because plaintiffs' complaint included several different

DEFENDANT NWMLS'S MOTION TO DISMISS - 10
CASE NO. 2:25-cv-00766-JNW

geographic areas, including a single local market, broader six-county-wide markets, or markets bounded by defendant's operations).

While paying lip service to real estate being "local," Compass' own conduct regarding its "3-Phased Price Discovery and Marketing Strategy" and particularly the Private Exclusive "pre-marketing" program undermines its asserted geographic market. Indeed, Compass admits that a key element of the Private Exclusives program involves marketing those properties *nationwide* to its own network of 34,000 Compass agents and their "millions of buyers." Compl. ¶¶ 20, 45, 49. In addition, Compass has made numerous public statements explaining how one of the critical elements associated with its Private Exclusive program is the fact that it allows sellers to access Compass' "nationwide network" of buyers. *Id.* ¶¶ 42, 49 ("PHASE 1 Compass Private Exclusive: … Make your listing available to a *nationwide network of 34,000 agents and their millions of clients*." (emphasis added)); *see also* www.compass-homeowners.com (same quote regarding "nationwide network of 34,000 top agents and their millions of clients" (last accessed June 27, 2025)); Robert Reffkin (CEO of Compass), "Congratulations to Weston and Charlotte Lipscomb on their launch of their Compass Private Exclusive…*With thousands of Private Exclusives and Compass Coming Soons across the country, off-MLS opportunities that are truly one of a kind can be accessed by working with one of the 34,000 Compass agents nationwide,*" LinkedIn posting (Jan. 2025), https://www.linkedin.com/posts/robertreffkin_congratulations-to-weston-and-charlotte-lipscomb-activity-7287844251562901504-hSOI/ (emphasis added).

Compass' failure to plead a cognizable geographic market is incurable. The "first week" of its Private Exclusive program is dedicated to nationwide marketing of a property to just Compass agents, making it a fundamental facet of the program. Compl. ¶¶ 42, 49. But Compass cannot have it both ways. It cannot plausibly claim a relevant geographic market for its antitrust claims related to its Private Exclusive program limited to "the city of Seattle and King County," while at the same time using that program to market and sell homes from that area to its own "nationwide network of 34,000 real estate brokers and their millions of clients." *Id.* ¶ 49. During

DEFENDANT NWMLS'S MOTION TO DISMISS - 11
CASE NO. 2:25-cv-00766-JNW

the Private Exclusive phase, only Compass brokers in New York City, Miami, Atlanta, Chicago, and other geographic regions in which it operates receive access to the listings and can compete for the "millions of buyers" in those far-flung cities who may be interested in purchasing a listing in the State of Washington or Oregon. While Compass agents all across the country have access to those listings, as discussed further below, all other NWMLS member firms in Compass' gerrymandered market of just "Seattle and King County" do not have any access to a Compass Private Exclusive—the Private Exclusive is invisible to non-Compass agents. In sum, Compass alleges an artificially narrow geographic market as the effective area of competition, and the area where Compass looks to sell its Private Exclusives and compete for buyers is far broader than "Seattle and King County", which is fatal to its Section 1 and Section 2 claims.[4]

2.    *Compass fails to plead NWMLS' alleged conduct caused any harm to competition.*

While its failure to plead a cognizable relevant market alone defeats its federal antitrust claims, Compass' antitrust claims also fail because it does not allege that NWMLS' conduct harmed *competition*, only that it harmed a *competitor*. A cognizable antitrust claim requires a plaintiff to allege harm to competition, not competitors. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("[P]laintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves."). Conclusory "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers do[ ] not sufficiently allege an injury to competition. Both effects are fully consistent with a free, competitive market." *Id.* at 1202.

a.    *Compass only alleges it should be entitled to free-ride.*

Instead of alleging harm to competition, Compass' complaint is a litany of individualized gripes about NWMLS' enforcement of its longstanding published rules. *E.g.*, Compl. ¶¶ 71, 74,

---

[4] As plaintiff, it is Compass' burden—not NWMLS'—to plead a geographic market, and NWMLS does not propound an alternative, only that Compass' limited market fails as a matter of law.

