The Honorable Jamal N. Whitehead

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        WESTERN DISTRICT OF WASHINGTON

10                                    AT SEATTLE

11   COMPASS, INC. AND COMPASS
     WASHINGTON, LLC,                            Case No. 2:25-cv-00766-JNW
12
                         Plaintiffs,             PLAINTFFS' BRIEF IN OPPOSITION
13                                               TO DEFENDANT'S MOTION TO
             v.                                  DISMISS
14
     NORTHWEST MULTIPLE LISTING                  ORAL ARGUMENT REQUESTED
15   SERVICE,
16                       Defendant.

17

18

19

20

21

22

23

24

25

26

27

28
     OPP TO MOTION TO DISMISS                                            COOLEY LLP
     Case No. 2:25-cv-00766-JNW                               1700 Seventh Avenue Suite 1900
                                                                   Seattle, Washington 98101
                                                                       +1 206 206 452 8700

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 4

    I.     COMPASS HAS PLED FEDERAL AND STATE ANTITRUST CLAIMS. ................................................................................................... 4

        A.    NWMLS Has Violated Sherman Act, Section 1, and RCW 19.86.030. ................................................................................... 6

             1.    NWMLS's Conduct Is Per Se Anticompetitive. ....................... 7

             2.    NWMLS's Conduct Is Anticompetitive Under the Rule of Reason. ......................................................................... 9

                 a.    Compass Has Defined Relevant Markets. .................. 10

                 b.    Compass Has Pled Harm to Competition. ................... 12

             3.    Compass Adequately Pleads Antitrust Injury ......................... 16

        B.    NWMLS Has Violated Sherman Act, Section 2, and RCW 19.86.040. ................................................................................. 17

    II.    COMPASS PLED BUSINESS TORT CLAIMS. ............................................ 20

    III.    DISMISSAL WITH PREJUDICE WOULD BE IMPROPER. ....................... 23

CONCLUSION .................................................................................................................. 23

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW

i

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ad Mgmt., Inc. v. GTE Corp.,*
92 F. 3d 781 (9th Cir. 1996) ................................................................................7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) ............................................................................... 19, 19-20

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) ..........................................................................................12

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.,*
611 F.3d 495 (9th Cir. 2010) .............................................................................17

*CollegeNET, Inc. v. Common Application, Inc.,*
711 F. App'x 405 (9th Cir. 2017) ......................................................................16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ....................................................................................19, 20

*Eminence Cap., LLC v. Aspeon, Inc.,*
316 F.3d 1048 (9th Cir. 2003) (per curiam) .....................................................23

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ..............................................................................17

*Flaa v. Hollywood Foreign Press Ass'n,*
2021 WL 1399297 (C.D. Cal. Mar. 23, 2021) ..................................................12

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ............................................................................................9

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,*
340 U.S. 211 (1951) ..........................................................................................16

*Libera v. City of Port Angeles,*
178 Wash. App. 669 (2013) ...............................................................................22

*Life Designs Ranch, Inc. v. Sommer,*
191 Wash. App. 320 (2015) ...............................................................................21

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
933 F.3d 1136 (9th Cir. 2019) .....................................................................17, 18

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW

ii

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

**TABLE OF AUTHORITIES**
continued

Page(s)

*Newcal Indus., Inc. v. IKON Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ................................................................4

*Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*,
    472 U.S. 284 (1985) ................................................................................7

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...........................................................19

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ............................................................................9, 10

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) .........................................................10, 11

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ...............................................................18

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .............................................................22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. at 438 (2009) .........................................................................20

*PLS.com, LLC v. National Association of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ...................................................... *passim*

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ................................................................4

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ...................................................12

*Tacoma Auto Mall, Inc. v. Nissan N.A., Inc.*,
    169 Wash. App. 111 (2012) ..................................................................23

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .............................................................12

*Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*,
    2024 WL 3837959 (N.D. Cal. July 22, 2024) ....................................10

*United States v. Apple, Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025) .....................................18, 19

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                     - iii -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

# TABLE OF AUTHORITIES
### continued

**Page(s)**

*United States v. Google LLC*,
 2025 WL 1132012 (E.D. Va. Apr. 17, 2025)................................................18, 19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ...........................................................................................20

*Westmark Dev. Corp. v. City of Burien*,
 140 Wash. App. 540 (2007) ........................................................................ 21-22

**Statutes**

15 U.S.C.
 § 1 .........................................................................................................................6
 § 2 .......................................................................................................................17

RCW
 19.86.030 ...................................................................................................6, 7, 17
 19.86.040 ......................................................................................................17, 20

Sherman Act ............................................................................................................6, 7, 17

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ..................................................................................................4

NAR, *Consumer Guide:  Alternative Listing Options*,
 https://www.nar.realtor/the-facts/consumer-guide-alternative-listing-options
 (last visited July 21, 2025) .................................................................................6

Stacy Moncrieff, *NAR Introduces New Flexibility for Sellers While Retaining
 Clear Cooperation Policy*, REALTOR® MAGAZINE MEDIA (Mar. 25,
 2025), *https://www.nar.realtor/magazine/real-estate-news/nar-introduces-
 new-flexibility-for-sellers-while-retaining-clear-cooperation-policy* ..................................6

U.S. Federal Trade Commission, *The Residential Real Estate Brokerage
 Industry* (Dec. 1983) ..........................................................................................5

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                        - iv -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

**INTRODUCTION**

Defendant NWMLS—a monopoly created by combining otherwise competing real estate brokers—abuses its immense power by controlling how homes are sold in the Seattle area, blocking consumer choice and broker competition, and forcing homesellers and their brokers to market their homes thorough NWMLS (on terms dictated by NWMLS and the brokerages that control it). *See* ECF 27 at 2:2-3 ("NWMLS'[s] rules were designed to prohibit conduct like Compass'[s] . . . ."). NWMLS has done this by (1) adopting and enforcing a rule mandating that brokers must submit all of their listings to NWMLS before marketing them, (2) quickly changing another rule that, on its face, allowed a broker to premarket certain listings before submitting them to NWMLS, and (3) ignoring a third rule that, also on its face, allows premarketing of certain listings.

Discovery will show whether NWMLS is doing this to protect its monopoly and the fees it charges, ensure incumbent brokers in the Seattle area continue to receive their commissions, or both. But we know that NWMLS is not doing this to protect homesellers or competition. In every U.S. State outside of Washington and in every other multiple listing service (MLS) outside of NWMLS, MLS rules allow homesellers and their brokers to use office exclusives to market properties outside of the MLS, lessen potential negative impacts of days-on-market and price changes on a homeseller by premarketing homes outside of the MLS, and choose when and how to use the local MLS as a tool to market properties (as MLSs originally were intended). And, in every U.S. state outside of Washington and in every MLS outside of NWMLS, brokers compete by offering homesellers different marketing plans. In fact, the importance of premarketing is enshrined in federal antitrust agency statements criticizing mandatory submission policies, like NWMLS's, and the antitrust policy of the real estate broker trade association, which protects office exclusives.

