UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| COMPASS, INC. AND COMPASS WASHINGTON, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>NORTHWEST MULTIPLE LISTING SERVICE,<br><br>    Defendant. | CASE NO. 2:25-cv-00766-JNW<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS |

## 1.  INTRODUCTION

This case concerns a dispute between Compass, Inc. and Compass Washington, LLC (together, "Compass"), a national real estate brokerage, and Northwest Multiple Listing Service ("NWMLS"), the dominant multiple listing service in the Seattle area. Compass alleges that NWMLS's operating rules—which require member brokerages to list all properties on its platform before marketing them elsewhere—violate federal and state antitrust laws and constitute tortious interference with Compass's business relationships. NWMLS maintains that the

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 1

challenged rules are procompetitive because they ensure all member brokerages have equal access to listing information.

NWMLS moves to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). Dkt. No. 27. Having considered the briefing, the record, the relevant law, and the arguments of counsel at oral argument, the Court is fully informed and DENIES the motion. The Complaint states plausible claims for relief under Sections 1 and 2 of the Sherman Act, Washington's Consumer Protection Act, and state common law.

## 2.  BACKGROUND

The following facts are drawn from the Complaint, Dkt. No. 1, and are accepted as true for purposes of this order. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021).

Defendant NWMLS is a real estate multiple listing service that operates in Washington and parts of Oregon. It is owned and operated by competing real estate brokerages and their agents in Seattle. NWMLS maintains a database of residential real estate listings that is, according to the Complaint, essential for brokers to compete effectively in the Seattle and King County market.

Compass is a real estate brokerage operating nationwide, including in Washington State. Until recently, Compass was on NWMLS's board. Compass alleges that "NWMLS creates rules that govern how residential real estate brokers market homes and compete in the Seattle area, and it levies penalties (such as fines up to $5,000 or withholding of critical data) for any alleged violations of those rules." Dkt. No. 33 at 8 (citing complaint at ¶¶ 2, 10, 15–17, 19, 36, 56-71, 74–76,

89). Specifically, Compass challenges NWMLS's Rule 2, which it alleges "forces every homeowner and their broker to market their listing through NWMLS." *Id.* (citing complaint at ¶ 56). That rule states: "Members shall not promote or advertise any property in any manner whatsoever . . . unless a listing for that property has been delivered to NWMLS or input by the member and has not been cancelled, expired, or taken temporarily off the market." *Id.*

Compass's marketing strategy operates differently from what NWMLS's rules require. Under what Compass calls its "3-Phased Price Discovery and Marketing Strategy" for homeowners ("3-Phased Strategy"), the first phase—called "Compass Private Exclusives"— involves marketing property exclusively to other Compass agents across the country without listing the property on any MLS. Compass alleges that this phase is designed to "test the market and gather feedback" for the homeowner on appropriate pricing before the property is widely listed. Dkt. No. 1 at 2. Compass acknowledges, however, that homes can sell during this first phase without ever reaching the MLS. *Id.* at 13–14. According to the Complaint, homes marketed through the 3-Phased Strategy "were associated with an average 2.9% higher close price" compared to those that were not pre-marketed, "received an offer on average 20% faster," and "were on average 30% less likely to experience a price drop once active on the MLS." *Id.* at 4.

NWMLS informed Compass that it believed the 3-Phased Strategy violated NWMLS rules. When Compass continued to offer its 3-Phased Strategy, NWMLS found that Compass had violated Rule 2. As a penalty, NWMLS blocked all Compass agents from receiving NWMLS's Internet Data Exchange ("IDX") data

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 3

feed for two days. Dkt. No. 1 at 26, 31. The IDX data feed is a licensed stream of NWMLS member listings that brokerages use to populate their public-facing websites with other members' listing information.

Compass sued NWMLS, alleging antitrust and tortious interference claims.[1] It argues that NWMLS has engaged in anticompetitive conduct by requiring its members to post all listings on its platform. NWMLS argues that the challenged rule is procompetitive because it ensures that all member brokerages of the listing service have access to and can compete for the same listings. NWMLS moved to dismiss for failure to state a claim. Dkt. No. 27; Fed. R. Civ. P. 12(b)(6).

