HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COMPASS, INC. and COMPASS
WASHINGTON, LLC

             Plaintiffs,

     v.

NORTHWEST MULTIPLE LISTING
SERVICE,

             Defendant.

Case No. 2:25-cv-00766 - JNW

NWMLS'S OPPOSITION TO
COMPASS'S MOTION TO DISMISS
AMENDED COUNTERCLAIMS

NOTE ON MOTION CALENDAR:
June 25, 2026

Oral Argument Requested

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 1

153365515.1 0068832-00015

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 3

II.     FACTUAL BACKGROUND ................................................................................. 4

   A.    NWMLS Is a Cooperative Organization Whose Rules Foster Fairness, Efficiency, and Transparency in Real Estate Transactions. ................................. 5

   B.    Compass Launched a Private Marketing Scheme – 3PM. ................................... 6

   C.    Compass Knowingly Violated NWMLS Rules. .................................................. 7

III.    LEGAL STANDARD ............................................................................................ 8

IV.     ARGUMENT .......................................................................................................... 9

   A.    NWMLS Has Standing to Assert the Counterclaims. .......................................... 9

     1.    NWMLS establishes injury in fact. .............................................................. 9

     2.    NWMLS establishes causation. .................................................................. 12

     3.    NWMLS establishes redressability. ........................................................... 13

     4.    NWMLS can also establish associational standing. ................................... 13

   B.    NWMLS's Declaratory Judgment Claim Is Justiciable. .................................... 13

     1.    The declaratory claim is not an improper mirror image. ............................ 13

     2.    The controversy is not moot. ...................................................................... 14

     3.    The requested declaration is sufficiently specific. ..................................... 15

   C.    NWMLS Properly Pleads Fraudulent Misrepresentation. .................................. 15

     1.    NWMLS pleads Compass's scheme with sufficient particularity. ............. 16

     2.    The Counterclaims plead false or misleading representations and omissions. ............. 17

     3.    NWMLS alleges knowledge, intent, reliance, and damages. ..................... 18

   D.    NWMLS States a Viable CPA Claim. ................................................................ 18

     1.    NWMLS alleges unfair or deceptive conduct. ........................................... 19

     2.    NWMLS plausibly alleges causation. ......................................................... 21

   E.    NWMLS States a Claim for Tortious Interference. ........................................... 22

     1.    NWMLS properly pleads interference through improper means. ............... 22

     2.    NWMLS pleads pecuniary loss. ................................................................. 23

   F.    Compass's Request for Judicial Notice Should Be Rejected. ............................ 24

   G.    If Any Claim Is Found Deficient, Leave to Amend Should be Granted. ........... 25

V.      CONCLUSION ..................................................................................................... 25

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 2

**STOEL RIVES** LLP
**ATTORNEYS**
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

153365515.1 0068832-00015

## I.    INTRODUCTION

Compass, Inc. and Compass Washington, LLC (collectively "Compass") ask the Court to do at the pleading stage what Rule 12 does not permit: resolve factual disputes about the value of complete listing data, the materiality of days-on-market and price-history information, the reasonableness of consumer and broker reliance on Northwest Multiple Listing Services' ("NWMLS") data services, the economic cost to NWMLS of Compass's noncompliance, and Compass's likelihood of resuming the same conduct if NWMLS's Rules are not enforced. NWMLS's Amended Counterclaims (Dkt. 98, the "Counterclaims") plausibly allege all of those facts, more than sufficiently for purposes of notice pleading. The motion to dismiss should be denied.

*First*, NWMLS has standing to sue. Contrary to Compass's assertion, NWMLS does not sue "on behalf of the public." It sues to protect its own business and property: its listing database, its paid data services, the integrity and reliability of the information it distributes to members and subscribers, and the contractual relationships through which it maintains a uniform, pro-consumer marketplace. NWMLS alleges that Compass intentionally withheld listings from NWMLS during the first two phases of its 3-Phased Marketing ("3PM") private marketing scheme, then later submitted those listings in a way that omitted material history—days on market, pricing changes, and exposure history—while intending that NWMLS incorporate and redistribute that incomplete information through its database and data products." NWMLS further alleges that Compass's conduct forced NWMLS to incur operational, compliance, enforcement, legal, system, and administrative costs to investigate and remedy Compass's violations. Those are concrete injuries to NWMLS's own business and property, not generalized grievances.

Compass minimizes and tries to sanitize its conduct. Compass argues that the challenged conduct lasted only "weeks," affected only a "single-digit" number of listings, caused only "*de minimis*" degradation, and involved no meaningful deception because Compass publicly described aspects of 3PM. But whether Compass violated NWMLS's Rules for two weeks or two years does

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 3

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

153365515.1 0068832-00015

not bear on whether NWMLS can state a plausible claim. At most, it goes to the scope of NWMLS's damages for Compass's violations. The Counterclaims allege that Compass's model was designed to create and preserve incomplete listing histories—specifically, to avoid "days on market and price drop history"—and that Compass intended to continue that model unless restrained by NWMLS's Rules and, now, Washington law. Whether the resulting degradation was substantial, whether Compass's public marketing cured the misleading nature of incomplete NWMLS listing data, and whether NWMLS's enforcement costs were incremental and compensable are factual questions.

*Second*, Compass's legal arguments fare no better. Declaratory relief is not duplicative where it would resolve whether Compass's Private Phases violate NWMLS's contractual rules and whether those rules are enforceable—not merely whether NWMLS violated antitrust law. NWMLS's fraudulent misrepresentation claim is properly alleged because Compass's scheme involved knowingly incomplete and misleading listing submissions regarding material property facts, intended to be incorporated into and relied on through NWMLS's data systems. The Consumer Protection Act ("CPA") claim is viable because the pleaded conduct has the capacity to deceive a substantial portion of the public and caused injury to NWMLS's business and property. And the tortious interference claim is properly pleaded because Compass knowingly induced NWMLS members and subscribers to violate their contractual obligations to NWMLS through improper means, including conduct alleged to violate Washington real estate statutes, NWMLS's Rules, and the duties of honesty and fair dealing.