DEFENDANT NWMLS'S MOTION TO DISMISS - 12
CASE NO. 2:25-cv-00766-JNW

89.  Compass' allegations that NWMLS has harmed the brokerage services market apparently turns on an undefined dichotomy in the Complaint: "innovative brokerages"—only Compass--and "traditional brokerages"—all other NWMLS members.  But Compass alleges nothing suggesting that the distinction exists in the brokerage business, much less is recognized, and offers no objective criteria for this self-anointed characterization.  The only distinction between "innovative" and "traditional" brokerages is that the "innovative brokerage", *i.e.*, Compass, seeks to violate NWMLS rules by improperly withholding listings for itself, and "traditional brokerages" do not.

At bottom, Compass complains that NWMLS' rules prevent it from withholding its own listings from the NWMLS database, while Compass takes full advantage of the other firms' continuing to submit all of their listings in accordance with NWMLS rules.  *See id.* ¶ 42 (touting that "photos and floorplans of your home are only visible to Compass agents and their serious clients.").  That is not innovation; it is free riding.[5]  Free riding is the extraction of value without payment.  *Chi. Prof'l Sports Ltd P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674–75 (7th Cir. 1992) ("Firms that take advantage of costly efforts without paying for them, that reap where they have not sown, reduce the payoff that the firms making the investment receive.").  Free-riding is a common inefficiency in joint ventures, and ventures may adopt operating rules to prevent one member from taking advantage of others in such fashion.  *Id.*; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 212-13 (D.C. Cir. 1986) ("The free ride can become a serious problem for … a joint venture because the party that provides capital and services without receiving compensation has a strong incentive to provide less, thus rendering the common enterprise less effective.").  Preventing free-riding enhances competition, and the parties need not

---

[5] When Compass competes for buyers, it wants the information about days on the market and the like so it can drive prices lower for its customers.  But when it is the seller's agent, it does not want to give up its listings because that lack of disclosure of vital information keeps prices high.  Sharing some of its extracted value with its customer is not a legitimate justification for free riding.  *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) (preventing free-riding is a valid business justification under the antitrust laws).

DEFENDANT NWMLS'S MOTION TO DISMISS - 13
CASE NO. 2:25-cv-00766-JNW

1    engage in expensive and unnecessary discovery to demonstrate this point. *See Am. Express*, 585

2    U.S. at 551 ("nothing inherently anticompetitive" about restrictions imposed to prevent free-

3    riding); *Rothery*, 792 F.2d at 221–23 (efforts to eliminate the "problem of the free ride" promote

4    market efficiency and increase "effectiveness in serving consumers").

5        Compass' own allegations demonstrate that NWMLS and its rule enforcement benefits

6    competition among brokers and is mutually beneficial for real estate transactions among

7    consumers.  Compass repeatedly explains that "[a] real estate broker in the Seattle area cannot

8    successfully compete without access to NWMLS listings data."  Compl. ¶¶ 15, 18, 65, 69 ("access

9    to this data is critical for any real estate broker or brokerage to do business.").  Compass' admission

10   is unsurprising because "the NWMLS database allows real estate brokers to provide their buyers

11   with information about virtually all listed properties in which the customers might have an

12   interest." *Id.* ¶ 33; *see also* ¶¶ 34–36.  In other words, access to all listings is crucial for all brokers

13   to compete; Compass concedes that NWMLS' rules promote broker participation and market

14   transparency, ultimately benefiting brokers and home buyers and sellers. *See Todd v. Exxon Corp.*,

15   275 F.3d 191, 213 (2d Cir. 2001) ("[A]ccess to information may better equip buyers to compare

16   products, rendering the market more efficient").

17       In short, Compass claims to have suffered "anticompetitive harm" when just its license to

18   NWMLS IDX listing data feed was suspended for two days.  Compl. ¶ 68–70.[6]  Yet, Compass

19   wants to free ride by depriving its competitors of access to Compass' own listings through its

20   Private Exclusive program, Compl. ¶¶ 3 (limited to "Compass brokers and their clients"), 42, 44,

21   49, 53, 64, 67, while being the only brokerage with 100% real time access to all listings.  But again,

22   Compass cannot have it both ways—depriving its competitors of Compass' newest and most

23   choice listings while claiming it needs unfettered access to all other brokers' listings.  Such a

---

[6] To be clear, during that two-day period, Compass maintained full membership in NWMLS and still maintained full access to all NWMLS listings data.  As alleged, Compass only lost access to the IDX data feed, which essentially operates as a "pipe" supplying NWMLS data to Compass' public facing website.  Compl. ¶¶ 68, 93.