As specifically alleged in the Complaint:

- NWMLS is a monopoly created by the combination of nearly all of the residential real estate brokers in the Seattle area, and it is owned and controlled by those competitors, ECF 1 ¶¶1, 24-26, 80-88;

- • a residential real estate broker must be a member of NWMLS, and follow its rules, to meaningfully sell homes in the Seattle area, *id.* ¶¶14, 33-36, 69;

- • NWMLS has rules that determine and restrict how residential real estate brokers compete in the Seattle area, *id.* ¶¶2, 10, 15-17, 19, 36, 56-71, 74-76, 83, 89;

- • homesellers in the Seattle area want options on how to market their property, including the ability to premarket the home before placing it into NWMLS, and some Seattle-area homesellers contracted with and instructed Compass to premarket their home before submitting it to NWMLS, *id.* ¶¶3-6, 39-41, 44, 50-53, 62, 67, 91-94;

- • NWMLS has blocked that choice and competition by (1) adopting and enforcing a mandatory submission rule, (2) quickly changing another rule to block premarketing, and (3) ignoring a third rule to block premarketing, *id.* ¶¶2, 10-17, 19, 36, 56-76, 83, 89-94, *see also* ECF 27 at 2:2-3 ("NWMLS'[s] rules were designed to prohibit conduct like Compass'. . . ."); and

- • as a result, homesellers, Compass, and any other brokers who want to compete by offering premarketing outside of the MLS in the Seattle area are harmed, *id.* ¶¶2, 11-17, 19, 54, 71-76, 83, 89-94.

These facts alone are more than sufficient to state antitrust and business tort claims.

In its motion, NWMLS repeatedly makes two arguments, each of which is contrary to facts alleged in the Complaint and relevant caselaw.   ***First***, NWMLS uses words like "transparency," "fairness," and "free-riding" to argue it is justified in blocking competition and interfering with Compass's business.  But the Complaint shows those justifications are false and, at best, the subject for discovery and trial.  There is no evidence, and no allegations in the Complaint, showing such issues are present with premarketing.  And nothing gives NWMLS the right to decide how homesellers should market their property or how brokers should compete.  ***Second***, NWMLS claims that it is immune from scrutiny because Compass agreed to follow NWMLS's rules, despite NWMLS changing and ignoring those rules to block Compass from offering homesellers premarketing choices and to prevent competition from alternative brokers and listing services.  But that supports Compass's claim:  it shows NWMLS's immense power.

While making these misplaced arguments, NWMLS virtually ignores the Ninth Circuit's decision in *PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022). There, the Ninth Circuit rejected many of the same arguments NWMLS makes, and concluded

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                                          - 2 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1  that a MLS rule blocking members from submitting a listing only to a private listing network

2  (and not to the local MLS) "shares all the hallmarks of a group boycott" that harmed competition.

3  *Id.* at 834-35.  Here, like in *PLS*, Compass has alleged that NWMLS, and the brokers who own

4  and control it, are boycotting any brokers who offer homesellers the option to market a property

5  without submitting it to NWMLS.  Thus, like in *PLS*, Compass has stated a claim.

6        Compass has stated a claim, and respectfully requests the Court deny NWMLS's motion.

7                              **BACKGROUND**

8        NWMLS is a monopoly created, owned, and controlled by nearly all the competing

9  residential real estate brokers in the Seattle area, including the dominant Windemere brokerage.

10  ECF 1 ¶¶1, 24-26, 80-88.  NWMLS creates rules that govern how residential real estate brokers

11  market homes and compete in the Seattle area, and it levies penalties (such as fines up to $5,000

12  or withholding of critical data) for any alleged violations of those rules.  *Id.* ¶¶2, 10, 15-17, 19,

13  36, 56-71, 74-76, 89.  Any broker who wants to do business in the Seattle area must follow the

14  rules NWMLS creates and enforces because membership in NWMLS, and access to its listing

15  service, is essential for any broker wishing to offer brokerage services to homebuyers and

16  homesellers. *Id.* ¶¶14, 33-36, 69.  To maintain its monopoly power, NWMLS Rule 2 forces

17  every homeowner and their broker to market their listing through NWMLS:  "Members shall

18  not promote or advertise any property in any manner whatsoever . . . unless a listing for that

19  property has been delivered to NWMLS or input by the member and has not been cancelled,

20  expired, or taken temporarily off the market."  *Id.* ¶56.

21        One of Compass's recent innovations is a premarketing service called the Compass 3-

22  Phased Price Discovery and Marketing Strategy for homeowners.  In consultation with the

23  homeowner, Compass provides bespoke plans on the timing and method of marketing a property

24  to minimize negative effects of submitting to an MLS right away (such as punishing effects of

25  days on market and price changes), and best sell the property.  *Id.* ¶¶3-8. Homeowners' demand

26  for these options has been significant across the country, including in the Seattle area.  *Id.* ¶¶3-

27  6, 39-41, 44, 50-53, 62, 67.  Earlier this year, Seattle area-homesellers contracted with Compass

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                           - 3 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

brokers for brokerage services in connection with the sale of their homes, which included directives to the brokers that the home should be premarketed with the Compass 3-Phased Price Discovery and Marketing Strategy. *Id.*

But that was abruptly stopped in the Seattle area by NWMLS. Deploying a shifting web of tactics—including adopting and enforcing Rule 2; quickly changing another rule that, on its face, allowed premarketing of certain listings (Rule 4); and ignoring a third rule (Rule 6) that, also on its face, allowed premarketing of certain listings—NWMLS blocked Compass, and any other broker in the Seattle area, from offering innovative premarketing like the Compass 3-Phased Price Discovery and Marketing Strategy. *Id.* ¶¶2, 10-17, 19, 36, 56-76, 83, 89-94. As a result, competition in the Seattle area remains stifled, harming homesellers, Compass, and any other broker wishing to compete by offering premarketing in the Seattle area.

## LEGAL STANDARD

A complaint need only be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a motion to dismiss, factual allegations in the complaint are taken as true, and the Court is required to draw any plausible inferences in favor of plaintiffs. *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A plaintiff need not prove its case in the complaint. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (citation omitted). Rather, plaintiffs need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

**I.    COMPASS HAS PLED FEDERAL AND STATE ANTITRUST CLAIMS.**

In its motion, NWMLS agrees with the core facts in the Complaint, which demonstrate an unlawful agreement and unlawful monopolization. *See* ECF 27 at 3:15-16 ("NWMLS is not a real estate brokerage; its members and owners, however, are competing real estate brokers.") *id.* at 3:22-23 ("A real estate broker in the Seattle area cannot successfully compete without access to NWMLS listings data." (quoting ECF 1 ¶15)); *id.* at 3:20-5:22 (agreeing that NWMLS

1  has a set of rules telling brokers in the Seattle area how to compete and cooperate); *id.* at 7:3-21

2  (agreeing that the brokers that control NWMLS adopted and enforced Rule 2, "vot[ed] down" a

3  proposal by Compass to change Rule 2, amended Rule 4, and ignored Rule 6, all to stop Compass

4  and any other brokers in the Seattle area from offering homesellers the option to premarket their

5  properties); *id.* at 7:22-8:1 (agreeing that NWMLS punished Compass and all its brokers for

6  following the instructions of homesellers who wanted to premarket their properties, and that

7  NWMLS can punish them again in the future at its sole discretion).  Accordingly, Compass has

8  stated its antitrust claims.