### 3.  LEGAL STANDARD.

The Court will grant a Rule 12(b)(6) motion if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, the Court accepts factual allegations pled in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). The Court need not, however, accept "'allegations that are merely conclusory,

---

[1] Compass asserts claims under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I); Washington's Consumer Protection Act, RCW 19.86.030 (Count II); Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III); RCW 19.86.020 and 19.86.040 (Count IV); and state common-law tortious interference with contract and business expectancy (Counts V and VI). *Id.* ¶¶ 96–145.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 4

unwarranted deductions of fact, or unreasonable inferences.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001)).

## 4. DISCUSSION

### 4.1 Compass states a plausible claim under Section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in [undue] restraint of trade or commerce among the several States." 15 U.S.C. § 1; *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) ("*Amex*") (explaining restraint of trade means "undue" or "unreasonable" restraint). A Section 1 claim requires "(1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (1996). NWMLS challenges only the second element, arguing that Compass has not plausibly alleged an unreasonable restraint of trade.

There are two ways a restraint on trade may be found unreasonable. *Amex*, 585 U.S. at 540. The first is under a *per se* analysis. "A small group of restraints are [deemed] unreasonable per se because they always or almost always tend to restrict competition and decrease output." *Id.* (citation modified). Under this approach, the court will presume the restraint is anticompetitive without "inquiry into the particular market context in which [it] [is] found." *PLS.Com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) (quoting *Bd. of Regents of Univ. of Okla.*,

468 U.S. 85, 100 (1984)). The second is the rule of reason. If a restraint is not per se unreasonable, courts conduct "a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Amex*, 585 U.S. at 541 (citation modified). Compass argues its claims survive under both frameworks. The Court addresses each in turn.

### 4.1.1    The Court need not resolve the *per se* question or nature of the restraint at this stage of the case.

Compass claims that NWMLS conduct constitutes a *per se* unlawful group boycott. A group boycott is "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *PLS.com*, 32 F.4th at 834 (quotations omitted). Per se treatment typically applies only to horizontal restraints—those "imposed by agreement between competitors" at the same level. *Amex*, 585 U.S. at 540–41. Restraints that are vertical—those "imposed by agreement between firms at different levels," such as between a platform and its users—are generally evaluated under the rule of reason. *Id.*

Compass contends that this case is like *PLS.Com, LLC v. National Association of Realtors*, in which the Ninth Circuit held that the plaintiff had adequately alleged a per se unlawful group boycott against an MLS industry trade association and its affiliated listing services. 32 F.4th at 834–37. In *PLS.com*, a group of real estate agents formed PLS, a new multiple listing service that was "similar to an MLS, but that allowed sellers to choose how much information to share." *Id.* at 830. Unlike most multiple listing services ("MLSs"), PLS was not

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 6

affiliated with the National Association of Realtors ("NAR").[2] *Id.* at 829. NAR-affiliated MLSs required home sellers to list certain information about their homes. *Id.* at 830. In response to PLS's growth, NAR adopted the "Clear Cooperation Policy," which required members of NAR-affiliated MLSs who listed properties on PLS to also list those properties on an MLS, with all the information required by the MLS. *Id.* "Agents who did not comply faced severe penalties, including in some cases several-thousand dollar fines, or suspension from, or termination of, their access to the MLS." *Id.* NAR "admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS." *Id.* at 831.

The Ninth Circuit found that the Clear Cooperation Policy, as alleged, "share[d] all the hallmarks of a group boycott"—"PLS's competitors coerced its suppliers (sellers' agents) not to supply PLS with listings (or to do so only on highly unfavorable terms), and they did so for the express purpose of preventing PLS, a new entrant to the market after decades of little to no competition, from competing with the MLSs." *Id.* at 834–35.

Compass argues the same reasoning applies here because NWMLS, like the NAR-affiliated MLSs in *PLS.com*, is controlled by competing brokerages who used its rules to protect their market position and stifle competition at the brokerage level. NWMLS responds that *PLS.com* is distinguishable for two reasons. First, NWMLS argues that its operating rules are the rules of a cooperative venture,

---

[2] To avoid confusion, the Court notes that NWMLS is not affiliated with NAR.

which are ordinarily evaluated under the rule of reason rather than condemned as per se unlawful. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 296 (1985). Second, NWMLS contends that Compass is a brokerage, not an MLS, Dkt. No. 36 at 4, and that NWMLS thus did not target a rival competitor at its own market level—the hallmark of a group boycott under PLS.com.