The motion should be denied.

## II.     FACTUAL BACKGROUND

For purposes of a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded allegations of material fact as true. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). As such, this summary of relevant facts is based on Compass's own allegations in the Complaint (Dkt. 1) and NWMLS's allegations in the Amended Counterclaims (Dkt. 98).

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 4

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

**A.    NWMLS Is a Cooperative Organization Whose Rules Foster Fairness, Efficiency, and Transparency in Real Estate Transactions.**

For decades, NWMLS has operated a real estate multiple listing service cooperative. (Dkt. 1 ¶¶ 24–25.) NWMLS's subscribers include more than 30,000 real estate brokers who represent both sellers and buyers. (Dkt. 98 Counterclaims ("CC") ¶ 1.) NWMLS members, including Compass, are real estate brokerage firms. (Dkt. 1 ¶¶ 24–25.) Brokerages who join NWMLS's member-owned network agree to abide by a set of operating rules—the NWMLS Bylaws ("Bylaws") and NWMLS Rules and Regulations ("Rules"). (Dkt. 98, CC ¶ 9.) Brokerage firms and their brokers who subscribe to NWMLS's services agree to abide by the Bylaws and Rules. (*Id.*)

NWMLS's commitment to transparency and equal access benefits all parties involved in real estate transactions, including home buyers, sellers, listing brokers, buyer brokers, and appraisers. (*Id.* ¶ 10.) NWMLS establishes Rules for its participating members to ensure that consumers, and the brokers they choose to have represent them, have access to residential real estate listings and property data on equal terms, regardless of sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, families with children status, honorably discharged veteran or military status, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability. (*Id.*) These listings and property data include, but are not limited to, the number of days a property has been listed on the market—in short, how long it has been available for purchase and sale—as well as listing price changes, a seller's offer of broker compensation (if any), tax records, and sales histories. (*Id.*)

In addition to operating its own platform that centralizes data for consumers and brokers, NWMLS also provides its members with other valuable products and services. NWMLS members may also use different tools to access listings and property data through NWMLS's Internet Data Exchange ("IDX") program, which consolidates all of its members' listings in a data feed (the

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 5

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

"NWMLS IDX Data Feed") that member firms can then license to use to populate their own public facing websites. (*Id.* ¶11.) By receiving a license to the NWMLS IDX Data Feed, member firms, regardless of their size, can then populate their public facing websites with a significant inventory of real estate listings that are available for sale to consumers. (*Id.*) To ensure fairness and transparency for all and to prevent free-riding by recalcitrant members, NWMLS Rules prohibit members from promoting or advertising any property for which listing data has not been submitted. (*Id.* ¶ 12.)

NWMLS's platform and data services are a core component of its business. (*Id.* ¶ 15.) The economic value of NWMLS's platform, including but not limited to the various products and services it provides—like the NWMLS IDX Data Feed—depends on its accuracy, its completeness, and the uniform application of NWMLS Rules across members. (*Id.*)

**B.      Compass Launched a Private Marketing Scheme – 3PM.**

In March 2025, Compass launched 3PM, purportedly to offer sellers the ability to market and sell their homes through Compass's private networks, without simultaneously listing the property in the NWMLS database. (Dkt. 1 ¶¶ 7, 10, 49, 62-65.) NWMLS alleges that the first two phases of the 3PM (the "Private Phases") run afoul of NWMLS Rules governing access and transparency because Compass refuses to list the property with NWMLS, making a seller's listing invisible to non-Compass brokers representing potentially interested buyers. (Dkt. 98, CC at ¶¶ 16-32.) In sum, NWMLS alleges:

- *Phase 1: Private Phase*. In the first phase of 3PM, a property is not publicly marketed or listed on NWMLS, but it is only available for sale to a potential purchaser who is working with a Compass agent. (*Id.* ¶ 21.) The Private Phase thus serves as a façade to gain entry to the marketplace at a critical juncture—when the property is new to the marketplace—while simultaneously withholding listing information from buyers and other brokers who are not working with a Compass agent. (*Id.*) NWMLS alleges that such exclusionary marketing hurts sellers, buyers, and other brokers, and only benefits

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 6

153365515.1 0068832-00015

Compass and its brokers by allowing them a greater opportunity to participate on both sides of the sale (the sale side and the buy side), allowing Compass to receive the full commissions on the sale of a home rather than just one side of the transaction. (*Id.*) Compass admits that the Private Phase fails to result in sales 95% of the time. (*Id.* ¶ 22.)

- ***Phase 2: Private Coming Soon Phase***. In the second, Private Coming Soon Phase, Compass makes property accessible only on the Compass website, and only viewable by select brokers and their buyers who are subscribed to or visit Compass.com. (*Id.*) Private Coming Soon Phase properties are not listed with NWMLS. (*Id.*) NWMLS alleges that a Private Coming Soon listing is not actually "coming soon" because it is already available for sale, just not publicly. (*Id.*)

It is only in the third phase of 3PM that Compass finally submits listings to NWMLS and the listings are shared in the full public marketplace. (*Id.* ¶ 23.) It is not until this point in Compass's private marketing scheme that all buyers and brokers can finally compete on equal terms for the sale of the property and the vast majority of Compass's listings finally sell. (*Id.*) Concerningly, Compass's practices do not end with manipulating the timing of listing properties on NWMLS. (*Id.* ¶24.) While properties in 3PM are in at least the first two phases, Compass intentionally withholds material facts regarding the listing from consumers and other brokers, including the days on market (the time that the property was listed "privately and exclusively" with Compass) and price changes. (*Id.*) Compass shamelessly calls these facts, material to any buyer, "negative insights." (*Id.* ¶¶ 24-25.)