DEFENDANT NWMLS'S MOTION TO DISMISS - 14
CASE NO. 2:25-cv-00766-JNW

complaint fails to raise cognizable anticompetitive harm; the antitrust laws and this Court should not be used to grant a single competitor a competitive advantage over all other competitors. *See Qualcomm Inc.*, 969 F.3d at 993 ("[T]he antitrust laws, including the Sherman Act, 'were enacted for the protection of *competition*, not *competitors*.'") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).

Finally, Compass enlists the Department of Justice Antitrust Division ("DOJ") to buttress its deficient claims, Compl. ¶ 38, but the DOJ recently made clear that it has "not taken a position" on whether "a 'clear cooperation' policy, which requires MLS participants to post listings . . . to the MLS within 24 hours of publicly marketing properties" "standing alone . . . (without . . . exceptions benefiting primarily large brokerages) are anticompetitive." Supp. Statement of Interest, *Nosalek v. MLS Prop. Info. Net., Inc.*, No. 1:20-cv-12244-PBS, ECF 358 (D. Mass. Mar. 17, 2025). In short, the DOJ provides Compass no succor.

> b. *Compass fails to allege harm to both sides of the putative relevant market.*

To state an antitrust claim, Compass must plausibly allege an injury caused by NWMLS that harms *competition* on both sides of the two-sided market for real estate transactions: the sale and purchase of real estate. *See Am. Express.*, 585 U.S. at 546 ("Evaluating both sides of a two-sided transaction platform is … necessary to accurately assess competition."). Real estate transactions involve a classic two-sided market. *See* Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. Eur. Econ. Assn. 990, 991–93 (2003) (identifying real estate as a quintessential two-sided market).[7]

---

[7] Organization for Economic Co-operation and Development, Roundtable on Two-Sided Markets, Note by the United States submitted to the Competition Committee, ¶ 23 (June 4, 2009), http://justice.gov/sites/default/files/atr/legacy/2011/05/12/270430.pdf (discussing real estate as a two-sided market and explaining that "[a] listing service is more valuable to a buyer if more sellers list their homes on it, and is more valuable to a seller if more buyers search for homes with it. The network effects are so significant that individual realtors and real estate firms frequently join together to form" an MLS).

DEFENDANT NWMLS'S MOTION TO DISMISS - 15
CASE NO. 2:25-cv-00766-JNW

Compass must allege that NWMLS' rules somehow harmed both buyers and sellers of real estate.  Compass fails to do so, focusing its allegations, instead, solely on sellers; and, really, focusing only on some alleged harm to Compass brokers representing sellers.  *See supra* 7–10. Compass purposefully ignores the harm caused by the Private Exclusive program to the buy side. And Compass emphasizes throughout its Complaint that the goal of its blatant violations of NWMLS rules *is to increase consumer prices for real estate*:

- ¶ 6 – A goal of testing the market "as an office exclusive" is in part to "increase buyer demand and their home's sale price";

- ¶ 8 – "homes pre-marketed using Compass' 3-Phased Price Discovery and Marketing Strategy were associated with an average 2.9% higher close price compared to those that were not pre-marketed" (see also ¶ 43 (same));

- ¶ 40 – Explaining Compass' program is to test if "asking price is too high";

In sum, not only does Compass' Complaint fail to allege harm to both sides of the undisputably two-sided market at issue; it also makes clear that its preferred business seeks to drive up prices to buyers.  *See name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. 12-8676, 2013 WL 2151478, at *6 (C.D. Cal. Mar. 4, 2013) ("[Plaintiff] alleges no evidentiary facts suggesting that the fee has actually injured competition.  The injury Plaintiff alleges to its preferred business model is insufficient to support an antitrust claim."); *see also SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (dismissal "'appropriate where the complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose.'" (citation omitted)).  Compass' failure to properly allege any relevant market or harm to competition is fatal to its Section 1 and 2 claims.

### B. Compass fails to plead antitrust injury.

Compass also fails to plead it suffered antitrust injury.  Beyond the foundational Article III standing requirements, antitrust plaintiffs must also meet an additional standing burden by

DEFENDANT NWMLS'S MOTION TO DISMISS - 16
CASE NO. 2:25-cv-00766-JNW

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

pleading sufficient facts to establish antitrust standing.  "'[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement[, the court] must dismiss it as a matter of law.'"  *Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 75–76 (2d Cir. 2013) (first alteration in original; citation omitted).  Establishing antitrust standing requires that a plaintiff show "antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021) (citation omitted).