9      In fact, mandatory submission rules, like NWMLS's, have been a concern for antitrust

10  enforcers for decades.  Contrary to NWMLS's argument that "the DOJ provides Compass no

11  succor," *id.* at 15:6-12, since the early 1980s, the antitrust authorities have unequivocally found

12  mandatory submission rules, without more, to be anticompetitive:  "[o]n its face, requiring that

13  MLS members submit all of their listings of a designated type restricts the competitive freedom

14  of the broker-members.  Alternative methods of selling houses are effectively foreclosed."  U.S.

15  Federal Trade Commission, *The Residential Real Estate Brokerage Industry*, 130 (Dec. 1983),

16  https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--

17  Butters-Report.pdf ("Butters Report").  The Federal Trade Commission ("FTC") further

18  explained that the ability for a homeseller to choose to market a property off the MLS was the

19  only protection of consumers and competition from the anticompetitive mandatory submission

20  rules.  Specifically, the FTC cited the National Association of REALTORS's® ("NAR")

21  antitrust policy point 11, which "requires that an MLS not prohibit or discourage a member from

22  accepting a listing from a seller preferring to give an 'office exclusive.'"  Butters Report at 129-

23  30 ("Realtor MLSs following the NAR's Policy Point 11 may have ameliorated any competitive

24  injury which would otherwise have resulted from 'mandatory' submissions of listings."); *see*

25  *also id.* at 130 ("Where 'office exclusives' are allowed, that is, where the seller can specify that

26  his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as

27  they see fit.").

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                          - 5 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

Since the Butters Report, NAR's antitrust policy has protected premarketing marketing. *See* ECF 1 ¶38 (barring Boards and associations of REALTORS® and their MLSs from "[p]rohibit[ing] or discourage[ing] Participants from taking 'office exclusive' listings."). NAR still recognizes that office exclusives are one of the only two options homesellers have "to limit the exposure of their home listing for privacy or other reasons." NAR, *Consumer Guide: Alternative Listing Options*, https://www.nar.realtor/the-facts/consumer-guide-alternative-listing-options (last visited July 21, 2025).

Ignoring these truths about the antitrust authorities and the industry trade group, NWMLS quotes the DOJ's statements on a separate issue—NAR's Clear Cooperation Policy— to falsely suggest that the antitrust enforcers have "not taken a position on" mandatory submission and premarketing. ECF 27 at 15:6-12. But NWMLS's blocking of premarketing harm competition more than the Clear Cooperation Policy because, as required by NAR's antitrust policy, the Clear Cooperation Policy "did not prohibit 'coming soon' listings, marketing to private networks, or office exclusives." Stacy Moncrieff, *NAR Introduces New Flexibility for Sellers While Retaining Clear Cooperation Policy*, REALTOR® MAGAZINE MEDIA (Mar. 25, 2025), *https://www.nar.realtor/magazine/real-estate-news/nar-introduces-new-flexibility-for-sellers-while-retaining-clear-cooperation-policy*. Thus, both the federal antitrust authorities and the real estate trade association have supported premarketing, and protected consumer choice and competition that NWMLS is blocking.

NWMLS's arguments to the contrary lack merit.

**A.     NWMLS Has Violated Sherman Act, Section 1, and RCW 19.86.030.**

The federal and Washington state antitrust laws provide that "[e]very contract . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1; *see* RCW 19.86.030 (same). "In order to prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis [*i.e.* anticompetitive]; and (3) the restraint affected interstate commerce."

*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F. 3d 781, 784 (9th Cir. 1996).  Compass has amply pled all three elements of its Section 1 and RCW 19.86.030 claims.  In fact, NWMLS does not challenge the first and third elements at all, and its motion is based only on arguments about whether NWMLS's conduct is anticompetitive.

### 1.    NWMLS's Conduct Is Per Se Anticompetitive.

***MLS Rules can be per se anticompetitive.***  "We use two kinds of analysis to determine whether a restraint of trade is unreasonable:  the per se approach and the rule of reason.  Some practices are so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind, is, in fact, anticompetitive in the particular circumstances.  These practices are per se violations of the Sherman Act, and we presume that they are anticompetitive . . . ."  *PLS*, 32 F.4th at 833 (cleaned up).  In its motion, NWMLS claims—contrary to binding circuit precedent—that MLS rules cannot be per se anticompetitive.  *See* ECF 27 at 9:1-8 ("While a small group of restraints are unreasonable per se . . . operating rules of cooperative ventures such as NWMLS are well outside that limited category of agreements." (cleaned up)).  But the Ninth Circuit rejected that notion in *PLS*.  In fact, the Ninth Circuit found that PLS "adequately alleged a *per se* group boycott" when it challenged the MLS rule prohibiting brokers from marketing a listing only on a private listing service.  *PLS*, 32 F.4th at 837.

Even *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, the case NWMLS cites, says the opposite of NWMLS's position.  472 U.S. 284, 296 (1985).  NWMLS says that a wholesale purchasing cooperative "must establish and enforce reasonable rules in order to function effectively," ECF 27 at 9:5-8, but NWMLS fails to include the important qualifier that followed:  "Unless it is shown that the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted."  *Nw. Wholesale Stationers*, 472 U.S. at 296.  Not only does the Complaint allege that NWMLS has market power (a monopoly, in fact) and exclusive access to a tool essential to effective competition, ECF 1

¶¶14-15, 33-36, 69, NWMLS's own motion agrees. *See* ECF 27 at 3:22-23 ("A real estate broker in the Seattle area cannot successfully compete without access to NWMLS listings data."). Thus, NWMLS's rules can be per se anticompetitive.

NWMLS's rules are per se anticompetitive in two ways.

**NWMLS's conduct constitutes a per se anticompetitive boycott.** In *PLS*, the Ninth Circuit found "a group of competitors coercing a competitor's suppliers to sell to that competitor only on 'unfavorable terms' constitutes a group boycott even if the competitors do not completely cut off the competitor's access to inputs it needs." *PLS*, 32 F.4th at 835. That is exactly what NWMLS is doing. It is owned and controlled by a group of competitors and it is coercing all other brokers in the Seattle area to provide listings (supply of necessary inputs competitors need) to others only if they market properties in ways NWMLS dictates, such as not offering premarketing options to homesellers. ECF 1 ¶¶1, 10-17, 19, 24-26, 80-88.