The Court has reservations about whether *PLS.com*'s *per se* group boycott analysis extends to this case given the meaningful factual differences identified above—most notably that Compass is a member brokerage rather than a rival listing service. But the Court need not resolve that question to decide this motion. Whether the restraint is best understood as horizontal or vertical, and whether *per se* or rule of reason analysis should ultimately apply, depend on factual questions that the Court will not resolve at the pleading stage. *See PLS.com*, 32 F.4th at 837 ("[W]e leave to the district court to determine in the first instance whether it should apply *per se* analysis or rule of reason analysis at later stages in this litigation"); *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*, No. 20-CV-03198-VC, 2024 WL 3837959, at *2 (N.D. Cal. July 22, 2024) ("[I]t remains to be seen whether a per se or rule of reason analysis should apply at later stages of this litigation"). As discussed below, the Complaint survives under the rule of reason— and does so even assuming the restraint is vertical—so the Court proceeds on that basis and reserves the *per se* question and the nature of the restraint for resolution on a developed record.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 8

### 4.1.2    Compass states a plausible Section 1 claim under the rule of reason.

The rule of reason is "a multi-step, burden-shifting framework that requires courts to conduct a fact-specific assessment to determine a restraint's actual effect on competition." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023) (citation modified). "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). Under the rule of reason, the plaintiff must first prove that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *PLS.Com*, 32 F.4th at 834 (quotation omitted). The "threshold step" in this analysis is defining the relevant market in which the alleged restraint occurs, *Tanaka,* 252 F.3d at 1063, because without a defined market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Amex*, 585 U.S. at 543 (citation modified). The term "relevant market" includes both a relevant product market and a relevant geographic market. *Tanaka*, 252 F.3d at 1063. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Id.*

Compass defines the relevant product markets as: (1) the market for "the provision of multiple listing services to real estate brokers," and (2) the market for "the provision of real estate brokerage services to sellers of residential real property." Dkt. No. 1 ¶¶ 77, 78. It defines the relevant geographic markets as Seattle, Washington, and King County, Washington. *Id.* ¶ 79. NWMLS challenges

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 9

neither *product market* definition but argues that the proposed *geographic markets* are artificially narrow. The Court disagrees.

A geographic market encompasses "the area of effective competition where buyers [of the relevant products] can turn for alternative sources of supply." *Id*. (citation modified). At this stage, the Court finds that the proposed geographic markets are plausible.

For the first product market, the complaint asserts that for Seattle-area brokers, "there are no meaningful multiple listing services other than NWMLS," which controls "almost 100%" of the market share. Dkt. No. 1 ¶¶ 77, 84. Taking all reasonable inferences in the light most favorable to Compass, real estate agents doing business in the Seattle metro or King County area would use multiple listing services that cater to that area. For the second product market, the complaint claims that "real estate brokerage services are local in nature because most sellers prefer to work with a real estate broker who is familiar with the local market conditions and [because] homeowners often desire a residential real estate broker who is a member of the multiple listing service that serves the area in which they are selling a home." *Id*. ¶ 79. These allegations are enough to allege a plausible geographic market at the pleading stage.

NWMLS counters that the alleged geographic market is implausible because it conflicts with Compass's assertion that its own 3-Phased Strategy markets homes nationally, to all its agents and to "millions of buyers." Dkt. No. 36 at 10 (quoting complaint). But this argument goes to the merits of the market definition, not its plausibility. That NWMLS operates more broadly than Seattle and King County, or

that Compass markets certain listings nationally, does not alter the Complaint's core allegation that home sellers and brokers in the Seattle area would not view services outside that area as reasonable substitutes. *See Tanaka*, 252 F.3d at 1063. Given that the relevant consumers here are home sellers and sellers' agents, NWMLS's argument about the location of buyers and buyers' agents is not persuasive.