### C.    Compass Knowingly Violated NWMLS Rules.

NWMLS Rules require members to deliver or input listings to NWMLS by the List Date and prohibit members from promoting or advertising a property unless the listing has been delivered to NWMLS or input by the member. Rule 2 specifically prohibits promotion or advertising "in any manner whatsoever," including through websites, e-mails, texts, open houses, previews, showings, and tours, unless a listing has been delivered to NWMLS or input by the

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 7

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

member and has not been cancelled, expired, or taken temporarily off market. (*Id.* ¶¶ 12, 13.) Compass had previously tried to get NWMLS to change its Rules to allow Compass to privately market properties; NWMLS declined. (*Id.* ¶ 29.) Compass plowed forward despite this. As a result, at the time Compass launched 3PM in Washington in early 2025, Compass knew the Private Phases violated the Rules. (*Id.*) Compass not only implemented 3PM in knowing violation of the Rules, Compass encouraged brokers to engage in the Private Phases, telling brokers that Compass would cover any sanctions, including financial penalties or fines incurred for violations of the Rules. (*Id.* ¶33.)

Compass proceeded with its private marketing scheme, which then resulted in submission of property listing information with materially incomplete and misleading listing data, including artificially erasing "days on market," incomplete pricing history, and suppressed exposure history. (*Id.* ¶ 55.) NWMLS notified Compass that it was not in compliance with the Rules. (*Id.* ¶ 35.) NWMLS invested time and resources in trying to get Compass to come into compliance. (*Id.*) After weeks of communications with Compass and weeks of Compass publicly flouting the Rules, NWMLS temporarily suspended Compass's IDX Data Feed license for 48 hours beginning April 15, 2025. (*Id.*)

### III.    LEGAL STANDARD

A Rule 12(b)(6) motion tests the sufficiency of the pleadings, not the merits of the claims. The Court accepts well-pleaded factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). A claim is plausible when the pleaded facts allow the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. "[A] complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 8

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

## IV.    ARGUMENT

### A.    NWMLS Has Standing to Assert the Counterclaims.

In a desperate attempt to avoid liability for its misconduct, Compass argues that NWMLS does not have standing to assert counterclaims. Not so. NWMLS establishes direct organizational standing in its own right. A party has organizational standing if it satisfies the traditional standing requirements: injury in fact, causation, and redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The Counterclaims establish each of the elements of Article III organizational standing. To be clear, the Counterclaims also explain why Compass's conduct harmed consumers and brokers. Those allegations are relevant to materiality, public interest impact under the CPA, unfairness, deception, and the commercial context of the dispute. They do not transform NWMLS's claims into claims brought on behalf of third parties.

### 1.    NWMLS establishes injury in fact.

A "concrete injury is one that 'actually exist[s],' meaning that it is 'real, and not abstract,' but 'not … necessarily … tangible.'" *Larson v. Trans Union, LLC*, 201 F. Supp. 3d 1103, 1105 (N.D. Cal. 2016) (alterations in original) (quoting *Spokeo, Inc. v. Robins*, 578, U.S. 330, 340 (2016)). An organization may establish direct organizational standing by alleging a diversion of resources. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (an organization may establish "injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question").

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), is informative. In *Havens*, a fair housing organization alleged that its mission was to "assist equal access to housing through counseling and other referral services." *Id.* The organization claimed that the defendant's discriminatory housing practices "frustrated" the organization's "ability to provide counseling and referral services for low-and moderate-income homeseekers" and that it forced the plaintiff 'to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id.* (citation omitted). The U.S. Supreme Court found that, based on the organization's allegation,

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 9

"there can be no question that the organization has suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.* The same analysis applies here.

The Counterclaims allege direct injury *to NWMLS itself*. That is because the economic value of NWMLS's platform and data services depends on accuracy, completeness, and uniform application of the Rules. (Dkt. 98, CC ¶ 15.) NWMLS specifically alleges that Compass's conduct degraded the value of NWMLS's own database and paid data services, and compromised the accuracy and completeness of NWMLS's property data, thereby increasing NWMLS's cost of delivering reliable data services. (*Id.* at ¶¶ 15, 35, 56, 57, 62, 64, 75.) Importantly, to combat Compass's private marketing scheme, NWMLS was forced to incur operational, enforcement, legal, system, and administrative costs—all specific to policing Compass's conduct. (*Id.*) This is not abstract harm. And it does not involve the mere expenditure of resources as part of NWMLS's ordinary activities. Compass's actions did not involve one broker who made a misstep in preemptively listing a property too early. Compass blatantly flouted the Rules in publicly establishing and rolling out an entire program with the specific knowledge that it violated NWMLS's Rules and would require NWMLS to act. NWMLS was forced to divert resources from its mission of providing informational and educational services to members.

Compass challenges whether NWMLS has plausibly alleged a sufficient magnitude of injury, arguing that the affected universe of its violations was only a "handful" of listings, that NWMLS's expenses were limited, and that any degradation in value was mathematically negligible. (Dkt. 106 at 11.) But this is the wrong inquiry. The scope, duration, and economic magnitude of the resulting injury are factual questions going to the merits and which are inappropriate for resolution on a motion to dismiss. Regardless, "[o]rganizations are not required to demonstrate some threshold magnitude of their injuries[.]" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021). Organizational standing requires "only a minimal showing of

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 10

injury." *March for Our Lives Idaho v. McGrane*, 697 F. Supp. 3d 1029, 1039 (D. Idaho 2023) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)). In fact, the Ninth Circuit found in *East Bay Sanctuary Covenant* that harm "amount[ing] to pennies" was sufficient. 993 F.3d at 663-64 (noting allegation of perceptibly impaired ability to provide services is sufficient to confer standing); *Crawford*, 472 F.3d at 951 ("The fact that the added cost has not been estimated and may be slight does not affect standing[.]").