Compass fails to allege that its supposed injury "flows from an anticompetitive aspect or effect of" NWMLS' conduct.  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (cleaned up).  "The antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods above their competitive level or diminish their quality."  *Id.* (cleaned up).  In fact, Compass alleges the opposite of antitrust injury.[8]  It alleges that NWMLS' rules enhance the quality of the brokerage market and facilitates competition.  Compl. ¶ 69 ("Access to this data is critical for any real estate broker or brokerage to do business.").  Compass further alleges that its Private Exclusive program, not NWMLS' rules requiring all listings be submitted, results in higher prices for consumers.  *Id.* ¶¶ 8, 43.  Finally, Compass never alleges that commission levels paid by sellers or buyers will increase as a result of NWMLS' actions.  Compass only complains that it cannot access NWMLS' IDX data feed to transfer listings to its website if it defies NWMLS rules by implementing its exclusionary business strategy of marketing homes privately to its own nationwide network of agents.  That is not a harm that the antitrust laws were intended to prevent because the NWMLS rules do not decrease market efficiency or diminish

---

[8] Compass alleges that NWMLS' actions also harmed homeowners.  Compl. ¶ 93.  But Compass is not a homeowner, so it lacks standing to assert such an injury.  *See, e.g.*, *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (eschewing third-party standing generally and rejecting the idea that an attorney can sue on behalf of his client).

DEFENDANT NWMLS'S MOTION TO DISMISS - 17
CASE NO. 2:25-cv-00766-JNW

market quality.  The Complaint acknowledges that NWMLS' rules are to the contrary and so it must be dismissed.

### C.    Compass fails to plead other elements of a Section 2 Claim.

Compass' Section 2 monopolization claim also fails because the Complaint is bereft of any allegations that NWMLS engaged in exclusionary or predatory conduct.  Additionally, Compass fails to allege that NWMLS had some antitrust duty to deal with Compass on its desired terms.

> ### 1.    *Compass' Section 2 claim fails because Compass does not plead that NWMLS committed any unlawful exclusionary conduct.*

Compass does not (and cannot) allege that NWMLS committed any exclusionary act. Compass must plead facts plausibly suggesting that NWMLS obtained or maintained monopoly power in the relevant market through exclusionary conduct.  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).  Exclusionary conduct is business behavior that is economically irrational except for its tendency to harm the competitive process.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986) (explaining that conduct is exclusionary under antitrust law if the conduct would not make economic sense for the defendant but for its elimination or softening of competition).  In other words, the challenged conduct must lack any legitimate business justification.  *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995) (conduct not unlawful unless it lacks a "legitimate business justification").

Compass comes nowhere close to meeting that standard.  It alleges nothing more than that NWMLS fairly enforced its own organizational rules, which Compass agreed to follow as part of its membership.  Compl. ¶ 36 (referencing Ex. 1, Rule 27; and Ex. 2 Data Use Policy).  Compass admits that it communicated with NWMLS multiple times over a ten-month period regarding its proposed "pre-marketing" program in the context of NWMLS' rules.  *Id.* ¶¶ 57–67.  Compass also concedes that NWMLS clearly communicated that the promotion and marketing of properties without submitting those listings to NWMLS would violate the rules.  *Id.*  Ultimately, Compass

DEFENDANT NWMLS'S MOTION TO DISMISS - 18
CASE NO. 2:25-cv-00766-JNW

chose to flout NWMLS' rules by embarking on the Private Exclusive stratagem with property owners and marketing those properties without submitting them to NWMLS. *Id.* ¶¶ 57–67. After Compass' repeated violations, NWMLS enforced its rules consistent with its Data Use Policy and temporarily suspended Compass' license to the NWMLS IDX listing data feed. *Id.* ¶ 68. In other words, Compass refused to share its listings with NWMLS, so NWMLS stopped automatically sharing the IDX listing data feed, *while still allowing Compass and its brokers to access that same information through the NWMLS database*. That is not exclusionary conduct. *See Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (enforcement of a contract against a breaching party not exclusionary conduct under the Sherman Act).