**NWMLS's conduct is per se anticompetitive because it blocks competition.** In *PLS*, the Ninth Circuit found a per se antitrust violation because the policy at issue "impaired PLS's ability to compete against the MLSs in the market for sellers' listings on almost any dimension because it requires the vast majority of PLS's suppliers (sellers' agents that are members of a NAR-affiliated MLS) to supply to PLS's dominant competitors (NAR-affiliated MLSs) even if PLS's product is better on the merits." *PLS*, 32 F.4th at 836. "Regardless of what PLS does— whether it charges less to list properties, provides a nationwide network, or develops a better interface—agents who belong to a NAR-affiliated MLS may not list on PLS without also listing on an MLS. Thus, the Clear Cooperation Policy essentially *eliminates* competition for most sellers' agents' listings between NAR-affiliated MLSs and rival services." *Id.*

Again, as alleged in the Complaint, and unchallenged by NWMLS in its motion to dismiss, NWMLS has blocked competition between brokers and with NWMLS itself. ECF 1 ¶¶15, 24, 33, 35, 82-84. For example, as alleged in the Complaint, NWMLS's conduct impairs the ability of any other listing service to compete with NWMLS by requiring the vast majority of brokers to supply to dominant listing service (NWMLS), even if other listing service products

1  are better on the merits, just like in *PLS*. *Id.* ¶33; ECF 28 at 9 ("Members shall deliver to

2  NWMLS or input all closed 'unlisted sales' not later than 5:00 PM of the third business day

3  following receipt of notice of closing of the sale[] . . . [including] [a] sale where a member

4  represents a buyer in the sale of a property that was listed in a residential multiple listing service

5  other than NWMLS.").

6                                    *        *        *

7       Like in *PLS*, NWMLS's rules are anticompetitive per se, "and we presume that they are

8  anticompetitive without inquiry into the particular market context in which they are found."

9  *PLS*, 32 F.4th at 833 (cleaned up).  Therefore, Compass has shown an unreasonable restraint of

10 trade under a per se analysis.

11              **2.      NWMLS's Conduct Is Anticompetitive Under the Rule of Reason.**

12      In addition to pleading facts showing NWMLS's conduct is per se anticompetitive,

13 Compass's allegations also show that NWMLS's conduct is anticompetitive under the rule of

14 reason.  *See id.* at 833-34 ("We use two kinds of analysis to determine whether a restraint of

15 trade is unreasonable:  the *per se* approach and the rule of reason.").  "The rule of reason requires

16 courts to conduct a fact-specific assessment of market power and market structure to assess the

17 restraint's actual effect on competition."  *Id.* at 834 (quoting *Ohio v. Am. Express Co.*, 585 U.S.

18 529 (2018) (cleaned up)).  In short, NWMLS's motion lacks merit because it fails to identify

19 any missing allegations; instead, it simply disagrees with the Complaint and asks the Court to

20 invade the province of the jury.

21      Nevertheless, even NWMLS's disagreements misstate the law and facts about

22 Compass's rule of reason claim.   To start, NWMLS is wrong to claim broadly and

23 unconditionally that market definition is required to state any antitrust claim.  *See* ECF 27 at

24 10:9-12.  In addition to per se claims, which as discussed above do not require market definition,

25 under the rule of reason, Compass could (and did) show a rule of reason claim "directly," without

26 the need to define a market.  *PLS*, 32 F.4th at 834 (citation omitted); *see also FTC v. Ind. Fed'n*

27 *of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                          - 9 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for" those inquiries." (cleaned up)).  The Complaint shows a "substantial anticompetitive effect directly" by showing "proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market."  ECF 1 ¶¶90-94.  Thus, "no inquiry into market definition and market power is required."  *See PLS*, 32 F. 4th at 834.

Moreover, where "horizontal restraints involve agreements between competitors not to compete in some way, [the Supreme] Court concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive."  *Am. Express*, 585 U.S. at 543 n.7.  Here, Compass alleges that NWMLS is a horizontal agreement among the competing brokers who own, control, and follow its rules to block premarketing.  ECF 1 ¶¶99-106.  This is a second sufficient way Compass stated an antitrust claim, even before looking to market definition.  *See PLS.com*, 32 F.4th at 836 (challenged policy "impaired [plaintiff's] ability to compete . . . in the market for sellers' listings . . . even if [plaintiff's] product is better on the merits"); *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*, 2024 WL 3837959, at *1 (N.D. Cal. July 22, 2024) (challenged policy "harms competition by impeding agents' ability to choose to post listings" as they and their clients desire).

Finally, Compass also alleges harm to competition indirectly, which is the only place market definition matters.  *PLS*, 32 F.4th at 834.  Under the indirect path of making a rule of reason claim, Compass "must show that [NWMLS has] market power in the relevant market and that 'the challenged restraint harms competition.'"  *Id.* (quoting *Am. Express*, 585 U.S. at 542).  NWMLS does not contest it has market power, and only makes an argument based on geographic market and one based on harm to competition—both fail.

### a.    Compass Has Defined Relevant Markets.

"Defining the relevant market is a factual inquiry ordinarily reserved for the jury."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).  "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description. . . .  The

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW

- 10 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.* at 1446. In its Complaint, Compass defined product markets for "the provision of real estate brokerage services to sellers of residential real property" and "the provision of multiple listing services to real estate brokers." ECF 1 ¶¶77-78. NWMLS does not contest either.

NWMLS only contests the geographic markets. "The geographic market extends to the area of effective competition where buyers can turn for alternate sources of supply." *Oltz*, 861 F.2d at 1446 (cleaned up). In the Complaint, Compass alleges "[t]wo relevant geographic markets are the city of Seattle and King County" because "most sellers prefer to work with a real estate broker who is familiar with local market conditions and homeowners often desire a residential real estate broker who is a member of the multiple listing service that serves the area in which they are selling a home." ECF 1 ¶79. Compass also alleged that this geographic market satisfied the hypothetical monopolist test, which has been recognized by the Ninth Circuit as a proper way to support market definition. *Compare Rebel Oil Co. v. Atl. Richfield Co.*, 51 F. 3d 1421, 1434 (9th Cir. 1995) *with* ECF 1 ¶¶77-78. NWMLS ignores these allegations.

Instead, NWMLS challenges that geographic aspect of the market definition because "NWMLS' areas of operation include Washington State broadly and even Oregon" and Compass premarkets "properties *nationwide* to its own network of 34,000 Compass agents and their 'millions of buyers.'" *Id.* at 10:14-16, 11:5-7. But those arguments are irrelevant to market definition. The buyers of the two product markets (Seattle-area homesellers and agents) would not turn to alternate sources of supply outside of the Seattle area. A homeseller would not use a broker who is not licensed to practice real estate in Washington state, is not a member of NWMLS, and does not know the Seattle area. Similarly, a Seattle-area broker would not use a listing service that does not cater to the Seattle area.