Moreover, the cases NWMLS cites to support its geographic market argument are distinguishable. In *Tanaka v. University of Southern California,* while the Ninth Circuit found the geographic market alleged was implausibly narrow, the facts in that case were markedly different from the ones alleged here. In *Tanaka*, the plaintiff was a collegiate soccer player seeking to transfer from the University of Southern California ("USC") to the University of California Los Angeles ("UCLA") without facing penalties for transferring as a collegiate athlete who had already agreed to play for USC. She alleged that the relevant product market was the "UCLA women's soccer program" and the relevant geographic market was Los Angeles. 252 F.3d at 1063. The Ninth Circuit rejected both aspects of the plaintiff's market definition. As for the geographic market, it found that the plaintiff had completely "fail[ed] to allege that Los Angeles is an 'area of effective competition' for student-athletes competing for positions in women's intercollegiate soccer programs." *Id*. The plaintiff stated that the relevant geographic market was Los Angeles because she desired to remain in Los Angeles. *Id*. But the Ninth Circuit held that the plaintiff's desire to live in Los Angeles was "irrelevant to the question of whether Los Angeles is an area of effective competition for the services of

women's intercollegiate soccer players." *Id*. In other words, the plaintiff attempted to define the market based on her own idiosyncratic preference to live near Los Angeles, rather than consumer behavior generally.

Here, Compass's market definition is premised on its allegations about how consumers of brokerage services actually behave, not on Compass's own preferences. Thus, Compass has plausibly alleged that Seattle and King County are areas of effective competition for the services at issue, especially considering the local nature of real estate markets. This conclusion is consistent with the general principle that dismissal based on a complaint's proposed market definition is disfavored because a "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Gibson v. Nat'l Ass'n of Realtors*, No. 4:23-cv-00788, 2024 WL 6821480, at *7 (W.D. Mo. Dec. 16, 2024) (quoting *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)). The geographic market may need refinement after discovery, but that work is for a later stage in the case.

## 4.2    Compass alleges plausible harm to competition.

Having found that Compass has plausibly alleged a relevant market, the Court turns to the substance of the first step of the rule of reason—whether Compass has plausibly alleged a substantial anticompetitive effect that harms consumers in the relevant market. *PLS.com*, 32 F.4th at 833; *Tanaka,* 252 F.3d at 1063. This can be established *directly*, through evidence of "actual detrimental effects on competition such as reduced output, increased prices, or decreased quality

in the relevant market," or *indirectly*, by showing "that the defendant has market power in the relevant market and that the challenged restraint harms competition." *PLS.com*, 32 F.4th at 834 (citation modified). Compass invokes both paths. Because the Court has already found that Compass has plausibly alleged a relevant market, and because NWMLS does not contest that it possesses market power within that market, the Court evaluates whether Compass has plausibly alleged that the challenged restraint harms competition.

To plead harm to competition under the rule of reason, "a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (quoting *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507–08 (9th Cir.1989)). "Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Id*. (quoting *Les Shockley Racing, Inc.*, 884 F.2d at 507–08). Harm to the plaintiff is different from harm to competition. *Id*. at 1202 (Allegations showing "only that plaintiffs ha[d] been harmed as a result of the practices at issue . . . . d[id] not, without more, allege a[] [plausible] injury to competition."). Indeed, "plaintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves." *Id*. at 1198. That is because the antitrust laws "were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 320 (1962)).

NWMLS argues that Compass only alleges harm to itself, not to competition. The Court disagrees. While much of the complaint does focus on harm to Compass and its brokers specifically, *see, e.g.*, Dkt. No. 1 ¶¶ 15, 17, 36, 68–69, 71, 75, 92, Compass also alleges NWMLS's rules prevent home sellers' agents from using marketing strategies that benefit homeowners, thereby decreasing the quality of real estate brokerage services available to sellers of residential real property, *see, e.g., id.* ¶¶ 39–41, 48–54. Compass alleges that NWMLS's rules deprive homeowners of the ability to choose how to market their properties, quash innovation, and benefit incumbent traditional brokerages at the expense of innovative competitors. *Id.* ¶¶ 87–94. The Ninth Circuit has recognized that decreased quality in the relevant market is evidence of harm to competition. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112, 1113 (9th Cir. 2021) (noting decreased quality of services in the relevant market constitutes indirect harm to competition); *Conklin v. Univ. of Wash. Med.*, 798 F. App'x 180, 181 (9th Cir. 2020) (Plaintiff would have stated an anticompetitive effect on the market if he had shown an increase in price or a decrease in the quality of the service). And as the Ninth Circuit explained in *PLS.com*, conduct that prevents new or innovative competitors from entering or competing in a market, leaving consumers with fewer choices and lower-quality products, is the kind of harm the Sherman Act is designed to address. 32 F.4th at 839–40; *see also Top Agent Network*, 2024 WL 3837959, at *1–2 (finding that a policy harming competition by "impeding agents' ability to choose to post listings" to a rival service adequately alleged harm to competition, not merely to a competitor).