Cases relied upon by Compass support the conclusion that NWMLS has organizational standing under Article III. For example, Compass relies on *Fair Housing Council of Oregon v. Travelers Home & Marine Insurance Co.*, No. 3:15-cv-00925-SB, 2016 WL 7423414, at *2 (D. Or. Dec. 2, 2016) ("*FHCO*"), for the proposition that a diversion of resources to litigation or "investigation in anticipation of litigation" does not constitute an injury in fact. FHCO had a mission of eliminating housing discrimination and advanced that mission through enforcement activities. 2016 WL 7423414, at *4 (citation and emphasis omitted). The *FHCO* Court found that the frustration-of-purpose prong of the organizational standing analysis was thus met. *Id.* With respect to diversion of resources, FHCO conceded that the costs involved were incurred exclusively for litigation purposes. *Id.* at *5. That is decidedly *not* the case here, where NWMLS incurred operational and system costs and expenses to enforce its Rules. NWMLS's damages are grounded in the resources NWMLS had to invest in monitoring, investigating, and enforcing with respect to Compass due to the threatened nature and scope of Compass's private marketing scheme, and did not act at all, let alone exclusively, for litigation purposes.

Finally, although the Court need not analyze the injury in fact element further, the alleged risk or threat of an injury is also sufficient to satisfy the "injury in fact" requirement if that risk or threat is "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S 398, 411, 414 n.4). Here, NWMLS has alleged a concrete injury that is actual or imminent. NWMLS alleges that it is not simply the application of Compass's 3PM to specific listings—including the seven specifically identified and at issue—

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

153365515.1 0068832-00015

which causes injury, but rather the 3PM private marketing scheme as a whole. That is because 3PM is designed, on its face, to withhold material listing history and to allow for submission of incomplete information into NWMLS's systems. That is a concrete and particular risk of harm. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (at pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because courts presume that "general allegations embrace those specific facts that are necessary to support the claim") (citation omitted).

### 2.    NWMLS establishes causation.

Compass argues that NWMLS's costs incurred in addressing Compass's violations are somehow "self-inflicted" because costs stemmed from NWMLS enforcing its Rules. (Dkt. 106 at 13.) This is a backwards argument. The proximate cause of enforcement costs is the member who violates the rules of a multiple listing service, not the multiple listing service that enforces them. Compass conflates the act of rule enforcement with voluntary self-harm. If Compass's argument were accepted, it would effectively immunize any rule violator from accountability by penalizing the enforcing party for exercising its rights (and duties). When enforcement proceedings are necessitated by noncompliance, those costs are the consequence of the violator's own conduct.

The cases relied on by Compass are inapposite. *Craghtten v. United States*, 790 F. Supp. 3d 984, 990–91 (D. Idaho 2025), involved an immigrant's "self-inflicted" challenge to the legality of the requirement that he fill out a form with a registration number to be permitted to purchase a firearm. *Washington v. U.S. Department of Health & Human Services*, 482 F. Supp. 3d 1104, 1118 (W.D. Wash. 2020), involved the State's claim that a change in federal law would require it to change form letters, posters, brochures, and websites. Neither case has bearing here, where NWMLS did not choose to incur enforcement costs for its own benefit; it incurred them because Compass failed to comply with rules that Compass had agreed, as a member of NWMLS, to follow. Compass itself chose to blatantly violate the Rules, and Compass itself chose to publicly declare

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 12

153365515.1 0068832-00015

its plans to try to upend NWMLS's cooperative Rules, causing NWMLS to incur costs to investigate, monitor, and enforce Compass's compliance.

### 3. NWMLS establishes redressability.

Redressability is a modest standard. *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). Indeed, Compass ignores the element altogether. To establish redressability, a party must show only that a favorable decision is likely to redress the injury, not that a favorable decision will inevitably redress it. *Id.* That is the case here. A judgment that Compass's conduct violates NWMLS's Rules and state law will force Compass's compliance and avoid further, or future, diversion of NWMLS's resources from policing Compass's private marketing schemes.

### 4. NWMLS can also establish associational standing.

Compass argues in passing that NWMLS fails to allege associational standing on behalf of its members because it did not identify any member. (Dkt. 106 at 9.) Even in the absence of injury to itself, however, NWMLS can establish associational standing because NWMLS may sue on behalf of its members if (1) any one of its members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the purposes of the organization; and (3) neither the action nor the relief sought requires participation by the individual member or members. *EEOC v. Nev. Resort Ass'n*, 792 F.2d 882, 885 (9th Cir. 1986). All hold true here. And identification of a member is not required for associational standing where, as here, it is clear that one or more of an organization's members have been or will be adversely affected by the conduct. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025).

### B. NWMLS's Declaratory Judgment Claim Is Justiciable.

### 1. The declaratory claim is not an improper mirror image.

NWMLS seeks a declaration that its Bylaws and Rules, on which it relies to prohibit the Private Phases of 3PM and related practices, are lawful and enforceable, and that Compass's Private Phases and related practices violate those Bylaws and Rules. NWMLS also seeks a declaration that the Private Phases of 3PM violate Washington's newly-amended law restricting

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 13

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

153365515.1 0068832-00015

private marketing and requiring public marketing of property listings. NWMLS's requested relief is not the negative of Compass's antitrust claim, which presume other facts. It would affirmatively resolve the parties' contractual and operational dispute about Compass's obligations as an NWMLS member, whether the Private Phases violate NWMLS Rules, and whether NWMLS may enforce those Rules prospectively. Those questions matter regardless of whether Compass ultimately proves or fails to prove its own affirmative antitrust claim.