Compass claims that its license to the NWMLS IDX listing data feed of other member's listings was revoked "without warning or any due process." Again, however, its Complaint undermines that assertion. *First*, as Compass acknowledges, it proposed a change to Rule 2 on July 15, 2024, that would have allowed for its Private Exclusive program, but NWMLS' Bylaws and Rules Committee voted against the change. Compl. ¶ 10. *Second*, Compass agreed to the Data Use Policy by way of its NWMLS membership, a policy which states explicitly that, "NWMLS may, in its sole discretion, refuse to grant a license to any Member…*and revoke any license granted at any time and for any reason and require Member … to delete any Listing Data received under such license.*" Ex. 2 at 3 (emphasis added). Thus, Compass acknowledged and agreed that its license to NWMLS data could be revoked "at any time and for any reason." *Third*, Compass further concedes that violations of NWMLS rules could result in terminating a user's access to the NWMLS IDX data feed. Compl. ¶ 36. And Compass admits that its Private Exclusive program violated NWMLS rules because there would be no other reason for Compass to have met with NWMLS on July 15, 2024, to "ask it to allow office exclusives." *Id.* ¶ 57. *Fourth*, Compass acknowledges receipt of a "Discipline Complaint" filed by another firm against it before suspension of its license to the NWMLS IDX data feed. *Id.* ¶ 64. Compass' awareness that its access could be revoked at any time and for any reason, coupled with its knowing violation of

DEFENDANT NWMLS'S MOTION TO DISMISS - 19
CASE NO. 2:25-cv-00766-JNW

NWMLS' rules, after being afforded months of time to follow NWMLS' rules, fails to plausibly rise to exclusionary conduct.

2.    *Compass' Section 2 claim also fails because NWMLS has no antitrust duty to deal with Compass or any other entity.*

Compass' monopolization claim relies upon the false principle that NWMLS bears an obligation to deal with it on Compass' preferred terms. Antitrust law imposes no such obligation on NWMLS. Compass' complaints are not a plea to enforce some antitrust duty against NWMLS, because there is none; rather, Compass is really just asking this Court to be a regulator of the Washington-Oregon real estate marketplace.

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). "The Sherman Act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 407–08 (cleaned up). Compass voluntarily agreed to those rules. When it decided on a new business strategy, it demanded that NWMLS alter its operating rules to conform to that preferred strategy. Compass simply dislikes that it was unable to persuade its co-members of NWMLS to amend the rules to something Compass does like. Compass wants access to all NWMLS listings, and in exchange, Compass wants to cherry pick which listings it provides to NWMLS. Compl. ¶¶ 44, 52, 53 (withholding a "rare log cabin"), 62, 68, 69. All NWMLS members, including Compass, agree to adhere to the organization's operating rules. Those rules do not allow such cherry picking. *Id.* ¶¶ 10, 36. When Compass follows NWMLS' "terms and conditions" of dealing by placing all of its listings on NWMLS, NWMLS gives Compass access to the same listings as any other member. *Id.* ¶ 69, 70. And, as NWMLS' rules make plain, Compass, like any other member, may seek an exception when requested by the seller from NWMLS to avoid publicly listing a property, and other key exceptions that allow Compass to accommodate its sellers' requests for security and

DEFENDANT NWMLS'S MOTION TO DISMISS - 20
CASE NO. 2:25-cv-00766-JNW

privacy—minus the exclusionary, free riding elements Compass prefers. *See supra* 6-7. In such circumstances, the antitrust laws do not impose a duty on NWMLS to deal with Compass differently than its other members. *See Pac. Bell*, 555 U.S. at 448–49 (describing when antitrust laws impose a duty to deal).

## II.    Compass Fails to Plausibly Allege State Antitrust Claims.

Compass' state antitrust claims fail for the same reasons as its Sherman Act claims because the relevant state statutes direct this Court to apply the same analysis. Washington's Consumer Protection Act, RCW chapter 19.86, instructs courts interpreting alleged violations to

> be guided by final decisions of the federal courts and final orders of the Federal Trade Commission interpreting the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or monopolizes trade or commerce or may substantially lessen competition, determination of the relevant market or effective area of competition shall not be limited by the boundaries of the state of Washington.