Finally, it is black letter law that there can be multiple relevant antitrust markets. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However,

1    within this broad market, well-defined submarkets may exist which, in themselves, constitute

2    product markets for antitrust purposes." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325

3    (1962).  NWMLS's argument is built on a fallacy; even if they prove at trial that a national

4    market exists for the products at issue, which NWMLS expressly fails to do in this motion, ECF

5    27 at 12 n.4, it does not disprove the existence of a local one.  Both can be true.

6              Unsurprisingly then, the cases on which NWMLS relies to suggest the opposite are

7    readily distinguishable.  In *Flaa v. Hollywood Foreign Press Ass'n*, 2021 WL 1399297, at *7

8    (C.D. Cal. Mar. 23, 2021), the court ultimately dismissed an amended complaint because

9    plaintiffs amended to define 40 distinct foreign sub-markets which offered "low pay for limited

10   opportunities," rendering these numerous, narrow geographic sub-markets "economically

11   insignificant."  *Id.* at *8 (citation omitted).  NWMLS does not, and could not, make any

12   analogous argument that the Seattle and King County areas are "economically insignificant."

13   Likewise, in *Tanaka v. University of Southern California*, 252 F.3d 1059, 1065 (9th Cir. 2001),

14   the plaintiff attempted to allege a geographic market tied to her own idiosyncratic preference to

15   be "near home," rather than one based on consumer behavior generally.  Here, Compass pled a

16   geographic market appropriately premised on consumer behavior, not its own preferences.  And

17   in *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1175 (N.D. Cal. 2013), the court faulted the

18   plaintiff, not (as NWMLS suggests) for pleading multiple local markets, but for suggesting that

19   additional, unidentified, local markets were also relevant.  *Id.* ("The problem is not that the

20   geographical markets for Inpatient Hospital Services are necessarily invalid or pleaded too

21   generally.  The problem is that Plaintiffs fail to identify many of the local markets at all.").

22   Compass has made no analogous allegation here.  Thus, Compass did not need to define a

23   market, but it did anyway.

24              **b.    Compass Has Pled Harm to Competition.**

25        The Complaint explains repeatedly and in detail how NWMLS is harming competition:

26        • "NWMLS is hurting consumers by:  (a) taking away a critical freedom available
            in every other state to sell their properties in the manner the home seller chooses;
27          (b) decreasing the innovation available to consumers; (c) quashing competition
            that Compass brings to the traditional real estate brokers (like Windermere and

28

the others that own and control NWMLS); and (d) further entrenching NWMLS's monopoly and the traditional real estate brokerages' collective power in the Seattle area (by ensuring all listings continue to go to NWMLS and homeowners' market their home as NWMLS and traditional brokerages instruct)"; and

- "NWMLS has hurt Compass and its real estate brokers by: (a) eliminating an option that homeowners like; (b) blocking competition from Compass and its brokers; (c) curtailing their ability to win business from traditional real estate brokerages; and (d) requiring Compass and its brokers to ignore instructions from homeowners on how to sell their properties."

*See, e.g.*, ECF 1 ¶¶16-17; *see also id.* ¶¶74-76, 83-94. Compass has shown that NWMLS has blocked competition from Compass, hurting Compass and at least two sets of consumers: homesellers and residential real estate brokers. Contrary to NWMLS's motion, Compass has done far more than make conclusory allegations. *Cf.* ECF 27 at 12:18-21.

Ignoring those allegations, NWMLS claims that "[Compass] does not allege that NWMLS' conduct harmed *competition*, only that it harmed a *competitor*." *Id.* at 12:14-15. But such an argument is meaningless. The Ninth Circuit has held that "sometimes harm to a competitor also harms competition which, in turn, harms consumers." *PLS*, 32 F.4th at 832. In *PLS*, the Ninth Circuit found that the plaintiff (a competitor to the MLS) had shown harm to competition by alleging that the MLS rules "prevented PLS from gaining a foothold in the market and makes it virtually impossible for new competitors to enter, leaving agents with fewer choices, supra-competitive prices, and lower quality products." *Id.* at 840; *see also id.* at 841 ("[W]e recently reaffirmed that a plaintiff need not allege that the exclusionary conduct has succeeded in displacing all competition to adequately plead antitrust injury." (cleaned up)). All NWMLS's argument shows is that the harm to Compass and the harm to competition are inextricably intertwined.

NWMLS then tosses in two additional concepts that are misplaced and incorrect on the law and facts: purported justifications and two-sided markets (*Amex*). ECF 27 at 12:22-16:23.

**NWMLS's conduct is not justified.** While NWMLS claims justifications like the avoidance of free-riding, transparency, and fairness, *see* ECF 27 at 1:2-5, 13:22,14:13-14, 14:18-20, these types of arguments were rejected by the Ninth Circuit in *PLS*. There, the defendants

argued that the Clear Cooperation Policy is procompetitive because it "benefits buyers' agents because it allows them to see more listings on the MLSs and to avoid the need to consult competing services." *PLS*, 32 F.4th at 836.  The Ninth Circuit unambiguously held:  "This is not a procompetitive justification because it does not explain how the Clear Cooperation Policy enhances *competition. . . .* In the end, sparing consumers the need to patronize competing firms is not a procompetitive justification for a group boycott." *Id*.  Regardless, NWMLS's justifications are false and inconsistent with the Complaint.  Because the industry trade group's antitrust policy protects premarketing, every other MLS in the country allows homeowners to choose how to market their property and for brokers to compete for homesellers by offering that choice.  ECF 1 ¶¶10, 16, 18, 38, 57, 76, 91.  And none have reported problems hypothesized by NWMLS (and none are in the Complaint).

In fact, if anyone is guilty of unfairness, lack of transparency, or free-riding, it is NWMLS.  As explained by the Complaint, NWMLS contributes no listings, but it still receives revenues from brokers who want to access those listings though its data feed.  *Id*. ¶¶33-35, 55-56, 86-88.  Thus, NWMLS unfairly free-rides on the hard work of brokers and the value of a home, and then uses the brokers' own listings and homesellers' own property to make money and block competition and choice.  *Id*. ¶¶33-35, 55-56, 86-88.

In short, there is no evidence (and certainly no allegations) supporting NWMLS's claimed justifications of fairness, transparency, efficiency, or free-riding; and, if NWMLS proffers any in this case, it is for a jury to decide how to weigh them against the immense harm its rules cause to competition, Compass, its brokers, and homesellers.