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 14

NWMLS raises two more arguments in support of its contention that Compass has not alleged harm to competition. Neither warrants dismissal.

First, NWMLS argues that Compass has failed to allege harm to competition because it seeks only to "free ride." Free riding "occurs when one party to an arrangement reaps benefits for which another party pays, though that transfer of wealth is not part of the agreement between them." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 212 (D.C.C. 1986). NWMLS explains that Compass intends to free ride in this instance because it wants to reap the benefits of NWMLS's rules without abiding by them. Specifically, it wants to violate NWMLS's operating rules by withhold listing information, while simultaneously taking advantage of the listing information that other, compliant brokerages provide.

True, there is "nothing inherently anticompetitive" about restrictions imposed to prevent free riding. *Amex*, 585 U.S. at 531; *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985) ("The Supreme Court has recognized that the control of free riding is a legitimate objective of a system of distribution."). But whether NWMLS's rules are a reasonable response to free-riding or a pretext for anticompetitive coordination among other brokerages is a question fact that cannot be resolved on this motion. That an agreement may have procompetitive effects is not a basis for dismissal under Rule 12(b)(6) when—as here—the plaintiff has plausibly alleged harm to competition. *See Tanaka*, 252 F.3d at 1063. Thus, dismissal based on NWMLS's "free ride" argument is inappropriate.

Finally, NWMLS argues that real estate is a two-sided market—with buyers on one side and sellers on the other—and that Compass must therefore allege

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 15

anticompetitive effects on "both sides" of the market to establish antitrust injury. According to NWMLS, Compass has failed to allege harm to buyers. NWMLS's argument invokes the framework the Supreme Court established in *Amex,* 585 U.S. at 534, for two-sided transaction platforms.

So called two-sided transaction platforms are those that "offer[] different products or services to two different groups who both depend on the platform to intermediate between them" where the business "cannot make a sale to one side of the platform without simultaneously making a sale to the other" side of the platform. *Id.* at 534–35. For some subsets of two-sided platforms, "courts must define the relevant market to 'include both sides of the platform' because one cannot accurately assess the competitive impact of a particular practice by looking to only one side of the market." *PLS.Com*, 32 F.4th at 838 (quoting *Amex*, 585 U.S. at 544).

The parties have identified no binding precedent, and the Court is aware of none, holding that the real estate market must be defined as a two-sided market under *Amex*. The Parties dispute whether the Court must even address this issue at the pleadings stage. Whether *Amex* applies to a given market definition depends on the characteristics of that market, and the Ninth Circuit has held that in some cases, "the court may need to wait to examine the evidence to determine whether *Amex* applies." *PLS.com*, 32 F.4th at 837. This is such a case. The Court cannot conclude as a matter of law from the Complaint's allegations alone that the real estate market shares the simultaneous-transaction characteristic that drove the *Amex* holding.

Moreover, even if *Amex* applies, NWMLS overstates its rule. *Amex* does not require a plaintiff to allege harm to *both sides* of a two-sided platform. *PLS.Com*, 32 F.4th at 839. "All *Amex* held is that to establish that a practice is anticompetitive in certain two-sided markets, the plaintiff must establish an anticompetitive practice on the 'market as a whole.'" *Id.* (quoting *Amex*, 585 U.S. at 547). While this may be accomplished by showing harm to both sides of the two-sided platform, it may also be accomplished by showing that harm to one side outweighs any benefit to the other side, "causing anticompetitive effects on the market as a whole." *Id.*

The Complaint alleges that NWMLS's rules harm sellers and the broader competitive process. Whether any benefits to buyers outweigh those harms is a factual question that cannot be resolved at this stage. *See Gibson*, 2024 WL 6821480, at *7 (plaintiffs need not address "whether their proposed product market is two-sided—including both home buyers and sellers—at the pleadings stage).