Whether a declaratory judgment counterclaim may proceed is within the Court's complete discretion and should be allowed where it serves a useful purpose beyond simply denying liability. *Flynn v. Love*, 653 F. Supp. 3d 823, 827–28 (D. Nev. 2023) (denying dismissal of declaratory judgment counterclaim, finding that claim raised new legal theories and sought relief beyond scope of affirmative claim). Here, it does. Compass's claims challenge NWMLS's conduct, but NWMLS's counterclaim seeks affirmative resolution of Compass's ongoing and future obligations under NWMLS's Bylaws and Rules. That relief would clarify the parties' legal relationship and guide future conduct in a live commercial relationship. Compass's own motion confirms the point. Compass argues that NWMLS "already forced Compass into compliance" and that Compass is not currently offering 3PM in Seattle. (Dkt. 106 at 15.) But NWMLS alleges that Compass has aggressively implemented 3PM elsewhere, touts a network of 340,000 agents, has not agreed or been enjoined from resuming 3PM in Washington or Oregon, and by its own affirmative assertions challenging NWMLS, would resume the challenged conduct if NWMLS did not enforce its Rules. A declaration would thus do more than duplicate Compass's claims; it would resolve the continuing dispute over whether Compass may resume the challenged practices without violating NWMLS Rules.

### 2.    The controversy is not moot.

Compass's mootness argument fails. A party cannot moot a case by simply ending its unlawful conduct pending litigation, and bears the burden of showing that it is clear that the allegedly wrongful behavior could not reasonably be expected to recur. *Pierce v. Ducey*, 965 F.3d

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 14

1085, 1089–90 (9th Cir. 2020). NWMLS alleges that Compass has not clearly ceased its efforts, that there is no injunction or agreement preventing Compass from utilizing 3PM again, that Compass may promptly resume 3PM if NWMLS does not enforce its Rules, and that NWMLS lacks full visibility into Compass's current conduct because private listings are, by design, private. Those allegations establish a live controversy. Voluntary cessation does not moot a dispute where the challenged conduct could reasonably recur. *Rosemere Neighborhood Ass'n v. U.S. EPA*, 581 F.3d 1169, 1172–73 (9th Cir. 2009) (mere cessation of illegal activity in response to pending litigation does not moot a case unless party alleging mootness can show allegedly wrongful behavior could not reasonably be expected to recur). Compass cannot avoid declaratory relief by pointing to the fact that NWMLS's enforcement temporarily stopped the challenged practices. That is especially true where Compass continues to defend its private marketing scheme, litigate its lawfulness, and attack NWMLS's authority to prohibit such practices.

### 3. The requested declaration is sufficiently specific.

Compass argues that NWMLS seeks an abstract declaration that all of its Rules are lawful. That misreads the Counterclaims. NWMLS seeks a declaration that its enforcement of its Rules, including specifically Rule 2, which requires members to submit all listings and prohibits members from promoting or advertising any property for which listing data has not been submitted, is appropriate in response to Compass's private marketing scheme. RCW chapter 18.86 now effectively codifies Rule 2, making Compass's private marketing practices not only a violation of NWMLS's Rules, but also a violation of state law. Compass's feigned ignorance of the basis for NWMLS's counterclaim is not credible, as Compass itself has sought to change NWMLS's Rules to avoid enforcement.

### C. NWMLS Properly Pleads Fraudulent Misrepresentation.

Compass's fraud argument rests on an artificially cramped view of the Counterclaims. NWMLS does not allege merely that Compass used the labels that Compass likes—"Private Exclusive" or "Coming Soon." NWMLS alleges a broader scheme: Compass withheld properties

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 15

from required public marketing with NWMLS while they were available for purchase, omitted material listing history when the properties were later submitted to NWMLS, encouraged brokers to input false or misleading information, and did so knowing that NWMLS's database and users rely on complete and accurate property information.

### 1. NWMLS pleads Compass's scheme with sufficient particularity.

Fed. R. Civ. P. 9(b) requires enough detail to give Compass notice of the misconduct alleged. *Gaspar v. Turn Techs., Inc.*, No. C23-1274, 2024 WL 3497342, at *1 (W.D. Wash. July 22, 2024) (applying Ninth Circuit standard requiring fraud allegations include the who, what, when, where, and how of the misconduct alleged). NWMLS has done so. The Counterclaims identify the *relevant actor*—Compass and Compass brokers acting under Compass's direction; the *relevant program*—3PM and its Private Phases; the *relevant time period*—beginning in or about March 2025 in Washington; the *relevant categories of misrepresented or omitted facts*—days on market, price changes, exposure history, and whether properties had already been available for purchase; and *why the information was misleading*—because properties had been marketed or made available before they were submitted to NWMLS, while the later NWMLS listing data concealed or omitted that material history.

Compass complains that NWMLS does not identify each specific listing or buyer. But Rule 9(b) does not require a plaintiff to plead every evidentiary detail where, as here, it was Compass as the broker firm that directed the misrepresentations at issue. NWMLS alleges that Compass's private listings were private, that NWMLS lacks full visibility into Compass's current conduct, and that the misconduct involved Compass-controlled listings and Compass-directed broker conduct. Further, because Compass's misrepresentations stem from omissions, NWMLS does not have full or precise insight into every time, place, and specific content of an omission. *See Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1279 (W.D. Wash. 2020) ("Rule 9(b)'s standard is relaxed in fraudulent omission cases."). Indeed, in such cases, courts recognize that a plaintiff will not be able to plead the "time, place and specific content" of an omission as precisely

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 16

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

as would a plaintiff in a false representation claim. *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013).