RCW 19.86.920; *see also PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) (citing *State v. Black*, 676 P.2d 963 (Wash. 1984)) (noting Washington's Consumer Protection Act is 'patterned after Sections 1 and 2 of the Sherman Antitrust Act.'"). Accordingly, courts in this district analyze antitrust claims brought under both the federal Sherman Act and the state Washington Consumer Protection Act in tandem. As a result, a failure to allege a violation of Sections 1 or 2 of the Sherman Act likewise fails to allege a violation of RCW 19.86.030 (state equivalent of Section 1) and/or RCW 19.86.040 (state equivalent of Section 2). *See Subspace Omega, LLC v. Amazon Web Servs., Inc.*, No. 2:23-CV-01772-TL, 2024 WL 5202517, at *15 (W.D. Wash. Dec. 23, 2024) (dismissing monopolization claims brought under both Section 2 and RCW 19.86.040); *Zulily, LLC v. Amazon.com, Inc.*, 761 F. Supp. 3d 1368, 1389 (W.D. Wash. 2024) (analyzing restraint of trade claims brought under Section 1 and RCW 19.86.030 in tandem). Thus, for the reasons set forth above, this Court should also dismiss Compass' state-law antitrust claims brought under RCW chapter 19.86.

DEFENDANT NWMLS'S MOTION TO DISMISS - 21
CASE NO. 2:25-cv-00766-JNW

129463289.1 0068832-00015

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

**III.    Compass Fails to Plausibly Allege its State-Law Tort Claims.**

Compass also fails to allege any violations of Washington tort law: tortious interference with contract and tortious interference with business expectancy.  Under Washington law, claims of interference with a contract or business expectancy must satisfy five elements: (1) the existence of a valid contractual relationship or business expectancy, (2) the defendant's knowledge of and intentional interference with that relationship or expectancy, (3) a breach or termination of that relationship or expectancy induced or caused by the interference, (4) an improper purpose or the use of improper means by the defendant that caused the interference, and (5) resultant damage. *See Kieburtz & Assocs., Inc. v. Rehn*, 842 P.2d 985, 267 (Wash. App. 1992); *Greensun Grp., LLC v. City of Bellevue*, 436 P.3d 397, 405 (Wash. App. 2019); *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997) (tortious interference with contract).

But both of Compass' tortious interference claims fail for the same reasons: (1) Compass failed to allege any contract or business expectancy with which NWMLS knowingly interfered (2) NWMLS did not act with improper purpose or improper means as required by law.  At all times, NWMLS acted properly pursuant to its bylaws and written rules—rules to which Compass agreed to through its membership.  Such actions are not a violation of Washington's tort laws.

**A.    Compass fails to plead that NWMLS interfered with any contract or business expectancy.**

The threshold element for both state-law tort claims requires that Compass allege "the existence of a valid contract or business expectancy.'" *Kieburtz & Associates*, 842 P.2d at 267 (citation omitted).  Compass has done no such thing.  The Complaint never identifies any valid contract with which NWMLS knowingly interfered.  Instead, it asserts in conclusory fashion that "Compass, its brokers, and its agents were parties to valid contracts with each other and with homeowners in the Seattle area," Compl. ¶ 135, and that "NWMLS intentionally prevented Compass's and its brokers' performance of those contracts." *Id.* ¶ 137.  Likewise, the Complaint fails to identify any business expectancy with which NWMLS supposedly interfered.  Instead, it

DEFENDANT NWMLS'S MOTION TO DISMISS - 22
CASE NO. 2:25-cv-00766-JNW

contains conclusions: "Compass, its brokers, and its agents had business relationships or expectancies with a probability of future economic benefit for Compass," *id.* ¶ 141, and "NWMLS intentionally induced or caused the termination of those business relationships or expectancies." *Id.* ¶ 143. Such assertions are not factual allegations suggesting the existence of any actual valid contract or business expectancy.

### B.    Compass fails to plead that NWMLS acted with an improper purpose or means.

To establish an improper purpose or improper means, Compass must demonstrate that NWMLS "had a duty to not interfere," via "[t]he existence of a statute, regulation, a recognized common law, or an established standard of trade or profession." *Libera v. City of Port Angeles*, 316 P.3d 1064, 1068 (Wash. App. 2013) (business expectancy); *see also Pleas v. City of Seattle*, 774 P.2d 1158 (Wash. 1989). But Compass fails to allege that NWMLS had such a duty; in fact, Compass alleges that NWMLS acted pursuant to its rules. Compl. ¶ 36 ("If a NWMLS participant violates those rules, including by violating NWMLS' Data Use Policy pursuant to Rule 27, NWMLS can punish that real estate broker and/or brokerage, including by fining the real estate broker or blocking their access to the listings database by revoking their license under NWMLS' Data Use Policy."). Even if Compass vehemently disagrees with NWMLS' rules, such a disagreement fails to state a violation of Washington tort law.