**NWMLS's Amex *arguments fail.*** NWMLS's *Amex* arguments are premature at best.  In *PLS*, the Ninth Circuit expressly held that "whether *Amex* applies depends on the characteristics of the relevant product. . . . In some cases, a plaintiff will include facts in the complaint that disclose these characteristics and thus trigger *Amex*.  In others, the complaint will not contain the necessary facts, and the court may need to wait to examine the evidence to determine whether *Amex* applies." *PLS*, 32 F.4th at 839.  NWMLS does not show that the

1   Complaint triggers *Amex*.  Instead, it cites conclusory statements in two academic papers that

2   preceded *Amex* and *PLS*, ECF 27 at 15:15-21, 15 n.7, that are not in the Complaint, and which

3   do not trigger any *Amex* analysis under the Ninth Circuit's *PLS* decision.

4         In fact, NWMLS admits that Compass defined the market to not trigger *Amex* by

5   "focusing its allegations . . . solely on sellers."  *Id*. at 16:2-3.  *See also* ECF 1 ¶77 ("[T]he

6   provision of real estate brokerage services ***to sellers*** of residential real property.") (emphasis

7   added).  That means the markets alleged in the Complaint are quintessentially one-sided.  Real

8   estate brokers provide those services only to homesellers, and only homesellers pay the brokers

9   for their services.  *Id.*  Similarly, the other set of markets, "the provision of multiple listing

10  services to real estate brokers," is about providing listing services to brokers, and brokers paying

11  the listings services.  *Id*. ¶78.  These markets are also one-sided and have nothing to do with

12  homebuyers (the group that NWMLS claims triggers *Amex*).

13        Finally, in its *Amex* argument, NWMLS claims that premarketing "seeks to drive up

14  prices to buyers," ECF 27 at 16:13-15, which is irrelevant (as just discussed) and untrue.  The

15  Complaint alleges, and NWMLS agrees in its motion, that premarketing can result in the

16  homeowner ***decreasing*** a home listing price.  *See id*. at 16:12 ("[e]xplaining Compass' program

17  is to test if 'asking price is too high'").  Moreover, premarketing helps the homeseller market

18  the property better and without negative aspects of the MLS (such as unwanted days-on-market

19  or price changes attributed to the listing), to find the right buyers.  ECF 1 ¶¶ 41, 48, 53.  Any

20  higher purchase price simply shows the premarketing succeeded; it does not benefit a buyer for

21  a home to be mispriced or marketed in a way that does not attract buyers.  *See id* ¶¶11, 71

22  (alleging that premarketing results in more homes for sale), ¶¶53-54 (showing premarketing sells

23  homes faster).

24                        *     *     *

25        In short, NWMLS's arguments are that it can adopt rules to block competition it deems

26  bad, which is the antithesis of antitrust doctrine.  It is black letter law that it is a per se antitrust

27  violation for a combination to engage in anticompetitive conduct, even if the result of the

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                          - 15 -

C OOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1    anticompetitive conduct is that there is a benefit, such as lower prices. *See Kiefer-Stewart Co.*

2    *v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213 (1951) (holding that an agreement among

3    competitors to fix maximum prices, "no less than those to fix minimum prices, cripple the

4    freedom of traders and thereby restrain their ability to sell in accordance with their own

5    judgment").

6         Compass has alleged an unreasonable restraint of trade under a rule of reason analysis.

7                    **3.    Compass Adequately Pleads Antitrust Injury**

8         Similar to its other arguments, NWMLS claims that Compass alleged "that NWMLS'

9    rules enhance the quality of the brokerage market and facilitates competition." ECF 27 at 17:13-

10   15. But Compass did no such thing. NWMLS's sole citation for that claim is paragraph 69 of

11   the Complaint, which states simply that "[a]ccess to this data is critical for any real estate broker

12   or brokerage to do business." *Id.* As admitted by NWMLS in the motion, that allegation is true.

13   *Id.* at 14:7-13. Yet nothing in that statement shows the rules that block competition enhance or

14   facilitate anything—other than NWMLS's monopoly and the inhibition of competition.

15        Next, NWMLS again claims competition "results in higher prices for consumers," *id.* at

16   17:15-17, which as discussed above is wrong and irrelevant. *See, supra*, I(A)(2)(b). NWMLS

17   also faults Compass for not alleging "that commission levels paid by sellers or buyers will

18   increase as a result of NWMLS' actions." *Id.* at 17:17-18. But, like so many of NWMLS's

19   arguments, that simply ignores the *PLS* decision where the Ninth Circuit said that a plaintiff may

20   provide harm directly by showing "*reduced output*," or "*decreased quality*." *PLS*, 32 F.4th at

21   834 (emphasis added); *see also CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x

22   405, 406 (9th Cir. 2017) ("A plaintiff may assert antitrust injury from coercive activity that

23   prevents consumers from making free choices between market alternatives as well as restraints

24   that artificially erect barriers to market entry and protect lower quality products." (cleaned up)).

25   The Complaint shows actual detrimental effects on competition, including reduced output (fewer

26   homes for sale) and decreased quality in the relevant markets. *See* ECF 1 ¶¶71, 90-94.

27        In sum, the Complaint shows antitrust injury.

28
OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                        - 16 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1                                     *      *      *

2          Therefore, Compass has stated Section 1 and RCW 19.86.030 claims.

3          **B.      NWMLS Has Violated Sherman Act, Section 2, and RCW 19.86.040.**

4          The federal and Washington state antitrust laws prescribe that "[e]very person who shall

5   monopolize . . . any part of the trade or commerce among the several States, or with foreign

6   nations, shall be deemed guilty of a felony."  15 U.S.C. § 2; *see also* RCW 19.86.040 (same).

7   "[A] claim for monopolization of trade has two elements:  'the possession of monopoly power

8   in the relevant market and . . . the acquisition or perpetuation of this power by illegitimate

9   predatory practices.'"  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506

10  (9th Cir. 2010) (cleaned up).   "At step one, the plaintiff must establish that the defendant

11  possesses monopoly power, which is the substantial ability 'to control prices or exclude

12  competition.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (citation

13  omitted).   NWMLS does not contest that it has a monopoly.   ECF 27 at 8:21-21:25; *see also*

14  ECF 1 ¶¶80-84 (alleging near 100% market share in all relevant markets).   As such, NWMLS's

15  only argument is about step two.   "At step two, the plaintiff must show that the defendant

16  acquired or maintained its monopoly through 'anticompetitive conduct.'"  *Epic Games*, 67 F.4th

17  at 998 (citation omitted).   "This anticompetitive-conduct requirement is 'essentially the same'

18  as the Rule of Reason inquiry applicable to Section 1 claims."  *Id.* (citation omitted).   As

19  discussed above, Compass has shown a rule of reason violation and thus has stated a monopoly

20  claim.  *See, supra*, I(A)(2).  NWMLS's two arguments to the contrary, that Compass agreed to