## 4.3    Compass adequately pleads antitrust injury.

NWMLS also argues that Compass has not pled antitrust injury—that is, that Compass's alleged injuries do not flow from anticompetitive conduct but instead result from legitimate rule enforcement. The Court disagrees.

To succeed on any antitrust claim, the plaintiff must establish the claimed injury flows from antitrust acts harmful to consumers. *PLS.Com*, 32 F.4th at 832. The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). "Antitrust

injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (citation modified).

NWMLS challenges the third element of antitrust injury, arguing that "[t]he antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods above their competitive level or diminish their quality." Dkt. No. 27 at 23 (quoting *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001)). But Compass's theory of injury is that NWMLS's rules restrict its ability to offer innovative marketing services, which in turn restricts consumer choice and diminishes the quality of brokerage services available in the market. These injuries flow directly from the conduct Compass alleges to be anticompetitive.

As the Court found above, Compass has plausibly alleged diminished quality of services in at least one of the relevant markets alleged—the offering of real estate brokerage services to sellers of residential real property. That is sufficient to satisfy the antitrust injury requirement at the pleading stage. Accordingly, the Court rejects NWMLS's antitrust injury argument.

### 4.4    Compass states a plausible claim under Section 2 of the Sherman Act.

Section 2 of the Sherman Act targets independent anticompetitive conduct, *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989–90 (9th Cir. 2020), by making it "unlawful to 'monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize' a market," *Epic Games, Inc.*, 67 F.4th at 998 (quoting 15

U.S.C. § 2). Section 2 claims require: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Epic Games, Inc.*, 67 F.4th at 998 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, (1966)). "At step one, the plaintiff must establish that the defendant possesses monopoly power." *Id*. NWMLS does not contest monopoly power.

NWMLS only challenges the second prong, arguing that Compass has not alleged exclusionary conduct. "At step two, the plaintiff must show that the defendant acquired or maintained its monopoly through anticompetitive conduct." *Id*. (citation modified). The Ninth Circuit has held that "[t]his anticompetitive-conduct requirement is 'essentially the same' as the Rule of Reason inquiry applicable to Section 1 claims." *Epic Games, Inc.*, 67 F.4th at 998 (quoting *Qualcomm*, 969 F.3d at 991). Accordingly, the Court finds that Compass has plausibly stated anticompetitive conduct under Section 2 for the same reasons Compass stated a plausible Section 1 claim under the Rule of Reason.

The Court rejects NWMLS's arguments to the contrary. First, NWMLS argues that its conduct cannot be exclusionary because it was simply enforcing rules to which Compass agreed, and that such enforcement is economically rational independent of any anticompetitive purpose. Dkt. No. 27 at 24–25. It maintains that Compass must show that its conduct lacks any legitimate business justification, and that "Compass comes nowhere close to meeting that standard." *Id*. But NWMLS

cites no binding precedent for that standard, which appears inconsistent with the Ninth Circuit's legal framework for such cases.

NWMLS also argues that Compass's Section 2 claim fails because NWMLS has no antitrust duty to deal with Compass or any other entity. In some, "limited circumstances," a monopolist may have a duty to cooperate or deal with a rival competitor, and failure to do so may run afoul of the antitrust laws. *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This "refusal to deal" doctrine comes into play when the plaintiff alleges that a monopolist's refusal to cooperate or deal with its *rivals* is anticompetitive. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985) ("*Aspen Skiing*") (discussing whether controller of several ski areas had an antitrust duty to cooperate with a smaller, rival ski area); *United States v. Apple*, No. 24-cv-4055, 2025 WL 1829127, at *12 (D. N.J. June 30, 2025) (collecting cases) ("The Court finds the refusal to deal doctrine does not apply to Apple's alleged conduct in this case because Plaintiffs do not allege Apple is failing to deal with its smartphone rivals, but rather that Apple's conduct is imposing restrictions on developers and smartphone users.").