Finally, NWMLS pleads sufficient facts which, taken as true, give rise to an inference that Compass and its brokers had a duty to disclose material facts. That is the case even where the disclosure requirement runs to a third party. *See Short*, 444 F. Supp. 3d at 1280 (finding plaintiffs pleaded sufficient facts to suggest duty to disclose information about safety defects "even absent a transaction or fiduciary relationship").

### 2.    The Counterclaims plead false or misleading representations and omissions.

Compass argues that there can be no misrepresentation because 3PM was purportedly publicly marketed. That misses the point. Compass's public promotion of its private marketing scheme, 3PM, does not cure the materially incomplete listing data that Compass later submitted to NWMLS under the guise of 3PM's Private Phases. The alleged deception is not that Compass hid the existence of 3PM from the world. It is that Compass submitted or caused brokers to submit listings into NWMLS's database without material history reflecting that the properties had already been available for purchase and had already undergone private marketing, testing, and possible price changes. That information matters. NWMLS alleges that days on market, pricing history, and exposure history are material pieces of information for consumers, brokers, appraisers, and other market participants. Compass's disagreement with that materiality allegation is not grounds for dismissal.

Nor does Compass's semantic defense of "Private Exclusive" and "Coming Soon" resolve the fraud claim. NWMLS alleges that Compass marketed "non-exclusive" listings as "private exclusives" and marketed properties as "coming soon" when they were already available for purchase. (Dkt. 98 ¶¶ 69, 70.) Whether those labels were misleading in context depends on how they were used, what consumers and brokers reasonably understood, and what information was omitted. Those are factual questions that cannot be resolved on a motion to dismiss.

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 17

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

### 3. NWMLS alleges knowledge, intent, reliance, and damages.

Compass argues that NWMLS cannot plead ignorance or reliance because NWMLS knew that Compass intended to implement 3PM. But knowledge that Compass was operating 3PM is not the same as knowledge of the entire set of properties, listing histories, price changes, exposure histories, and specific omissions embedded in Compass-controlled listing submissions. NWMLS was not given a list by Compass of properties where it was violating NWMLS Rules; NWMLS had to investigate, hunting and pecking for information to identify properties at issue. NWMLS alleges that Compass's implementation of its private marketing scheme deprived NWMLS of full visibility into Compass's conduct. That allegation supports NWMLS's claim that it did not know the full extent of Compass's misrepresentations and omissions.

Reliance is also sufficiently pleaded. NWMLS alleges that Compass intended its listing information to be incorporated into NWMLS's database and distributed through NWMLS's systems. NWMLS necessarily relies on member-submitted listing data to operate its platform and paid data services. The Counterclaims allege that Compass knowingly compromised that process by submitting or causing the submission of incomplete and misleading data.

Finally, NWMLS pleads damages: degradation of its data products and services, diminution in the economic value of its paid services, increased operational costs, compliance and enforcement expenses, and impairment to the value of its listing database and related data services. Compass may ultimately dispute the bases or scope of NWMLS's damages, but that has no bearing at this stage where damages are plausibly alleged.

### D. NWMLS States a Viable CPA Claim.

The purpose of the CPA is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. The CPA is to be "liberally construed that its beneficial purposes may be served." *Id.* The CPA prohibits unfair or deceptive acts or practices in trade or commerce that affect the public interest and injure business or property.

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 18

RCW 19.86.020; *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784–85 (1986). To establish a CPA claim, NWMLS must establish five elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property, and (5) causation. Here, Compass challenges only elements one and five, effectively conceding that NWMLS adequately alleges the remaining elements.

### 1. NWMLS alleges unfair or deceptive conduct.

While NWMLS need not establish that Compass engaged in both unfair methods of competition and deceptive acts or practices, it can do so. *Klem v. Wash. Mut. Bank,* 176 Wn.2d 771, 787 (2013) (the word "or" between "unfair" and "deceptive" is disjunctive).

Compass argues that NWMLS's failure to identify individuals who were deceived renders NWMLS's claim of deception implausible. (Dkt. 106 at 22.) This ignores the standard. To show that a party has engaged in an unfair or deceptive act or practice that violates the CPA, a plaintiff need not prove that the act in question *in fact* deceived someone or was "*intended* to deceive, but that the alleged act had the *capacity* to deceive." *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30 (1997) (emphases added) (quoting *Hangman*, 105 Wn.2d at 785). The capacity-to-deceive test is to deter deceptive conduct before injury occurs. *Id.*

NWMLS plausibly alleges deceptive acts or practices. A knowing failure to reveal something of material importance constitutes deceptive intent under the CPA. *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 75 (2007); *Peterson v. Kitsap Cmty. Fed. Credit Union*, 171 Wn. App. 404, 426 (2012). Compass's conduct plainly has the capacity to deceive. "[K]nowing failure to reveal something of material importance is 'deceptive' within the [meaning of the] CPA." *Indoor Billboard/Wash., Inc.*, 162 Wn.2d at 75 (first brackets in original) (quoting *Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104, 116 (2001)). Courts find that deception exists if there is a representation, omission, or practice that is likely to mislead a reasonable consumer. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 19

(2009). To evaluate the tendency to deceive, courts look "not to the most sophisticated [consumers] but rather to the least." *Id.* (citation omitted).