"Exercising one's legal interests in good faith is not improper interference." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 279 P.3d 487, 498 (Wash. App. 2012). "'Asserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose.'" *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir. 1997) (quoting *Birkenwald Distrib. Co. v. Heublein, Inc.*, 776 P.2d 721, 726 (Wash. App. 1989)). In *Omega*, the Ninth Circuit held that the defendant company did not act with an improper purpose or means under Washington law when it terminated its relationships with distributors who were acquired by a competitor because the company simply enforced its policy to not do business with competitors. *Id.* at 1166

DEFENDANT NWMLS'S MOTION TO DISMISS - 23
CASE NO. 2:25-cv-00766-JNW

n.11.  Moreover, the Court explained that it was irrelevant whether the company's action to terminate such relationships was actually in its best economic interests.  *Id.* at 1166 ("[Defendant], rightly or wrongly, perceived that [plaintiff's] acquisition of its distributors conflicted with [defendant's] economic interests.").

Here, NWMLS' actions reflect nothing more than the good faith enforcement of its rules and policies, which Compass agreed to as part of its membership in NWMLS.  Compass asserts that NWMLS acted pursuant to its written Data Use Policy in temporarily suspending Compass' license to the NWMLS IDX listing data feed after repeated violations.  Compl. ¶ 36.  And Compass acknowledges that NWMLS believes that Compass' Private Exclusives "will lead to the dismantling of the real estate market place."  *Id.* ¶ 16.  Whether NWMLS' belief is right or wrong is irrelevant as a matter of law because Compass agrees that NWMLS acted in accordance with Rule 27 to protect its own economic interests by temporarily suspending Compass' access to the NWMLS IDX data feed until Compass complied with the rules it accepted by virtue of its membership in NWMLS.  That conduct defeats both tortious interference claims under Washington law.  *See Omega*, 127 F.3d at 1166.  The two state common-law tort claims should also be dismissed.

## CONCLUSION

For the foregoing reasons, Compass' Complaint fails to state a claim upon which relief can be granted.  The Court should dismiss the Complaint with prejudice, without leave to be replead.

*I certify that this memorandum contains 8,379 words, in compliance with the Local Civil Rules.  I further certify that the parties met-and-conferred on May 27, 2025, via telephone regarding this Motion, consistent with Rule 5.6 of the Court's Chambers Procedures – Civil.*

DEFENDANT NWMLS'S MOTION TO DISMISS - 24
CASE NO. 2:25-cv-00766-JNW

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

2    DATED:  June 30, 2025                    Respectfully submitted

3                                            *s/Vanessa Soriano Power*
                                             Vanessa Soriano Power, WSBA No. 30777
                                             Christopher R. Osborn, WSBA No. 13608
4                                            Harrison L.E. Owens, WSBA No. 51577
                                             STOEL RIVES LLP
5                                            600 University St
                                             Suite 3600
6                                            Seattle, WA 98101-3197
                                             Telephone: 206-386-7653
7                                            Email: vanessa.power@stoel.com
                                             Email: chris.osborn@stoel.com
8                                            Email: harrison.owens@stoel.com

9
                                             *s/Claude Szyfer*
10                                           Claude Szyfer (admitted pro hac vice)
                                             HOGAN LOVELLS US LLP
11                                           390 Madison Avenue
                                             New York, NY 10017
12                                           Telephone: 212-918-3000
                                             Email: claude.szyfer@hoganlovells.com
13
                                             Liam Phibbs (admitted pro hac vice)
14                                           HOGAN LOVELLS US LLP
                                             Columbia Square
15                                           555 Thirteenth St NW
                                             Washington, DC 20004-1109
16                                           Telephone: 202-637-5600
                                             Email: liam.phibbs@hoganlovells.com
17
                                             *Attorneys for Defendant Northwest*
18                                           *Multiple Listing Service*

19

20

21

22

23

24

25

26

DEFENDANT NWMLS'S MOTION TO DISMISS - 25
CASE NO. 2:25-cv-00766-JNW