21  NWMLS's rules and NWMLS has no duty-to-deal, both fail.

22          ***Compass having to follow NWMLS's rules shows NWMLS's power.***  NWMLS claims

23  that it cannot be liable under the antitrust laws because it "fairly enforced its own organizational

24  rules, which Compass agreed to follow as part of its membership."  ECF 27 at 18:20-22, 20:15-

25  24.   This argument is directly contradicted by the Ninth Circuit's holding in *In re National*

26  *Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1159 (9th Cir. 2019).   *See*

27  *also United States v. Apple, Inc.*, 2025 WL 1829127, at *13-14 (D.N.J. June 30, 2025) (denying

28

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

motion to dismiss Section 2 claims where plaintiff alleged defendant imposed "exclusionary requirements" to use its platform); *United States v. Google LLC*, 2025 WL 1132012, at *38-41 (E.D. Va. Apr. 17, 2025) (finding Section 2 violation where defendant enforced its own "policy restrictions," including through contractual provisions).  There, the court declined to dismiss Section 2 claims where plaintiffs alleged that the defendant sports league, comprised of and controlled by competitor-members like NWMLS, simply sought to enforce membership terms. *Sunday Ticket*, 933 F.3d at 1159.  That is precisely analogous to Compass's claims here: NWMLS, comprised of and controlled by competitors, with a near-absolute control of both relevant markets, adopted and enforced rules as a condition of membership which were designed to, and have, maintained its market power.  *See, e.g.*, ECF 1 ¶¶10-16, 56-71, 80-84, 89-94.

Not only does NWMLS fail to bring the *Sunday Ticket* case to the Court's attention, NWMLS only cites a single, irrelevant out-of-circuit case from 1986.  ECF 27 at 18:20-19:9 (citing *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986)).  There, the court did not say a monopolist is free to do what it wants so long as the victim agrees.  *See Olympia*, 797 F.2d at 374-76.  Instead, the court concluded there was insufficient evidence that Western Union had abused its monopoly power by initially "encourage[ing] the entry of independent providers" of telex terminals, but later "having created and nurtured new competition, Western Union stopped helping the new competitors because it found it could not liquidate its terminal inventory as rapidly as it had hoped to be able to do." *Id.* at 374-75.  No such facts are alleged here.

In short, that Compass must follow NWMLS's rules shows the antitrust problem.

***NWMLS's duty-to-deal arguments are wrong.***  In its last argument on antitrust, starting on the twentieth page of its brief, NWMLS claims a silver bullet:  it can never be found liable for a monopolization claim based on its rules because it has no duty to deal with Compass.  *See* ECF 27 at 20:10-12.  But NWMLS misstates the duty-to-deal caselaw, which provides no quarter for NWMLS.

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW

- 18 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

**First**, the general rule does not apply here because Compass alleged that NWMLS is creating and maintaining a monopoly. "*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (cleaned up). The Complaint alleges that NWMLS has the purpose to create and maintain a monopoly, and thus the duty-to-deal line of cases is irrelevant. *See* ECF 1 ¶¶10-16, 56-71, 89 (describing NWMLS's anticompetitive acts, including "adoption and enforcement of Rule 2, modification of Rule 4, decision to ignore Rule 6, and boycott of Compass by cutting off its access to the listings database").

**Second**, the general rule does not apply because NWMLS is imposing anticompetitive restrictions on other competitors. "The Court finds the refusal to deal doctrine does not apply to [defendant's] alleged conduct in this case because Plaintiffs do not allege [defendant] is failing to deal with its smartphone rivals, but rather that [defendant's] conduct is imposing restrictions on developers and smartphone users." *Apple*, 2025 WL 1829127, at *12 (denying motion to dismiss); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (contrasting unilateral refusal to deal with actionable conduct that "limit[s] the abilities of third parties to deal with rivals"); *Google*, 2025 WL 1132012, at *43 (rejecting application of refusal to deal framework to Google's conduct that effectively "compelled its [ad] publisher customers to use [Google's services]"). Here, NWMLS restricts how homesellers and broker market properties; and, unlike the defendants in those cases, this is of particular concern because NWMLS is owned and controlled by a combination of virtually all of the competitors in its market. ECF 1 ¶¶24-26, 80-84.

**Third**, even if the general rule applied, a jury could find an exception. "It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 n.32 (1992) (quoting *Aspen Skiing*, 472 U.S. at 602-

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW

- 19 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1   05); *see id.* at 483 (finding a monopolization claim where "Kodak took exclusionary action to

2   maintain its parts monopoly and used its control over parts to strengthen its monopoly share of

3   the Kodak service market)"; *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.

4   438, 448 (2009) (finding, despite the general rule, "firms may not charge 'predatory' prices");

5   *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004)

6   (finding, despite the general rule, that a monopolization claim is stated where "[t]he unilateral

7   termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a

8   willingness to forsake short-term profits to achieve an anticompetitive end" (citing *Aspen Skiing*,

9   472 U.S. at 608, 610-11)).  The general rule does not apply, but even if it did, it is for discovery

10  and trial.

11                          *        *        *

12          Therefore, Compass has stated Section 2 and RCW 19.86.040 claims.

13  **II.     COMPASS PLED BUSINESS TORT CLAIMS.**

14          In the business tort section of its motion, NWMLS only makes arguments about two

15  elements:  (1) the existence of a valid contract or business expectancy; and (2) that NWMLS

16  acted with improper purpose or means.  ECF 27 at 22:12-16.  In the Complaint, Compass pled

17  both.

18          ***Compass alleged valid contracts and business expectancy.***  The Complaint explains that

19  "Compass, its brokers, and its agents were parties to valid contracts with each other and with

20  homeowners in the Seattle area," ECF 1 ¶135, and that "NWMLS intentionally prevented

21  Compass's and its brokers' performance of those contracts."  *Id.* ¶137.  It also says that

22  "Compass, its brokers, and its agents had business relationships or expectancies with a

23  probability of future economic benefit for Compass," *id.* ¶141, and "NWMLS intentionally

24  induced or caused the termination of those business relationships or expectancies."  *Id.* ¶143.

25  While these facts are sufficient to state a claim, Compass did not stop there.  It explained that:

26  (1) as a result of Defendant's misconduct, including its ultimate decision to "cut off Compass's

27  access to its data feed," Compass was required to either "in put all Rule 6 listings into the

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                          - 20 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

NWMLS" or "*actually cancel*[]" those listings, *id*. ¶¶68-70 (emphasis added); (2) Compass could not enter these listings into the NWMLS because the sellers for those listings had "*executed the agreements* with the express understanding that their properties would only be marketed privately," *id*. ¶69 (emphasis added); (3) Compass clients stopped using Compass because it could no longer offer them what they had contracted for, *id*. ¶71; and (4) Compass had a reasonable business expectancy of signing up customers in the Seatttle area who would choose Compass because of its renowned offerings, but who due to NWMLS's misconduct, will no longer seek out Compass, *id*. ¶¶44, 71-72.