Taking the complaint's allegations in the light most favorable to Compass, this case does not implicate the "refusal to deal" doctrine because Compass does not allege that NWMLS is a rival multiple listing service that refuses to cooperate with a competitor. Rather, it challenges the enforcement of certain NWMLS rules against its member brokerages—its consumers. Accordingly, at least at this point, the refusal to deal doctrine is inapposite and does not warrant dismissal.

**4.5    Compass alleges plausible state-law claims.**

NWMLS moves to dismiss Compass's state law antitrust claims under RCW 19.86.030 and 19.86.040, as well as its common law tortious interference claims. The state antitrust claims survive for the same reasons as the federal antitrust claims because Washington's Consumer Protection Act is "patterned after Sections 1 and 2 of the Sherman Antitrust Act." *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) (citing *State v. Black*, 676 P.2d 963, 967 (Wash. 1984)).

Compass's tortious interference with a contract and tortious interference with a business expectancy claims also survive. Under Washington law, "[a] plaintiff claiming tortious interference with a contractual relationship or business expectancy must prove five elements: (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 279 P.3d 487, 498 (Wash. Ct. App. 2012) (citation modified). The first and fourth elements are at issue here.

NWMLS argues that Compass fails to allege a business expectancy or valid contract with which NWMLS interfered. But the complaint alleges both. Compass alleges that it and its agents had valid contracts with each other "and with homeowners in the Seattle area." Dkt. No. 1 ¶ 135. Compass also alleges sufficient facts to show business expectancy—or that "future business opportunities are a

reasonable expectation and not merely wishful thinking." *Life Designs Ranch, Inc. v. Sommer*, 364 P.3d 129, 138 (Wash. Ct. App. 2015) (citation modified); *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 33 (Wash. Ct. App. 2002) ("A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value."). The complaint asserts that Compass's 3-Phased Program was successful in Seattle, as it is elsewhere in the country, and that NWMLS's conduct precludes the program, thereby interfering with Compass's business in Seattle. From the complaint, one could reasonably infer that Compass's program would have continued to be successful and garner business; thus, the expectancy alleged is more than "wishful thinking." *Life Designs Ranch, Inc.*, 364 P.3d at 138.

NWMLS also argues that Compass fails to allege that NWMLS "interfered for an improper purpose or used improper means," *Tacoma Auto Mall, Inc.*, 279 P.3d at 498 (quotation omitted), which is required to show unlawful interference, *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (en banc) (plaintiff must establish "that the interference complained of [was] 'wrongful' in some way" or in other words, "that [the] plaintiff had a 'duty of non-interference.'"). A court need not, however, find that a defendant acted with "ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means." *Libera v. City of Port Angeles*, 316 P.3d 1064, 1068 (Wash. Ct. App. 2013).

NWMLS contends that the challenged interference "must" violate "a statute or other regulation, or a recognized rule of common law, or an established standard of trade or profession," to constitute tortious interference. *Pleas*, 774 P.2d at 1163.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 22

But even assuming NWMLS is correct, Compass has alleged that the challenged conduct violates Washington and federal antitrust laws, which is sufficient to plead improper purpose or means at this stage.

Finally, NWMLS asserts that it was simply enforcing its rules in good faith, which is inherently lawful. *See Tacoma Auto Mall, Inc.*, 279 P.3d at 498 ("Exercising one's legal interests in good faith is not improper interference."). But whether NWMLS in fact acted in good faith is a factual question that cannot be resolved on this motion to dismiss. Thus, Compass's state-law claims survive dismissal as well.

## 5.  CONCLUSION

Accordingly, the Court DENIES NWMLS's motion to dismiss for failure to state a claim. Dkt. No. 27. The Court's denial of this motion, however, should not be read as expressing any view on the ultimate merits of the Parties' competing theories. The question before the Court on this motion is whether the Complaint states a plausible claim for relief, not whether Compass will ultimately prevail. The Court holds only that, accepting the Complaint's well-pleaded factual allegations as true and drawing all reasonable inferences in Compass's favor, the Complaint clears the plausibility threshold.

The Court regrets the delay in ruling on this matter.

Dated this 19th day of March, 2026.

Jamal N. Whitehead
United States District Judge

ORDER DENYING DEFENDANT'S MOTION TO DISMISS - 23