Here, NWMLS alleges that through the Private Phases, Compass withheld listings from NWMLS and the broader market, limited access to properties to only Compass-affiliated brokers and selected buyers, and that this resulted in the submission of incomplete or misleading data into NWMLS's systems, including artificially erased days-on-market history, incomplete price history, and suppressed exposure history. It also alleges that Compass deceptively marketed "non-exclusive" listings as "private exclusives." Those allegations, taken as true at this stage, plausibly state conduct with the capacity to deceive a substantial portion of the public.

Compass's contrary argument depends on factual defenses: that 3PM was transparent, that any buyer could ask a Compass agent for information (assuming that they knew to do so), that Compass's marketing materials disclosed enough, and that NWMLS's own systems or terms of use somehow eliminated any deception. Even if the Court takes judicial notice of additional documents and facts suggested by Compass (and it should not), those arguments cannot be resolved on the pleadings. A practice may be deceptive even if some information is publicly available somewhere else, particularly where (as here) NWMLS alleges that Compass intentionally omitted material information from the very same data channel on which market participants rely.

NWMLS also plausibly alleges unfairness. Compass's alleged conduct created a two-tiered marketplace in which Compass-affiliated participants received earlier or preferential access to listings while NWMLS members, subscribers, and consumers, and non-Compass brokers, received incomplete information later. NWMLS alleges that Compass's practices undermined transparency, eroded trust in residential real estate data, and degraded the value of NWMLS's platform and services. That states unfair conduct under the CPA. *See Deegan v. Windermere Real Est./Ctr.-Isle, Inc.*, 197 Wn. App. 875, 890 (2017) (reversing order dismissing CPA claim, finding alleged

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 20

153365515.1 0068832-00015

omission of material facts by listing agents sufficiently alleged "a deceptive omission of material facts, and hypothetical facts support such a claim").

Compass's assertion that 3PM is a "reasonable business practice" is a merits defense that cannot be resolved without fulsome review of the evidence. And the Counterclaims allege the opposite: that the Private Phases were exclusionary, deceptive, contrary to transparency and equal access, harmful to the integrity of listing data, and later addressed by Washington's Public Marketing Law, RCW chapter 18.86. Compass cannot defeat those allegations by reference to its own, self-promoting marketing materials on its website.

### 2. NWMLS plausibly alleges causation.

Compass offers a two-sentence argument to assert that NWMLS fails to allege proximately-caused injury to its business. (Dkt. 106 at 25-26.) Not so. Business and property injuries compensable under the CPA are "relatively expansive." *Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 431 (2014). NWMLS alleges injury to its business and property in multiple ways: degradation of paid data services, impairment to proprietary data assets, increased costs of delivering accurate and reliable data products, operational and enforcement expenses, and diminution in the value of its listing database. Those are cognizable CPA injuries. *Brown v. Transworld Sys. Inc.*, 646 F. Supp. 3d 1328 (W.D. Wash. 2022) (finding allegation that out-of-pocket expenses were incurred and loss of time away from business constituted CPA injuries). NWMLS also sufficiently alleges proximate cause.

To prove causation, "[a] plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Indoor Billboard/Wash., Inc.*, 162 Wn.2d at 83. That is the case here. As explained above, NWMLS's injuries are not properly characterized as "self-inflicted" where it was Compass that prompted NWMLS's enforcement of its Rules. That was Compass's willful conduct, forcing NWMLS to investigate, monitor, and enforce compliance, resulting not in generalized litigation costs, but specific operational injuries. There is a direct causal chain: Compass withheld listings and material listing history; Compass

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 21

later submitted or caused brokers to submit incomplete and misleading data into NWMLS; that data degraded NWMLS's products and services; and NWMLS incurred costs responding to and remedying the conduct. That satisfies proximate causation at the pleading stage.

### E.      NWMLS States a Claim for Tortious Interference.

NWMLS alleges a viable claim for tortious interference. *See Grange Ins. Ass'n v. Roberts*, 179 Wash. App. 739, 760-61, 320 P.3d 77 (2013) (elements include (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant had knowledge of that relationship or expectancy; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant interfered for an improper purpose or used improper means; and (5) resultant damages) (citation omitted). Compass does not dispute the first three elements. They are thus conceded for purposes of Compass's motion. The fourth and fifth elements are plausibly alleged.

### 1.      NWMLS properly pleads interference through improper means.

The fourth element of a tortious interference claim is disjunctive and requires either interference for an improper purpose or use of improper means. *Greensun Grp., LLC v. City of Bellevue*, 7 Wn. App. 2d 754, 767-68 (2019). Here, NWMLS alleges improper means. (Dkt. 98 ¶ 77 ("Compass's interference was based on improper means because Compass knew, or had reason to know, that directing its brokers to misrepresent material information in listings was in breach of brokers' obligations under at least RCW 18.86.030(b) and (d), RCW 18.85.361(3), and NWMLS Rules.").) Tortious interference through improper means arises from the use of wrongful means that cause injury to contractual or business relationships. *Greensun*, 7 Wn. App. 2d at 773. Where a party induces the violation of a state statute or standard in the trade or profession, the analysis centers on the nature of the conduct itself—not the subjective intent of the tortfeasor— because the violation supplies the requisite wrongfulness beyond the mere fact of interference. *Libera v. City of Port Angeles*, 178 Wn. App. 669, 676-77 (2013). That is the case here.