In addition to these contracts and relationships, the Complaint also alleges that NWMLS's conduct interfered with its valid contractual relationships with its brokers. "Since NWMLS shut off Compass's data feed, brokers have left Compass and at least three have specifically cited NWMLS's actions as the reason for their departure." *Id*. ¶¶73-74.

Thus, Compass alleges that it lost agents and customers due to NWMLS's misconduct. *See Life Designs Ranch, Inc. v. Sommer*, 191 Wash. App. 320, 337 (2015) (finding that plaintiff raised a "prima facie business expectancy" by pointing to its "historical" data to "demonstrate it could reasonably . . . expect" certain enrollment figures).

**NWMLS acted with an improper purpose or the use of improper means.** The Complaint explains that NWMLS has several improper purposes for interfering with Compass's contracts and business, and used many improper means. NWMLS wants to control how Seattle-area homesellers market their properties, ECF 1 ¶¶55-76, but it has no right to tell any homesellers what to do with their own property. The Complaint also explains that NWMLS's blocked competition with the incumbent brokers (who own and control NWMLS) to protect profits of NWMLS and its members. *Id*. ¶¶56, 71, 74-75. And, NWMLS's refusal to consider changes to Rule 2, its emergency changes to Rule 4, and its decision to ignore Rule 6 all show that NWMLS has singled out Compass, which operates in an innovative way that challenges traditional real estate brokerages. *See, e.g., id*. ¶¶1-3, 10-11; *see also Westmark Dev. Corp. v. City of Burien*, 140 Wash. App. 540, 560 (2007) (affirming jury decision finding improper

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                    - 21 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1  purpose because evidence suggested defendant "singled out [plaintiff] because of its general

2  opposition" to plaintiff's project).    NWMLS refused to engage with Compass regarding

3  changing Rule 2 for seven months, then rejected any changes to bring NWMLS in line with the

4  rest of the country; NWMLS "bypass[ed] its traditional rulemaking procedure to change the

5  decades-longstanding Rule 4" after Compass started using it to compete; and NWMLS cut off

6  Compass's access to the listing data feed after Compass started using Rule 6 to compete.  *See*,

7  *e.g.*, ECF 1 ¶¶10-11.

8          Ignoring these facts, NWMLS incorrectly claims that Compass was required to cite a

9  "statute, regulation, a recognized common law, or an established standard of trade or profession"

10  that NWMLS violated.  ECF 27 at 23:8-10.  But, as shown by the case NWMLS cites, that is an

11  incorrect statement of law; Compass is not required to establish that duty by claiming a specific

12  statute or regulation was violated (though it may).  *Libera v. City of Port Angeles*, 178 Wash.

13  App. 669, 676-77 (2013) ("The existence of a statute, a regulation, a recognized common law,

14  or an established standard of trade or profession *can* establish such a duty." (emphasis added)).

15  In any event, Compass **did** allege that NWMLS's conduct violated a duty established by law—

16  most obviously, that NWMLS violated relevant federal and state antitrust laws, which prohibited

17  NWMLS from acting anticompetitively and monopolistically with respect to Compass's

18  business.

19          NWMLS also asserts a "good faith" defense.  ECF 27 at 23:8-24:16.  This argument

20  sidesteps Compass's allegations entirely—namely, that NWMLS was **not** acting in good faith,

21  and instead was acting for the purpose of singling out and harming Compass so that Compass

22  could not compete with NWMLS's members by offering 3-Phased Marketing and Compass

23  Private Exclusives in the Seattle area, which power Compass only has because its members

24  control nearly 100% of the residential real estate transactions in the area.  ECF 1 ¶1.  This is not

25  a case of a "company simply enforce[ing] its policy to not do business with competitors."  ECF

26  27 at 23:19-26 (citing *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir. 1997));

27  *see also Tacoma Auto Mall, Inc. v. Nissan N.A., Inc.*, 169 Wash. App. 111, 132-34 (2012) (no

28

1  tortious interference where franchisor exercised its contractual right in purchase agreement and

2  dealership agreement not to approve sale of franchisee).  NWMLS is acting to protect itself and

3  its members' monopoly power, retaliate against Compass and anyone else who dares to compete

4  with consumer-desired options, and prevent Compass from offering innovative products that

5  some consumers in the Seattle area want.

6  **III.    DISMISSAL WITH PREJUDICE WOULD BE IMPROPER.**

7          NWMLS tells the Court it "should dismiss this entire case with prejudice, without leave

8  to replead."  ECF 27 at 3:1-2; *see also id.* at 24:19 ("The Court should dismiss the Complaint

9  with prejudice, without leave to be replead.").  As shown above, Compass pled all of its claims.

10  If the Court finds any pleading deficiency, Compass requests leave to amend.  *See Eminence*

11  *Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) ("Dismissal with

12  prejudice and without leave to amend is not appropriate unless it is clear on de novo review that

13  the complaint could not be saved by amendment.").

14                              **<u>CONCLUSION</u>**

15          Compass respectfully requests that the Court deny NWMLS's motion to dismiss.

16

17  I certify that this memorandum contains 8,334 words, in compliance with the Local Civil Rules.

18

19

20

21

22

23

24

25

26

27

28

OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                              - 23 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700

1    DATED this 21st of July, 2025                Respectfully submitted,

2

3

4                                                *s/ Ethan Glass*

5                                                Ethan Glass (*Pro Hac Vice*)
                                                 COOLEY LLP
6                                                1299 Pennsylvania Avenue
                                                 Suite 700
7                                                Washington, DC  20004
                                                 Telephone: +1 202 842 7800
8                                                Fax: +1 202 842 7899
                                                 Email: eglass@cooley.com

9                                                Sarah M. Topol (*Pro Hac Vice*)
                                                 Alessandra V. Rafalson (*Pro Hac Vice*)
10                                               COOLEY LLP
                                                 55 Hudson Yards
11                                               New York, NY  10001
                                                 Telephone: +1 212 479 6000
12                                               Fax: +1 212 479 6275
                                                 Email: stopol@cooley.com

13                                               Christopher B. Durbin (41159)
14                                               COOLEY LLP
                                                 1700 Seventh Avenue
15                                               Suite 1900
                                                 Seattle, WA  98101
16                                               Telephone: +1 206 452 8700
                                                 Fax: +1 206 452 8800
17                                               Email: cdurbin@cooley.com

18                                               *Attorneys for Plaintiffs Compass, Inc. and*
                                                 *Compass Washington, LLC*
19

20

21

22

23

24

25

26

27

28
OPP TO MOTION TO DISMISS
Case No. 2:25-cv-00766-JNW                       - 24 -

COOLEY LLP
1700 Seventh Avenue Suite 1900
Seattle, Washington 98101
+1 206 206 452 8700