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 22

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

153365515.1 0068832-00015

Compass argues that NWMLS Rules cannot constitute an "established standard" because Compass challenges them as anticompetitive. But Compass's antitrust allegations are not established facts, and the Court cannot resolve the lawfulness, enforceability, or commercial reasonableness of NWMLS Rules on this motion. Compass itself asserts that "[r]eal estate brokers selling a home in the Seattle area typically submit detailed information regarding the property to NWMLS." (Dkt. 1, ¶ 32.) That is consistent with NWMLS's Rules, which brokers rely on as established standards in the region. (Dkt. 98, CC ¶ 9 ("Brokerages who join NWMLS's member-owned network agree to abide by a set of operating rules—the NWMLS Bylaws … and NWMLS Rules and Regulations … Brokerage firms and their brokers who subscribe to NWMLS's services agree to abide by the Bylaws and Rules.").) In an attempt to subvert NWMLS's Rules requiring submission of information, Compass directed or encouraged brokers to submit false or misleading listing information; Compass induced violations of NWMLS Rules and contractual obligations; Compass encouraged conduct that violated brokers' statutory duties of honesty, good faith, and disclosure under Washington real estate law; and Compass committed unfair or deceptive acts under the CPA. "A court need not find that a defendant acted with ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means." *Libera*, 178 Wn. App. at 677.

Further, Compass's argument that RCW chapter 18.86 and RCW chapter 18.85 duties run only to buyers or sellers also misses the point. NWMLS does not rely on those statutes as creating a private statutory claim in NWMLS's favor. It relies on Compass's encouragement of broker conduct to violate their legal duties as improper means supporting tortious interference. Washington law recognizes that improper means may include conduct that violates statutes, regulations, recognized common law, or established standards of trade or profession. *Libera*, 178 Wn. App. at 676-77.

### 2. NWMLS pleads pecuniary loss.

NWMLS alleges damages from Compass's interference, including enforcement and compliance costs, operational expenses, impairment of data assets, and degradation of paid data

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 23

153365515.1 0068832-00015

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

services. Compass's insistence that those damages are speculative or self-inflicted is flat wrong, as addressed above. *See* Section A.2, *supra*.

### F.       Compass's Request for Judicial Notice Should Be Rejected.

On a motion to dismiss under Rule 12(b)(6), "[r]eview is limited to the contents of the complaint." *Sprewell*, 266 F.3d at 988 (citing *Enesco Corp. v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998)). Compass attempts to bring in facts outside the Counterclaims via judicial notice to try to convert the plausibility standard on a motion to dismiss into a merits matter. Compass's request should be rejected.

There are two exceptions that allow for reliance on documents outside the pleading. First, incorporation by reference allows a court to treat documents, identified and relied upon as central to a pleading, as though they are part of the pleading itself. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Second, courts may take judicial notice of facts that are "'not subject to reasonable dispute' … [because they are] 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'" *United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) (quoting and citing Fed. R. Evid. 201(b)). Courts are directed, however, to take judicial notice with reserve, as it may function to deprive a party of the opportunity to attack opposing evidence through rebuttal and cross-examination. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005). And "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999.

Here, through a series of footnotes, Compass asks the Court to take judicial notice of both NWMLS's website and Compass's website. (*See* Dkt. 106 at Notes 3, 5-11.) But while a website may be judicially noticed for its existence and content, it is improper to take judicial notice of websites for the content's truth. *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. SACV 16-01304 JVS (DFMx), 2016 WL 4487895, at *1 n.1 (C.D. Cal. Aug. 23, 2016) (taking judicial notice of online news articles and social media posts "solely for their existence and content, and not for the

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 24

153365515.1 0068832-00015

truth of any statements in the documents"), *aff'd*, 692 F. App'x 366 (9th Cir. 2017). Compass's attempt to challenge plausibility allegations by NWMLS on the merits by relying on judicial notice to establish the truth of the content of the websites, and not merely their existence, is improper and should be denied. *See Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2013 WL 5407039, at *6 (N.D. Cal. Sept. 25, 2013) (declining to take judicial notice of American Heart Association website pages because the defendant requested judicial notice of the truth of the contents of those pages).

### G.    If Any Claim Is Found Deficient, Leave to Amend Should be Granted.

Although the Counterclaims are adequately pleaded, dismissal with prejudice would be improper even if the Court identifies a deficiency. Leave to amend should be freely given under Rule 15. Compass's futility argument depends on its views based on the merits, not based on plausibility. To the extent that the Court identifies any deficiency, NWMLS should be given leave to cure, if needed, through additional listing-specific allegations, additional detail regarding NWMLS's operational costs, and additional facts concerning Compass's broker directives and listing submissions.

### V.    CONCLUSION

Compass asks the Court to disregard NWMLS's pleaded injuries, accept Compass's factual spin, and resolve disputed questions about materiality, deception, causation, damages, and future recurrence. That is not the proper analysis under Rule 12. NWMLS has plausibly alleged concrete injury to its own business and property, a live declaratory controversy, fraudulent misrepresentation, CPA violations, and tortious interference. The motion should be denied. In the alternative, any dismissal should be without prejudice and with leave to amend.

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 25

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

153365515.1 0068832-00015

*I certify that this memorandum contains 7,781 words, in compliance with the Local Civil Rules.*

DATED: June 18, 2026

STOEL RIVES LLP

*s/ Vanessa Soriano Power*
Vanessa Soriano Power, WSBA No. 30777
Rachel E. Hay, WSBA No. 60245
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Email: vanessa.power@stoel.com
Email: rachel.hay@stoel.com

Claude Szyfer (*pro hac vice*)
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Telephone: 212-918-3000
Email: claude.szyfer@hoganlovells.com

Liam Phibbs (*pro hac vice*)
Hogan Lovells US LLP
Columbia Square
555 Thirteenth St. NW
Washington, DC 20004-1109
Telephone: 202-637-5600
Email: liam.phibbs@hoganlovells.com

*Attorneys for Defendant*
*Northwest Multiple Listing Service*

NWMLS'S OPPOSITION TO MOTION TO DISMISS
AMENDED COUNTERCLAIMS - 26

153365515.1 0068832-00015